# EXHIBITS 33-37

# EXHIBIT 33

# Memorandum

**San Francisco Police Department**

To:    INSP. NAPOLEON HENDRIX    HOMICIDE
       INSP. EARL SANDERS        HOMICIDE

From: INSP. HENRY HUNTER #2031
      POLYGRAPHIST

Date: FRIDAY, APRIL 27, 1990

Subj: HOMICIDE CASE NO 891092371

APPROVED   YES   NO

————— ☐   ☐

————— ☐   ☐

————— ☐   ☐

This case concerns a fatal shooting which occurred on August 19, 1989. One of the witnesses in this case was scheduled to testify on Monday, April 23, 1990. Just prior to testify Pauline Maluina recanted her previous statements and denied being present at the scene of the incident. Ms. Maluina was offered a polygraph examination regarding her involvement and accepted.

On April 24, 1990 Ms. Pauline Maluina voluntarily submitted to a polygraph examination. She first read and signed a Consent and Waiver form containing the Miranda Admonition.

During the pre-test interview Ms. Maluina told me that at the time of the shooting she was at 24th Street and Mission. She said that she told the police she was there because her friend Messina Fauolo had asked her to do so. She said she was able to pick out the suspect in a photo spread because her friend described the photo to her. She said she wanted to tell the truth now and that no one had threatened her nor was she afraid of retaliation. She said that her friend was present at the shooting and had described the incident to her, that was how she was able to answer the investigators questions.

In order to demonstrate Ms. Maluina's veracity three polygraph charts were run utilizing a control question technique. These charts contained the following relevant questions:

    4.  Were you with Messina when the shooting happened?
        (Answer:  NO)

    5.  Were you present when the shooting happened?
        (Answer:  NO)

    7.  Did you see the shooting?
        (Answer:  NO)



Δπ EXHIBIT 18
Deponent
Date_____ Rptr._____
WWW.DEPOBOOK.COM

SFPD 00168

Insp. Napoleon Hendrix
Insp. Earl Sanders
April 27, 1990

Page two


An analysis and evaluation of the polygrams produced by Ms. Maluina yielded inconclusive results.

I discussed some discrepancies in Ms. Maluina's new statements to investigators and told her that if she had changed her story because of fear of retaliation or intimidation she should not do so because we would give her protection.  Ms. Malunia then asked to return to the Homicide Detail so she could speak to Insp. Hendrix.  Ms. Malunia was escorted to the Homicide Detail.

M9506B/66-67

SFPD 00169

# EXHIBIT 34

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                OAKLAND DIVISION

4

5

6

7

8   JOHN TENNISON,                    Case No. C 98-3842 CW

9                    Petitioner,

10       v.                           Judge:   The Hon. Claudia Wilken

11  IVALEE HENRY

12                   Respondent.

13

14

15

16

17

18          **POLICE INTERVIEW WITH**

19          **PAULINE MALUINA**

            **APRIL 24, 1990**

20

21

22

23

24

25

26

27

28

KEKER & VAN NEST

△ π EXHIBIT 17

Deponent_____

Date_____ Rptr._____
WWW.DEPOBOOK.COM

1

HENDRIX:  Today's date is Tuesday, 4/24/1990, the time is

approximately 11:17 hours. And this is an interview being

conducted in the Homicide Detail, present during this interview

is Inspector Napoleon L. Hendrix of the Homicide Detail,

Prentice E. Sanders of the Homicide Detail and the person

being interviewed, your name?

MALUINA:  Pauline Maluina.

HENDRIX:  Pauline Maluina. Pauline, you're a witness of San

Francisco Case #891-092-371, is that correct?

MALUINA:  Yeah.

HENDRIX:  The victim in this particular case is a young man

that was killed named Cooley?

MALUINA:  Yeah.

HENDRIX:  Now, the District Attorney's Office brought you

back from Hawaii to be a witness in the homicide case, am I

correct?

MALUINA:  Yeah.

HENDRIX:  You arrived in San Francisco, Monday, Sunday

afternoon?

MALUINA:  Yes.

HENDRIX:  And I picked you up at the airport along with

your mother?

MALUINA:  Uh-huh.

HENDRIX:  And then, later, while we were over at the Hall

of Justice going over previous statements you dropped a bomb

shell on the District Attorney's office and told him that you

were not present at the time when this thing supposedly took

KEKER & VAN NEST

1  place, am I correct?

2      MALUINA:   Yes.

3      HENDRIX:   And you further told him that you had made it up

4  because Masina, your friend, was lying some more, had coerced

5  you into, asked you to do this, is that correct?

6      MALUINA:   Yes

7      HENDRIX:   Alright, then at a later time, when I say a later

8  time I'm talking about this morning Tuesday, I sat down with

9  you so that uh, Mr. Butterworth from the District Attorney's

10  office and talked for a short period of time. Correct?

11      MALUINA:   Yes.

12      HENDRIX:   Later, I let you talk to Samoa to Masina, am I

13  correct?

14      MALUINA:   Yeah.

15      HENDRIX:   Alright, then after talking to Masina, you called

16  me to the room, that you wished to make a statement to me. And

17  that was that you now wish to tell the truth.

18      MALUINA:   Uh-huh.

19      HENDRIX:   About the different aspects that night. And you

20  said that when I interviewed you at the school that day, that

21  at that time you were telling the truth, am I correct?

22      MALUINA:   Uh-huh.

23      HENDRIX:   And that was not, and I repeat, not a

24  prefabrication of your imagination or anything, this was the

25  people that you remember seeing at the scene that night.

26      MALUINA:   Yeah.

27      HENDRIX:   With Masina.

28      MALUINA:   Uh-huh.

KEKER & VAN NEST

1  HENDRIX:  Okay, the statements that you made in YGC on the

2  707 hearing in reference to John Tennison, were those correct?

3  MALUINA:  Yes.

4  HENDRIX:  They were. Tennison was in fact one of the

5  persons that you saw at the scene that night?

6  MALUINA:  Uh-huh.

7  HENDRIX:  When you say uh-huh, that means yes?

8  MALUINA:  Yes.

9  HENDRIX:  Okay, thank-you. So everything that you told us

10  early on in the investigation when you were interviewed by

11  Inspector Hendrix, nothing has changed except the fact

12  yesterday you had said that you did not want to go forward

13  because you were not there. However, now you're telling the

14  truth and that was just a ploy because you were upset and

15  afraid and didn't want to testify in the case.

16  MALUINA:  Yes.

17  HENDRIX:  You feel better about that today after talking to

18  Masina?

19  MALUINA:  Uh-huh.

20  HENDRIX:  Okay. And any further court proceedings in this

21  case you will be available to testify, is that correct?

22  MALUINA:  Yes, Uh-huh.

23  HENDRIX:  Everything that you've told us on the previous

24  statements, tapes what have you, have been the truth?

25  MALUINA:  Yes.

26  HENDRIX:  Okay.  Inspector Sanders?

27  SANDERS:  No that's all.

28  HENDRIX:  There may be some further questions at a later

KEKER & VAN NEST

4

1  time by Mr. Butterworth who is not available, however, he'll
2  contact you. Alright, thank you very much. We will conclude the
3  interview at this time. And uhm, today's date is still Tuesday,
4  4/24/90 and the time is approximately 11:22. Still present are
5  the persons who were present at the beginning of this tape.
6  END OF TAPE.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

POLICE INTERVIEW WITH PAULINE MALUINA, APRIL 24, 1990

1     I, PATRICK W. MONTGOMERY, a paralegal with the law firm of

2  Keker & Van Nest, LLP., do hereby certify that under penalty of

3  perjury under the laws of the United States, the foregoing is a

4  full, true, and correct record of the April 24, 1990, audio-

5  taped interview of Pauline Maluina, provided by the District

6  Attorney's Office of the City and County of San Francisco,

7  pursuant to subpoena, as transcribed by me, to the best of my

8  ability.

9     Dated at San Francisco, California, this 7th day of

10  June, 2002.

11

12             PATRICK W. MONTGOMERY
                Paralegal

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 35

1  KEKER & VAN NEST, LLP
   ELLIOT R. PETERS - #158708
2  ETHAN A. BALOGH - #172224
   STACEY L. WEXLER - #184466
3  DANIEL PURCELL - #191424
   710 Sansome Street
4  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
5  Facsimile:  (415) 397-7188

6  Attorneys for Petitioner
   JOHN J. TENNISON

7

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                  OAKLAND DIVISION

12  JOHN J. TENNISON,                    Case No. C 98-3842 CW

13                       Petitioner,     **DECLARATION OF PAULINE
                                         MALUINA**
14        v.

15  IVALEE HENRY,

16                       Respondent.

17

18

19

20

21

22

23

24

25

26

27

28

313751.01

1
DECLARATION OF PAULINE MALUINA
CASE NO. C 98-3842 CW

1    I, PAULINE MALUINA, declare as follows:

2    1.    In 1990, I testified in the murder trial of John J. Tennison.  Specifically, I testified

3    that I witnessed Mr. Tennison and Anton Goff kill Roderick "Cooley" Shannon.  That testimony

4    was false.  I was not at the murder scene that night and did not witness Mr. Shannon's murder.  I

5    have never seen anyone get shot in my life.

6    2.    I currently reside in San Diego County.  I am 30 years old.  I am married and have

7    two children, ages eight and nine.

8    3.    In 1989, I lived in San Francisco in the Geneva Towers.  I was a friend of another

9    resident in the Towers, Masina Fauolo.  I knew Masina as a tough girl who was well-connected

10   with gang members and drug dealers living in Geneva Towers and throughout Sunnydale.  I also

11   knew Masina to engage in fights with other girls living in the area.

12   4.    At some point in late 1989, Masina asked me to lie about having witnessed the

13   murder of Roderick Shannon.  I did not witness this murder.  In fact, I was not even aware of the

14   murder until Masina told me about it.  I had never met Mr. Shannon.

15   5.    Masina told me that she had told the police that I had seen the murder and that the

16   police would be calling me.  Masina told me some of the things I should say to the police.  I

17   recall distinctly that Masina told me, among other things, which person to point to if the police

18   showed me a photo lineup.

19   6.    Some time later, Inspector Napoleon Hendrix came to see me at my school.  He

20   asked me about the Shannon murder.  He asked me where I had been on the night of the murder.

21   At first, I told him I didn't remember.  He told me that I was with Masina at Lover's Lane.  At

22   that point, partly out of loyalty to Masina, and partly out of fear of her, I told Inspector Hendrix I

23   had witnessed the killing.

24   7.    Throughout the process, Inspector Hendrix and the other investigator, Inspector

25   Earl Sanders, coached me to parrot the story Masina told them.  For example, I recall telling the

26   inspectors that Masina and I had been walking around the night of the murder and happened

27   upon the murder scene.  The inspectors told me that was not right, that Masina was driving a

28

2

1   stolen car and we were parked at Lover's Lane.  In fact, I have never been in a car with Masina

2   driving, and I have never been to Lover's Lane with her.

3        8.    I also testified at the trial of John Tennison and Anton Goff that I had witnessed

4   the murder of Mr. Shannon.  This was a lie that I did not want to tell, but I felt pressured to do so

5   by Masina, the police – especially Inspector Hendrix – and the prosecutor, Mr. Butterworth.

6        9.    At some point in 1990, I came from Hawaii to San Francisco to give testimony.

7   At that time, I decided to tell the police the truth, that I had not witnessed the killing.  I told

8   Inspector Hendrix and Mr. Butterworth that I had not witnessed the murder.  I told them that

9   Masina had asked me to lie, and that she had provided me with some information to give to the

10   inspectors during my interviews.  I told them that Masina told me which photo to pick out of the

11   photo lineup.  I had never seen Mr. Tennison before I picked his photo out of the lineup.  In fact,

12   I had never met Mr. Tennison or  Mr. Goff at that point.

13        10.    I also told Inspector Hendrix and Mr. Butterworth that Masina's own statements

14   about the murder were suspect because she was a liar.

15        11.    As soon as I told the police and prosecutor the truth, Mr. Butterworth in particular

16   became very upset with me.  He reminded me of what I had already said about the murder and

17   told me I needed to stick to my original story.  Neither Mr. Butterworth nor Inspector Hendrix

18   seemed interested in hearing the truth.

19        12.    I recall coming back to the Hall of Justice for another interview.  When I got

20   there, the police took me into a room by myself and gave me a polygraph examination.  During

21   this exam, I told the examiner that I did not witness the murder and that Masina had told me to

22   lie about it.

23        13.    After the polygraph, Inspector Hendrix and Mr. Butterworth again pressured me

24   to return to my previous untrue statements about the murder.  The police never told me the

25   results of my polygraph examination.

26        14.    At one point during the questioning, Inspector Hendrix called Masina in Samoa,

27   handed me the phone and left the room.  During this call, Masina also pressured me to return to

28

DECLARATION OF PAULINE MALUINA
CASE NO. C 98-3842 CW

313751.01

1    my earlier, untrue statements and told me additional details about the false testimony she wanted
2    me to give.

3        15.    Because of all this pressure by Inspector Hendrix, Mr. Butterworth, and Masina, I
4    became frustrated and decided to take the easy way out, which was to return to the lies I had told
5    earlier.  At the time, I remember thinking that the police didn't want to hear the true story, so I
6    would just say what they wanted to hear.

7        16.    The fact that I helped send an innocent man to jail has bothered me for the last 13
8    years.  I lied because I was young and impressionable and felt I had no way out.  After the trial, I
9    didn't tell anyone about my false testimony until I was contacted on June 6, 2003 by Eric Mason,
10   an investigator retained by Mr. Tennison's lawyers.  Other than several conversations with Mr.
11   Mason, I have had no contact with Mr. Tennison, his family, or his lawyers.

12       17.    I now want to come forward and tell the truth.  I am prepared to testify to what I
13   have said in this declaration if I am called upon to do so.

14       I declare under penalty of perjury under the laws of the State of California and the United
15   States that the foregoing is true and correct and that this declaration was executed on June __,
16   2003 in San Diego County, California.

17

18

19                                                    PAULINE MALUINA

20

21

22

23

24

25

26

27

28

4
DECLARATION OF PAULINE MALUINA
CASE NO. C 98-3842 CW

313751.01

**PROOF OF SERVICE**

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest, LLP, 710 Sansome Street, San Francisco, California 94111.

On June 17, 2003, I served the following document(s):

**PETITIONER TENNISON'S NOTICE OF SUPPLEMENTATION OF RECORD**

**DECLARATION OF PAULINE MALUINA**

☑ **by FACSIMILE TRANSMISSION (IKON) AND UNITED STATES MAIL,** by placing a true and correct copy with IKON Office Solutions, the firm's in-house facsimile transmission center provider, for transmission on this date. The transmission was reported as complete and without error. A true and correct copy of same was placed in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker & Van Nest, LLP for collection and processing of correspondence for mailing. According to that practice, items are deposited with the United States Postal Service at San Francisco, California on that same day with postage thereon fully prepaid. I am aware that, on motion of the party served, service is presumed invalid if the postal cancellation date or the postage meter date is more than one day after the date of deposit for mailing stated in this affidavit.

Glenn R. Pruden, Deputy Attorney General
Office of the Attorney General
455 Golden Gate Avenue, Suite 1100
San Francisco, CA 94102-7004
Fax No.: (415) 703-1234

James T. Hammer, Esq.
Deputy District Attorney
850 Bryant Street
San Francisco, CA 94103
Fax No.:      (415) 575-8875

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 17, 2003, at San Francisco, California.

*Diane Blais Miller*
DIANE BLAIS MILLER

i

# EXHIBIT 36

Deposition of Officer Nevil Gittens, 12/4/01

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

JOHN TENNISON,



        Petitioner,

vs.                          Case No.: C 98-3842 CW

IVALEE HENRY,

        Respondent.

---------------------------------//

---oOo---

DEPOSITION OF OFFICER NEVIL GITTENS

TUESDAY, DECEMBER 4, 2001

---oOo---

SHEILA CHASE, CSR, RPR
COMPUTER REPORTING ASSOCIATES
1243 Mission Road
South San Francisco, California  94080
Telephone:   (415) 239-2428
(650) 588-2410
Fax:   (650) 588-2418



Reported by
LORRIE L. HINTON, CSR, RPR
CSR No. 10523

1    experienced in San Francisco at that time?

2        A.    Yes.

3        Q.    And 1989, that was sort of when the gang

4    violence, sort of, greatly erupted in the city; is that

5    right?

6        A.    That's correct.

7        Q.    One of the -- I think the first big murders was

8    the murder of Peter Lee, also known, I think, as

9    Edrick Carr (phonetic) in March of 1989; is that

10   correct?

11       A.    I remember one of the murders was

12   Edrick Carr/Peter Lee.  But I couldn't tell you if that

13   was the first or -- I mean, there was stuff going on

14   prior to the gang task force being formed.  So there

15   were a lot of murders happening prior to that.

16       Q.    But you remember the murder of Peter Lee; is

17   that correct?

18       A.    Yes.

19       Q.    And Peter Lee was a part of the Sunnydale turf;

20   is that right?

21       A.    That's correct.

22       Q.    And would you -- did you recollect that was a

23   pretty -- as far as escalating violence, that murder was

24   part of that and part -- part of the escalating violence

25   between the Hunter's Point, Filmore, and Sunnydale gangs

38

1    that was in existence in 1989?

2       A.   What was the question?

3       Q.   I'll withdraw it and ask it another way.

4          Peter Lee -- Peter Lee was part of escalating

5    gang violence that was being witnessed, based on

6    different turfs of some of the black youth in the city;

7    is that right?

8       A.   Correct.

9       Q.   And there was different gangs or youths

10   associated with different neighborhoods that were

11   associated with the gang violence; is that right?

12      A.   That's correct.

13      Q.   One of the areas was Hunter's Point, correct?

14      A.   Correct.

15      Q.   One of the areas was Sunnydale?

16      A.   Correct.

17      Q.   One of the areas as Filmore?

18      A.   Correct.

19      Q.   And these different areas, where -- where young

20   African-American teens lived, would base their animosity

21   towards the other areas just on geography; is that

22   right?

23      A.   That was part of the problem.

24      Q.   People would be identified with where they

25   grew -- where they lived; is that right?

                                                                39

1      A.   That was part of the puzzle, yes.

2      Q.   Apart from Peter Lee, in addition, do you

3  remember shortly thereafter, there was a murder of

4  someone named Cheap Charley?

5      A.   Yes.

6      Q.   He was murdered at the same time as a woman

7  named Rochon Johnson (phonetic)?

8      A.   Yes.

9      Q.   And I think 11 other people were -- were shot

10  during the same drive-by incident; is that right?

11      A.   Correct.

12      Q.   Cheap Charley was associated with which area of

13  the city --

14      A.   Hunter's Point.

15      Q.   -- at the time of his murder?

16      A.   Hunter's Point.

17      Q.   Okay.  And that was at the time widely believed

18  to be direct retaliation for the murder of Peter Lee?

19      A.   Correct.

20      Q.   And the murder of Roderick Shannon was also

21  viewed by the police department as a retaliation or an

22  escalation of the violence by Hunter's Point for the

23  murder of Cheap Charley; is that right?

24      A.   I'm not aware of that.

25      Q.   Okay.  Are you -- when you were on the gang

                                                          40

Deposition of OFFICER NEVIL GITTENS - 12/4/01

1    Q.   And that case number there is the same case

2    number that's indi- -- indicated both on the audiotape

3    of the Ricard interview and on -- on your handwritten

4    notes concerning the Ricard interview, correct?

5    A.   Correct.

6    Q.   And that is the number that was the homicide

7    case number assigned to the hom- -- the Shannon

8    homicide; is that right?

9    A.   Yes.

10   Q.   And that's why it appears on Mr. Tennison's

11   arrest report because he was arrested as a perpetrator

12   of the Shannon homicide, correct?

13   A.   That's correct.

14   Q.   And the incident report described in Lewis 7,

15   described the incident as Mr. Tennison's arrest by the

16   San Francisco Police Department, correct?

17   A.   That's correct.

18   Q.   And it's arrest pursuant to an arrest warrant

19   that was issued by the Superior Court of the City of

20   San Francisco; is that right?

21   A.   Yes.

22   Q.   And the -- it identifies the three arresting

23   officers as Mr. Lindow, Mr. Lewis, Michael Lewis, and

24   you, Nevil Gittens; correct, sir?

25   A.   Correct.

                                                        55

1      A.    Yes.

2      Q.    At the completion of your interview, when you

3  had this evidence, what did you and officer Lewis do

4  with it?

5      A.    I don't recall.

6      Q.    Do you recall -- withdrawn.

7            Would -- consistent with your role in the

8  investigation of the Shannon homicide, would you have

9  provided this information to Officers Sanders and

10 Hendrix?

11     A.    Yes.

12     Q.    And you would have done so because they were

13 the homicide investigators who were running the

14 investigation, correct?

15     A.    Correct.

16     Q.    And you would have determined as an assisting

17 officer that they needed to evaluate this audiotape of

18 Mr. Ricard; is that correct?

19     A.    Correct.

20     Q.    And you would have not believed it your duty to

21 make the determination of what to do with this tape, it

22 would have been their responsibility as the lead

23 investigators, correct?

24     A.    That's correct.

25     Q.    When you informed -- withdrawn.

105

Deposition of OFFICER NEVIL GITTENS - 12/4/01

1          Would you -- withdrawn.

2          Given the import of Mr. Ricard's statements

3    that he was responsible for the homicide of

4    Roderick Shannon, would you have also provided

5    Mr. Hendrix and Mr. Sanders with a copy of the video --

6    a copy of the audiotape, so that they could listen to it

7    themselves?

8      A.    Yes.

9      Q.    And you would have also provided them with a

10   copy of your notes, which I've seen you today, from the

11   interview, as well; is that right?

12     A.    Yes.

13     Q.    Those documents would have been forwarded to

14   the homicide detail for being placed in the main

15   homicide file of this case, correct?

16     A.    Correct.

17     Q.    And at that point you would have waited for

18   further destruction from them, if they believed further

19   investigation, with your assistance, was required; is

20   that correct?

21     A.    Correct.

22     Q.    You don't remember any direction coming from

23   them after you informed them for further investigation,

24   correct?

25     A.    In regards to?

                                                        106

1          MR. BALOGH:  Well, these were -- none of these

2     were offered.  They're just marked for identification to

3     show them to the witness.  They'll all become exhibits

4     at the end of the transcript.

5          MS. DAWYDIAK:  I just wanted to make sure I

6     didn't miss something.

7          MR. BALOGH:  He's just viewed it, but nothing's

8     offered here or not offered.  It's just marked.

9          MS. DAWYDIAK:  Okay.  Thank you.

10          (Videotape played.)

11          MR. BALOGH:  Q.  Do you recognize this person

12     in the videotape to be Luther Blue?

13     A.   No, I do not.

14     Q.   Okay.  Do you remember being present at the

15     videotaped interview of Luther Blue?

16     A.   You mean absent that video, no, I do not

17     remember being present.

18     Q.   Okay.  Seeing that video, does that refresh

19     your recollection whether you, in fact, did participate

20     in an interview with Prentice Saunders of Luther Blue?

21     A.   Yes.

22     Q.   Okay.  And this interview with Luther Blue,

23     which you and Mr. Saunders was conducted was related to

24     the Shannon homicide; is that correct?

25     A.   I have -- I don't remember.

                                                      112

Deposition of OFFICER NEVIL GITTENS - 12/4/01

1                       REPORTER CERTIFICATE

2

3        I hereby certify that the foregoing is a true

4    record of the testimony as reported to the best of my

5    ability by me, a duly certified shorthand reporter and a

6    disinterested person, and was thereafter transcribed

7    under my direction into typewriting by computer.

8

9        I FURTHER CERTIFY that I am not interested in the

10   outcome of the said action and not connected with nor

11   related to any of the parties in said action or their

12   respective counsel.

13

14   Dated:  _12-27-01_

15            _for_ LORRIE L. HINTON, CSR, RPR
                      CSR NO. 10523

16

17

18

19

20

21

22

23

24

25

                                                         129

Deposition of OFFICER NEVIL GITTENS - 12/4/01

# EXHIBIT 37

1

UNITED STATES DISTRICT COURT

2

NORTHERN DISTRICT OF CALIFORNIA

3

OAKLAND DIVISION

4

5

6

7

8  JOHN TENNISON,                                Case No. C 98-3842 CW

9                        Petitioner,

10      v.                                       Judge:    The Hon. Claudia Wilken

11  IVALEE HENRY

12                        Respondent.

13

14

15

16

17

18                    **POLICE INTERVIEW WITH**

19                    **LOVINSKY RICARD**

20                    **FEBRUARY 8, 1990**

21

22

23

24

25

26

27

28

KEKER & VAN NEST

1

1    POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

2    HENDRIX:   Today's date Thursday, 01/08/90, ah, make that

3    02/08/90. The time is approximately 16:44 hours. This is an

4    interview is being conducted at the Hall of Justice, Homicide

5    Detail. Present during this interview is Inspector Napoleon L.

6    Hendrix of the Homicide Detail and also present is Officer

7    Michael Lewis of the Gang Task Force assigned to Homicide, Star

8    No. 540. And the person being interviewed is Lovinsky Ricard.

9    This is a continuing investigation into San Francisco case

10    number 890092371, and the date of occurrence on that will be

11    08/19/89.

12    Ah, Ricard, as I did previously when I talked to you, I'll

13    do this again. Give you your Miranda Warning. You have the

14    right to remain silent. Anything you say can and will be used

15    against you in a court of law. Three, you have the right to

16    talk to a lawyer and have him present with you while you are

17    being questioned. Four, if you cannot afford to hire a lawyer,

18    one will be appointed to represent you before any questioning

19    if you wish one. Turning the card over it says waiver 1101.

20    Number 1, two questions, do you understand each of these rights

21    I have explained to you?

22    RICARD:   Yeah.

23    HENDRIX:   Okay. Two, having these rights in mind, do you

24    wish to talk to us now?

25    RICARD:   Yeah.

26    HENDRIX:   Okay. Ricard, you live in Hunters Point at number

27    35 Calmer Place, apartment 230. Is that correct?

28    RICARD:   Yeah.

KEKER & VAN NEST

1    HENDRIX:   And you live there with your mother?

2    RICARD:   Yeah.

3    HENDRIX:   Brother?

4    RICARD:   Brothers.

5    HENDRIX:   Brothers. How many brothers you got?

6    RICARD:   Two.

7    HENDRIX:   Two brothers younger than you?

8    RICARD:   Yeah.

9    HENDRIX:   Okay. And one is Lavelle?

10   RICARD:   Lavelle Ricard.

11   HENDRIX:   Okay, what's the other one's name?

12   RICARD:   Laboyd Ricard.

13   HENDRIX:   Laboy?

14   RICARD:   Laboyd.

15   HENDRIX:   Laboyd. Okay. Ah, do you know a guy who lives in

16   Sunnydale by the name of Patrick?

17   RICARD:   Patrick? Uh . . .

18   HENDRIX:   Let me show you a picture -

19   RICARD:   I know, I know of him.

20   HENDRIX:   You know of him. Let's see if you've ever met

21   him.

22   RICARD:   Okay.

23   HENDRIX:   This person. That's Pat. How do you know Pat?

24   RICARD:   I seen a picture of him.

25   HENDRIX:   You seen a picture of him, and for the record let

26   it reflect I'm showing him San Francisco ID number x-ray

27   038713. Patrick DeShawn Barnett. How do you know Patrick?

28   RICARD:   His ah baby's mother is my girlfriend's sister.

1    HENDRIX:   His baby's mother is your girlfriend's sister.

2  And they live over on your side, Third Street, I mean San

3  Bruno?

4    RICARD:   As a matter of fact they stay right, right where

5  we made our turn there.

6    HENDRIX:   Right there by San Bruno?

7    RICARD:   Yeah, no, no.

8    HENDRIX:   San Bruno and Paul?

9    RICARD:   Third and Paul.

10   HENDRIX:   Third and Paul. They live at Third and Paul?

11   RICARD:   Yeah right on that street.

12   HENDRIX:   In that area?

13   RICARD:   Right there.

14   HENDRIX:   All right. Fine. And let me also ask you if you

15  know this young man. For the record let it reflect I'm showing

16  X-ray number 037597, Roderick E. Shannon, S-H-A-N-N-O-N.

17  And you've never met this person?

18   RICARD:   No.

19   HENDRIX:   Never in life?

20   RICARD:   No.

21   HENDRIX:   Never had anything to do with him, one way or the

22  other?

23   RICARD:   No.

24   HENDRIX:   Ah, do you know what kind of car Patrick drives?

25   RICARD:   No.

26   HENDRIX:   You ever seen him driving a car?

27   RICARD:   I seen him at Sunnydale when ahh, when, it's

28  this, you know, the vehicle starts to be squashed.

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

4

1    HENDRIX:   Hm hm (affirmative).

2    RICARD:    I seen the (unintelligible).

3    HENDRIX:   (unintelligible) Okay, but prior to the peace

4    making, ah, did you know ah, did you know him then?

5    RICARD:    No.

6    LEWIS:     (To Hendrix) What about by a moniker?

7    HENDRIX:   (To Lewis) Who, you mean Shannon?

8    LEWIS:     (To Hendrix)  Yeah, like Cooley.

9    HENDRIX:   (To Lewis)  Oh, did you mean Cooley?.

10   HENDRIX:   Do you know this kid Shannon by his nickname

11   Cooley?

12   RICARD:    I heard of him by that name.

13   HENDRIX:   You heard of him.

14   RICARD:    That's the second kid that got killed.  That's

15   the other one that got killed, from Sunnydale.

16   HENDRIX:   From Sunnydale? Yeah.

17   RICARD:    The other murdered kid.

18   HENDRIX:   Yeah, but you didn't know him?

19   RICARD:    No.

20   HENDRIX:   And you never saw him in life when he was

21   alive?

22   RICARD:    No.

23   HENDRIX:   You, ah, who do you run with, pal around with?

24   RICARD:    You mean ...

25   HENDRIX:   Who do you pal around with?

26   RICARD:    Pal around with?    Ah, George Dean. That's about

27   ...

28   HENDRIX:   George Dean?

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

5

1     RICARD:   Yeah. (unintelligible)

2     LEWIS:   That's the one we picked you up with?

3     RICARD:   No, that's someone else.  That's another friend

4 of mine.

5     HENDRIX:   Where does George live?

6     RICARD:   Ah, Navy Road. I don't know the address.

7     HENDRIX:   How old is George?

8     RICARD:   About eighteen.

9     HENDRIX:   (unintelligible) of yours?

10     RICARD:   Yes.

11     HENDRIX:   How tall is he?

12     RICARD:   Ah, maybe about my height.

13     HENDRIX:   How tall are you?

14     RICARD:   5'8", 5'9", something like that.

15     HENDRIX:   How much you weigh?

16     RICARD:   Maybe about 150, 155.

17     HENDRIX:   What school does he go to?

18     RICARD:   Ah... He doesn't.

19     HENDRIX:   Now back on August 18th.

20     LEWIS:   (To Hendrix) Is that right?

21     HENDRIX:   Yeah, August 19th, do you remember what you were

22 doing in 1989?

23     RICARD:   August 19?

24     HENDRIX:   Hm mmm (affirmative).

25     RICARD:   The day?

26     HENDRIX:   That night, do you know what you were doing that

27 night?

28     RICARD:   I don't even -- August 19? I can't remember.

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

6

1  HENDRIX:  Do you know Cheap Charlie?

2  RICARD:   Yeah.

3  HENDRIX:  You and Charlie tight?

4  RICARD:   Were.

5  HENDRIX:  Would you say he was a very dear, close friend?

6  RICARD:   Yeah, good friend.

7  HENDRIX:  Just as a side line, when this case is over,

8  we're going to arrest the people for doing Charlie.

9  We're going... both sides are going to fall.

10  HENDRIX:  We're not taking sides on positions it's not our

11  function.

12  RICARD:   That's what it seems like.  You're just sweating

13  every...

14  HENDRIX:  No. We take them just the way they happen. When

15  you want to build a building that what you do from the

16  foundation up. You don't start on the roof and come down.

17  Anybody ask you, you tell them, that's a promise. Just like

18  they happen. That's just the way they all going to be

19  prosecuted. Everybody going to end up their day in court. Ah,

20  ah, you knew Cheap Charlie, good friends.

21  You know, you know the owner of this truck?

22  RICARD:   No.  I never seen the truck before.

23  HENDRIX:  You never saw that truck before in your life?

24  RICARD:   No, I don't think so.

25  HENDRIX:  For the record let it reflect that I'm showing

26  him a picture of a truck with the license number 3 K as in KING

27  36279.

28  That's another picture of it

1    HENDRIX:   You know Luther Blue?

2    RICARD:    Yeah I know him.

3    HENDRIX:   You a good friends with Luther?

4    RICARD:    Yeah.

5    HENDRIX:   Real good?

6    RICARD:    Pretty good.

7    HENDRIX:   How often are you in Luther's company?

8    RICARD:    Ah, before he went to jail, we were like hm, -

9    HENDRIX:   He's out now.

10   RICARD:    I know before, but, since he was in jail, you

11   know like, when me and George kind of like tight now.

12   HENDRIX:   You can't be too tight when somebody's down, and

13   you out. When's the last time you seen Luther?

14   RICARD:    The other day.

15   HENDRIX:   How about this morning?

16   RICARD:    Hm hm (affirmative).

17   HENDRIX:   Were you with Luther when ah, back in August is

18   that when you guys were tight?

19   RICARD:    When he was in jail for ah six months I think.

20   HENDRIX:   Not in August.

21   RICARD:    I'm trying to think. I'm trying to remember back.

22   HENDRIX:   Oh, oh you're thinking out loud.

23   RICARD:    It's February.  January, December, November,

24   October...

25   HENDRIX:   If I told you he was out take it as gospel. Okay?

26   He was not in custody at that time. Would you've been in the

27   company of Luther Blue and how are you with the guys over in

28   Ingleside?

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

1    RICARD:    Ingleside?

2    HENDRIX:   Are you friends with any of the guys in

3    Ingleside?

4    RICARD:    What's that Lakeview? Yeah.   I mean I know, I

5    know when I seen him, I know (unintelligible)

6    HENDRIX:   How about Coog Nut?

7    RICARD:    Coog Nut?

8    HENDRIX:   The Ill Mannered Posse?

9    RICARD:    Yeah, I know him.

10   HENDRIX:   You know him?

11   RICARD:    Hm hm (affirmative).

12   HENDRIX:   You pal around with him at any time?

13   RICARD:    Not that I remember.   I know him though.

14   HENDRIX:   Do you ride with him sometimes.

15   RICARD:    No.

16   HENDRIX:   Been in his company, have you ever been in his

17   company?     Have you ever been in the company, when you guys

18   are rolling around, riding around... in a truck, in a car, in

19   two cars?

20   RICARD:    No, I mean if I seen him...he would be on Third

21   every now and then... you know, we was just kicking it then.

22   HENDRIX:   Luther's from HP

23   RICARD:    Right.

24   HENDRIX:   Coog Nut's from the other side.   How about Black

25   Carl? Do you know Black Carl?

26   RICARD:    Who?

27   HENDRIX:   Black Carl.

28   RICARD:    I don't know anyone by that name.

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

1  HENDRIX:   You don't think you ever heard his name?

2  LEWIS:     You knew him at all didn't you?

3  RICARD:    Carl...Black Carl...

4  HENDRIX:   Now when I say Coog Nut.  I'm talking about

5  Christopher Sanders.

6        Do you know this guy..(Shows him photograph)?

7  RICARD:    This...this Coog Nut?  This ain't the Coog Nut I

8  know.

9  HENDRIX:   Oh.  It's not the Coog Nut you know.

10  RICARD:    Not the Coog Nut I know.

11  HENDRIX:   Well, this Coog Nut is Christopher Sanders, S-A-

12  N-D-E-R-S, X-ray number 39215.  Do you know another Coog Nut?

13  Which one do you know?

14  RICARD:    He's a husky guy.

15  HENDRIX:   Husky guy, huh?

16  RICARD:    This is Luther.  For the record you said yeah,

17  Luther Blue, X-ray number 38352, also San Francisco adult

18  number 445441.  Here.   Do you know this young man?

19  RICARD:    No.

20  HENDRIX:   Ever met him.  For the record, I've shown him an

21  X San Francisco arrest no. 421390, John C. Sirles, S-I-R-L-E-S.

22  HENDRIX:   How about this young man? Have you ever met him?

23  For the record, I'm showing him San Francisco arrest no.

24  389461, Carl Williams, also known as Black Carl.  You've never

25  met him?

26  RICARD:    Which one is this?

27  HENDRIX:   Beg you pardon?  Surveillance photo.

28  LEWIS:   Who's the Coog Nut that you know. Why do they call

KEKER & VAN NEST

1   him Coog Nut?

2      RICARD:   That's his name.

3      LEWIS:  You don't know why they call him that.

4      RICARD:   That's the name he uses when he raps.

5      LEWIS:  He is a singer, a performer.

6      HENDRIX:  Where's he from?

7      RICARD:   Lakeview.

8      HENDRIX:  He's from Lakeview.   And he answers to the name

9   of Coog Nut?

10      RICARD:   Uh-huh.

11      LEWIS:  He involved with Ill Manner Posse singing group?

12      RICARD:   He's involved with singing group of Ill Manner

13   Posse?

14      HENDRIX:  He wears a jacket saying it too?

15      RICARD:   It says uh-  uh-huh.

16      HENDRIX:  When you say 'uh-huh,' that means yes?

17      RICARD:   Yes.

18      HENDRIX:  Okay...How tall is this guy?

19      RICARD:   Taller than me.

20      HENDRIX:  5'10", 5'11"?

21      RICARD:   Around there... about this. (Indicating.)

22      LEWIS:  And you're 5'8", so you're telling me we're

23   breaking almost 6', then?

24      RICARD:   Almost 6'.

25      LEWIS:  Anything else about him that's real distinguishing

26   that, you know, kinda like locks it into being him?  Facial

27   scars, beard, teeth?

28      RICARD:   No.  A little bit of--

1   HENDRIX:  Pony tail or anything tail in the back?

2   RICARD:  Waves.

3   HENDRIX:  Huh?

4   RICARD:  Waves.

5   HENDRIX:  Waves.

6   LEWIS:  How does he dress?  Does he dress like a performer?

7   Is he like people?

8   RICARD:  Like people, regular people.

9   LEWIS:  Like people.

10  HENDRIX:  Where does he hang?

11  RICARD:  I only see him every now and then, when he comes

12  by my(??)

13  LEWIS:  That would be where you were working?

14  RICARD:  Yeah.

15  HENDRIX:  But you've, never seen him in his natural setting

16  over in Lakeview?

17  RICARD:  Oh, I seen him over there.

18  HENDRIX:  Where?

19  RICARD:  On Randolph.

20  HENDRIX:  On Randolph. Okay. How about up at ocean View

21  Park?

22  RICARD:  Ocean View? That's where the jail's at?

23  HENDRIX:  Yeah.

24  RICARD:  Uh, no.  I've never seen him at the park.

25  HENDRIX:  Okay.

26  LEWIS:  See unlike the person we showed you, this person

27  has very light skin.

28  RICARD:  Pretty light-skinned, he is.

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

12

1    LEWIS:  Would you say he's the inspector's complexion?

2  Lighter, or darker?

3    RICARD:  Maybe a little bit lighter.

4    LEWIS:  A little bit lighter.

5    RICARD:  Uh-huh.

6    LEWIS:  And hair is wavy, but is it like it's done or is

7  it nature waves?

8    RICARD:  It's waves, I mean, you know, like done waves.

9    LEWIS:  Done waves.

10   HENDRIX:  You recognize this pick up?

11   RICARD:  (Shakes head.)

12   HENDRIX:  Ever seen one in Shoreview that looked like that?

13   RICARD:  In where?

14   HENDRIX:  Shoreview.

15   RICARD:  Up in Shoreview?

16   HENDRIX:  Yeah.

17   RICARD:  No.

18   HENDRIX:  You know Shaunee King?

19   RICARD:  I heard of him. Oh, wait a minute. That's the

20  brother from Dayton. Am I right?

21   HENDRIX:  What?

22   RICARD:  That's Shaunee's truck. Am I right?

23   HENDRIX:  Yeah, so you know Shaunee, you know his truck.

24   RICARD:  I know of Shaunee and I know he got a black

25  pick up truck with some things on it.  I know that. I've seen

26  the truck, you know, driving  around. The truck that everybody

27  pointed out by now.

28   HENDRIX:  You ever see the truck parked by the address on

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

1    Rosalee?

2      RICARD:   Rosalee?

3      HENDRIX:  It's right around the corner. When everybody be

4 dealing out back, Rosalee is right around on the side.

5      RICARD:   Right around the side of -- um, -- I don't know.

6      HENDRIX:  Matthews Court, where all you guys hang around

7 there.

8      RICARD:   Right on the outside of the circle. He stays

9 around there somewhere, I think.

10      HENDRIX:  For the record, I'm going to show you photographs

11 depicting the area of Rutland and Leland by a store, a grocery

12 store, a loading dock area, and ask you, have you ever been

13 over in this particular area?

14      RICARD:   Where's the store?

15      HENDRIX:  This is all -- the loading dock of the store.

16      RICARD:   Loading dock.

17      HENDRIX:  And this is the store here. The trucks back down

18 in to load.

19      RICARD:   I can't tell.

20      HENDRIX:  No parking.  And this is the store name and

21 everything right here. You don't recognize it?

22      LEWIS:    Corner of Rutland and Leland.

23      HENDRIX:  Rutland and Leland.  Here's a picture of

24 the store, right there.

25      HENDRIX:  You never been there?

26      RICARD:   No.

27      HENDRIX:  You never been to that store?

28      RICARD:   No.  Wait, wait, wait.  Wait a second.  Can I see

KEKER & VAN NEST

1   this?

2      LEWIS:   There's a park right up the street.

3      RICARD:   That's right.   This is where the um... thing is?

4      LEWIS:   There is where the gate is, that's right.

5      RICARD:   Okay, okay.  I know the store.  I know where it

6   is.

7      HENDRIX:  Were you present the night Roderick Shannon was

8   beat down?

9      RICARD:   Was what?

10      HENDRIX:  Beat down. Beaten down.

11      RICARD:   I heard he was shot.

12      HENDRIX:  I asked you, were you there the night that he was

13   beaten down?

14      RICARD:   No.

15      HENDRIX:  Okay. And I'll go the next step. Were you present

16   the night that he was shot? The blood that you saw in these

17   pictures is Roderick Shannon's blood where he was shot and

18   after he was beaten by 10 or 11 young black males. And you

19   were not present there that night?

20      RICARD:   I heard he was just shot.

21      HENDRIX:  He was beaten and shot. Don't take 11 people to

22   whip one. To beat him down on the ground, and stand over him

23   and shoot him. That's cold. Ill mannered and totally, total

24   disregard for another human's life. You were not present when

25   any of this took place.

26      RICARD:   No.

27      HENDRIX:  If I told you that somebody said that you were

28   present that night, what would be your reaction that? That they

KEKER & VAN NEST

1   were lying, were they mistaken in identity?

2   RICARD:   Either one.   Either that or maybe they trying to

3   cover they own ass, or maybe it's mistaken identity.

4   HENDRIX:   Okay, I can accept that.   Now do you have a

5   nickname?

6   RICARD:   What?

7   HENDRIX:   Do you have a nickname?

8   RICARD:   A nickname?   Yeah, I guess, yeah.

9   HENDRIX:   Everybody's got a nickname.   Most black people

10  have a nickname.  They will give you one whether you want it or

11  not.   Okay?

12  RICARD:   Vista.

13  HENDRIX:   They call you Vista.  Why?

14  RICARD:   As long as I can remember, that's what they been

15  callin' me.

16  HENDRIX:  And do you have some Starter jackets with that on

17  it?

18  RICARD:   Had.

19  HENDRIX:   Had, you got rid of them?

20  RICARD:   Nah, the police got 'em.

21  HENDRIX:   Who got it, Girard?

22  RICARD:   Somebody. One of 'em.

23  HENDRIX:   You got arrested in it?

24  RICARD:   Uh, I don't think I got arrested in it. No, it

25  was in my car.

26  HENDRIX:   It was in your car?

27  RICARD:   It was in my car.

28  HENDRIX:   And they busted the car?

KEKER & VAN NEST

1   RICARD:   Nah, they busted, they had jack some people by

2   my car. And then when I came back they told me that some people

3   had got jacked by my car. They found my jacket and stuff.  And

4   I don't know, but they say they found a gun around here. I

5   don't know if they found it off of them or what, but they was

6   all up in my car.

7   HENDRIX:   Okay.  So that would have been Narcotics Squad?

8   RICARD:   The what?

9   HENDRIX:   The narcs?

10   RICARD:   I guess. They were in black and white.

11   HENDRIX:   You didn't report it?

12   RICARD:   I wasn't there.

13   HENDRIX:   Did you ever check into it later on?  It's your

14   ride, your jacket.  I mean, I'd want to know about my stuff.

15   RICARD:   They told me the Police.  That's all I needed to

16   hear.

17   HENDRIX:   That was the end of it?

18   RICARD:   That was the end of it.  It was gone.

19   HENDRIX:   So what you're telling us, Officer Lewis and I,

20   is that the night that Cooley was shot you were not present.

21   RICARD:   No.

22   HENDRIX:   And you did not shoot him.

23   RICARD:   No.

24   HENDRIX:   And then somebody told us that you shot him to

25   avenge the death of Cheap Charlie.  What would you have to say

26   to that?

27   RICARD:   That's crazy.  Like I said --

28   HENDRIX:   Not to say you felt that way. I'm just asking,

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

1   did you do it?

2       RICARD:    No.

3       HENDRIX:   How long you known Soda Pop?

4       RICARD:    Soda Pop?  For a few years.

5       HENDRIX:   You go to school with him?

6       RICARD:    No.

7       HENDRIX:   Just kind of hang out in the same area with him?

8       RICARD:    Yeah, on the hill.

9       HENDRIX:   Did you ever go anywhere with Soda Pop?

10      RICARD:    Like where?  How far?

11      HENDRIX:   Anywhere, ride around with him in his car?

12      RICARD:    He don't have a car.

13      HENDRIX:   He had one.

14      RICARD:    Used to.  Well, I never got to go ride in his car

15  with him.

16      LEWIS:  Has he ridden in your car?

17      RICARD:    Yeah, once or twice.  Gave him a ride to where he

18  needed to go.

19      HENDRIX:   Did you ever ride in his car?

20      RICARD:    That used to be Soda Pop's car.

21      HENDRIX:   Yes it did.

22      HENDRIX:   For the record, let it reflect we're talking

23  about license no. 030BYO. Who owns it now?

24      RICARD:    I don't know.

25      HENDRIX:   The kid who lives up on Mathew, right?

26      RICARD:    He does? The only person that got -- somebody

27  has a green one up there, but it ain't like that.

28      HENDRIX:   Well, it's been painted, again.

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

1     RICARD:   Oh.   I would have thought he got rid of that car.

2 Thought he was gonna let that car go.

3     HENDRIX:   He did when the young man bought it.

4     RICARD:   Oh, okay.

5     HENDRIX:   It was in another young man's name who was shot

6 when Cheap Charlie was killed.

7     Even though it was Pop's car.

8     RICARD:   You mean somebody else got shot? Somebody got

9 killed.

10     HENDRIX:   No, he lived.   He got shot.   Nine other people

11 got shot when Cheap Charlie got killed.

12     RICARD:   That's right.

13     HENDRIX:   The guy who this car was registered to was shot

14 that night also. It was Pop's car.

15     RICARD:   Who was it registered to?   Dominic.

16     HENDRIX:   Huh?

17     RICARD:   Dominic.

18     HENDRIX:   They were tighter than hairs on a dog right?

19     RICARD:   That's right.

20     HENDRIX:   Nothing wrong with that.   We're not accusing him

21 of anything.

22     HENDRIX:   We're just trying to clear up a few loose ends

23 about this. What you saying is the night Cooley was shot you

24 were not present during the chase or during the time that he

25 was killed, was shot.

26     RICARD:   No.

27     HENDRIX:   Was Soda Pop with you that night?

28     RICARD:   No.

KEKER & VAN NEST

1    HENDRIX:   Do you know if he was present when he was killed?

2    RICARD:    I don't know.

3    HENDRIX:   Do you know if you had been in Soda Pop's company

4    that night?

5    RICARD:    I can't even recall.

6    HENDRIX:   You'd remember if you had been someplace involved

7    with somebody was killed. That's a red letter day, 'cause it's

8    not every day, 365 days a year that you gonna be present when

9    somebody's knocked off. You'd remember that.

10   Am I right or wrong?

11   RICARD:    Uh.  Yeah.

12   HENDRIX:   Or maybe you knocked off so many you can't

13   even remember.

14   RICARD:    Knocked off so many --

15   HENDRIX:   Yeah, it becomes commonplace after awhile,

16   no significance, you know.

17   RICARD:    But, it's like, I mean --

18   HENDRIX:   You're not involved in Cooley's death, you say?

19   RICARD:    No.

20   HENDRIX:   Okay, I think at a later time you might want to

21   think about this.

22   RICARD:    Think about what?

23   HENDRIX:   Whether you were there.  I know it's hard.  A lot

24   of times a young man don't face reality, face to face with the

25   truth. Just like looking at that wall and knowing it's not

26   gonna move -- it's gonna be there until you tear the sucker

27   down. This case gonna stay there like that wall until it's

28   torn down, and when it's torn down by myself, him, my other

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

1  partner, then the case will remain, people go to jail.

2    That's how we tear the wall down.

3    So all I'm saying today to you - if you want to talk

4  about this later, I don't think you've been exactly candid

5  with us, tonight.  I'm gonna give you the benefit of the doubt,

6  give you a chance to straighten it up, but later on, it's

7  going to become important, very important.

8    It can mean the difference between being out here on the

9  streets and being in jail. To me that would be important if

10  I sat in that chair.  If I wore your shoes.  But I can't tell

11  you how to live your life. I can't tell you what decisions to

12  make.  I can only give you the facts of what you're dealing

13  with.  That's all I will do.

14    Officer Lewis?

15    LEWIS:    Uh, do you own a weapon?

16    RICARD:    No.

17    HENDRIX:  Gun, or a rifle or a shotgun?

18    RICARD:    No.

19    HENDRIX:  Have you ever fired a gun or a rifle or a

20  shotgun?

21    RICARD:    Sure.

22    HENDRIX:  Were you in the city limits or outside?  Or what

23  were the circumstances? Or done it in a range.

24    RICARD:    Blasted off a couple of rounds...

25    HENDRIX:  Were you like up in the Hill, just free floating,

26  cracking off rounds? Because people do that up on the hill.

27    RICARD:    Yeah, we go up there, up on the hill sometimes

28  down by Candlestick Park.

1     HENDRIX:  Um, have you done it in the last year?

2     RICARD:   In the last year?

3     HENDRIX:  Yeah.

4     RICARD:   Yeah.

5     HENDRIX:  Do you know whose weapon it was?

6     RICARD:   My Uncle Steve's.

7     HENDRIX:  You borrowed your Uncle Steve's.  Where is it at

8  now?

9     RICARD:   Here.

10    HENDRIX:  It got taken from you?

11    RICARD:   Yeah.

12    HENDRIX:  How long ago?

13    RICARD:   Uh, maybe --

14    HENDRIX:  Is that when Girard came to your house?

15    RICARD:   Yeah.

16    HENDRIX:  What kind of weapon was it?

17    RICARD:   '57.

18    HENDRIX:  No shotgun then?

19    RICARD:   No.

20    HENDRIX:  You never learned how to shoot a shotgun or a

21  rifle?

22    RICARD:   Have I ever shot one?

23    HENDRIX:  Uh-huh.

24    RICARD:   Yeah.

25    HENDRIX:  Okay, I have nothing further.  I think I covered

26  all the points I wanted to put over to you. I thank you for

27  coming down, and thank you for calling the officers and taking

28  the time to talk to 'em. It's much easier this way. You get to

KEKER & VAN NEST

1   walk out and go home.   Rather than coming down here in cuffs

2   and stuff. It don't have to be so difficult to talk to.

3       RICARD:   Okay.

4       HENDRIX:   Do you have any questions?

5       RICARD:   Uh --

6       HENDRIX:   Anything you want to know? Any questions you want

7   answered?

8       RICARD:   From what you telling me, somebody --

9       HENDRIX:   Somebody's placing you at the scene of the crime.

10      RICARD:   Somebody's placing me at the scene of something.

11          (End of side one of tape)

12      HENDRIX:   Let me just turn it over.   There were no

13  questions asked of the witness.   And still present are the

14  persons who were present prior to this tape being turned over.

15      And you were asking...

16      RICARD:   Since you said my name came up with Pete.

17      HENDRIX:   Wait a minute. We're not talking about that now,

18  we're talking about Roderick Shannon right now. We'll talk

19  about the other later. We don't want to get the two involved.

20  Okay.

21      RICARD:   I'm just saying if somebody...

22      HENDRIX:   I'm saying you're name came up in this

23  investigation, with Cooley. Someone says you were there at the

24  scene. Now, I don't think this person would have a grudge with

25  you. I don't think this person would do it maliciously or try

26  to damage you in any way because it doesn't appear to be that

27  type of individual. However, it's something that has to be

28  explained, one way or another. And we'd be less than diligent,

KEKER & VAN NEST

POLICE INTERVIEW WITH LOVINSKY RICARD, FEBRUARY 8, 1990

1  sworn to do our duty if we didn't pursue, check it out.

2  Whether you were the victim or the suspect, it doesn't make no

3  matter. We'd do the same thing, the same job.

4      Alright, we'll conclude this interview at this time.

5  Today's date is still Thursday, 2/8/1990. The time is 17:15.

6  End of tape.  Still present are the persons who were present at

7  the beginning of this tape. End of tape.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KEKER & VAN NEST

1    I, PATRICK W. MONTGOMERY, a paralegal with the law firm of

2  Keker & Van Nest, LLP., do hereby certify that under penalty of

3  perjury under the laws of the United States, the foregoing is a

4  full, true, and correct record of the February 8, 1990, video-

5  taped interview of Lovinsky Ricard, provided by the District

6  Attorney's Office of the City and County of San Francisco,

7  pursuant to subpoena, as transcribed by me, to the best of my

8  ability.

9    Dated at San Francisco, California, this 7th day of

10  June, 2002.

 

 

 

                          PATRICK W. MONTGOMERY
                          Paralegal

KEKER & VAN NEST