**United States District Court**
For the Northern District of California

1

2                    IN THE UNITED STATES DISTRICT COURT

3

4                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6                                          No. C 04-0574 CW
   JOHN TENNISON,                          Consolidated with
7                                          No. C 04-1643 CW
           Plaintiff,
8                                          ORDER GRANTING IN
       v.                                  PART DEFENDANTS'
9                                          MOTIONS FOR
   CITY AND COUNTY OF SAN FRANCISCO; SAN   SUMMARY JUDGMENT
10  FRANCISCO POLICE DEPARTMENT; PRENTICE  AND PLAINTIFFS'
   EARL SANDERS; NAPOLEON HENDRIX; and     MOTION TO STRIKE
11  GEORGE BUTTERWORTH,                    AND DENYING
                                           PLAINTIFFS'
12         Defendants.                     MOTIONS FOR
   _____     SUMMARY
13                                         ADJUDICATION
   ANTOINE GOFF,
14
           Plaintiff,
15
       v.
16
   CITY AND COUNTY OF SAN FRANCISCO; SAN
17  FRANCISCO POLICE DEPARTMENT; PRENTICE
   EARL SANDERS; NAPOLEON HENDRIX; and
18  GEORGE BUTTERWORTH,

19         Defendants.
   _____/
20

21

22
        This is a civil rights action arising from the investigation,
23
   arrest and prosecution of Plaintiffs John Tennison and Antoine Goff
24
   by Defendants Prentice Earl Sanders, Napoleon Hendrix (together,
25
   the Inspectors) and George Butterworth.  Plaintiffs have filed
26
   motions for partial summary adjudication of their Brady claims
27
   against the Inspectors; the Inspectors oppose and cross-move for
28

summary judgment on all of Plaintiffs' claims.  Butterworth moves

separately for summary judgment.  The Inspectors move under Civil

Local Rule 56-2(a) to submit a statement of disputed facts.

Tennison moves to strike certain portions of the Inspectors'

declarations.  Goff joins in the motion to strike.  The Inspectors

have not filed an opposition to the motion to strike.  The matters

were heard on August 12, 2005.  Having considered the papers filed

by the parties and oral argument on the motions, the Court GRANTS

in part Butterworth's motion for summary judgment, the Inspectors'

motion for summary judgment and Plaintiffs' motion to strike, and

DENIES Plaintiffs' motions for summary adjudication and the

Inspectors' request to submit a statement of disputed and

undisputed facts.

PROCEDURAL BACKGROUND

On October 3, 1990, Plaintiffs, whose cases had been

consolidated for trial, were convicted by a jury of first degree

murder and conspiracy to commit murder in the shooting death of

Roderick Shannon.  Wong Dec., Ex. V.  In the Matter of the Claim for

Compensation by Antoine Maurice Goff and John J. Tennison, November

4, 2004 decision of the California Victim Compensation and

Government Claims Board (Matter of Goff and Tennison).  Each

Plaintiff individually filed a motion for a new trial, both of

which were denied.  Each Plaintiff individually filed a direct

appeal and then a petition for a writ of habeas corpus.  The State

courts denied the direct appeals and the habeas petitions.  Each

Plaintiff individually filed a petition for writ of habeas corpus

in this Court.  On August 26, 2003, this Court issued an Order

**United States District Court**
For the Northern District of California

Granting Tennison's Petition for Writ of Habeas Corpus based upon the suppression of material exculpatory evidence. Purcell Dec., Ex. 52, August 26, 2003 Habeas Order. Although the Court had not ruled on Goff's petition, both Plaintiffs were released from custody. The San Francisco district attorney decided not to retry them. Purcell Dec., Exs. 53, 54; Goff Dec. ¶ 7; Exhibits B and C submitted with Tennison's Complaint, October 27, 2003 State Court Order declaring Tennison factually innocent of the murder of Roderick Shannon. In 2004, Plaintiffs brought claims pursuant to California Penal Code § 4900[1] against the State of California seeking compensation for alleged wrongful incarceration. Wong Dec., Ex. V, Matter of Goff and Tennison. The Administrative Law Judge of the Victims' Compensation Board ruled that Plaintiffs had failed to establish by a preponderance of the evidence that they were entitled to compensation and their claims were denied. Id. at 10. Tennison has appealed this decision to the California superior court. Balogh Dec. at ¶ 42. Tennison's attorney anticipates that the losing party will appeal the superior court's decision to the California court of appeal. Id.

FACTS

I. Pre-Trial Events -- Masina Fauolo and Pauline Maluina

On August 19, 1989, Shannon was shot and killed in San

---

[1] California Penal Code § 4900 et seq. provides the statutory basis for the filing of a claim for injury sustained as a result of an erroneous conviction and incarceration. The claimant must prove by a preponderance of the evidence that the "crime was not committed by him, the fact that he did not, by any act or omission on his part, either intentionally or negligently, contribute to the bringing about of his arrest or conviction for the crime with which he was charged. . ." Cal. Penal Code § 4903.

Francisco.  San Francisco Homicide Inspectors Sanders and Hendrix had been assigned to focus on gang-related murders and worked with the Gang Task Force (GTF) with respect to any gang-related homicide.  The GTF was a group of officers in the San Francisco police department charged with stopping gang activity generally. Sanders and Hendrix headed the Shannon homicide investigation assisted by GTF members Michael Lewis, Neville Gittens and Leroy Lindo.

The evidence indicated that there had been a high-speed car chase that had ended with Shannon taking the evasive action of driving his car in reverse and then crashing his car backwards into a park fence along Visitacion Avenue.  One of the chasing vehicles was a pick-up truck that had gone into reverse to chase Shannon's car as it was driving in reverse.  Residents in the neighborhood of the shooting identified several cars involved in the chase, but could not identify any of the people involved.  The morning after the crash, SFPD Inspector Frank Falzon interviewed the owner of the car Shannon had been driving during the chase: his cousin, Patrick Barnett.  Balogh Reply Dec., Ex. 91, August 19, 1989 Barnett Interview at 1.  Falzon told Barnett that two cars and a large-sized pick-up truck were involved in the chase and asked him to find a witness to the murder.  Id. at 15-16.

On August 22, 1989, Masina Fauolo, an eleven-year old Samoan girl who lived in the Sunnydale section of San Francisco, called Hendrix and told him she had witnessed Shannon's killing.  She later described Shannon and herself as buddies, like brother and sister.  Over the next two months, Hendrix spoke to Masina every

4

day.

On October 4, 1989, Hendrix and Sanders submitted the following memorandum to their supervisor, Lieutenant Gerald J. McCarthy: "In order to encourage witnesses to come forward [in the Shannon homicide case], we request a reward of $2,500 from the Secret Witness Program.  We feel this reward will generate information that will lead to the arrest and conviction of the perpetrator(s) of the homicide."  Purcell Dec., Ex. 22, October 4, 1989 Memo.  The Secret Witness Program (SWP) was a community-based reward fund that was administered by the San Francisco Chamber of Commerce (COC) in the 1980s to encourage individuals to provide confidentially information that would assist the police in solving crimes in San Francisco.  Tabak Dec. at ¶ 4.  Individuals could call the COC's hotline to provide such information.  Id.  Also, at the request of the SFPD, the COC would post rewards for information leading to the arrest, prosecution and conviction of criminal suspects.  Id.  Any reward payment would be made directly by the COC to the individual who provided the information, not to police officers.  Id.  The SFPD did not fund the SWP.  Id.  A request that a reward be posted by the SWP had to be approved by the requesting officer's superior officers, then forwarded to the COC for its consideration.  Id.[2]

Hendrix and Sanders' request for a SWP reward was approved by three people.  An undated copy of a note addressed to McCarthy, Hendrix and Sanders, which is xeroxed over the October 4, 1989

---

[2]The SWP was discontinued in 1992.  Tabak Dec. at ¶ 4.

5

memo, reads, "Jerry: Per Mary Petrie, this request has been taken care of and the reward is in place." The memo was not turned over to Plaintiffs' trial attorneys.

Sanders testified that he didn't personally give the SWP memo to Butterworth, the assistant district attorney handling the case, but that it was in the police case file[3] and if Butterworth had asked for the file, he would have seen it. Purcell Dec., Ex. 51, Sanders Depo. at 129-31. Asked whether he had informed the assistant district attorney about his request to the SWP, Hendrix replied, "I don't know that I did." Purcell Dec., Ex. 1, Hendrix Depo. at 25. Butterworth did not know of this memo and he did not produce it to Plaintiffs' defense counsel. Purcell Dec., Ex. 42, Butterworth Depo. at 100. Plaintiffs' defense counsel never learned of this request. Purcell Dec., Ex. 41, Adachi Dec. at ¶ 7; Melton Dec. at ¶ 5. Masina and Pauline Maluina, the other witness against Tennison, testified that they did not receive any money for testifying against Plaintiffs. Wong Dec., Ex. UU, Masina Dec. at ¶ 8-10; Wong Dec., Ex. M, Pauline Depo. at 137, 139.

Neither the SFPD nor the COC has been able to locate any

_____

[3]The Bureau of Investigations of the SFPD maintains an investigative case file for all cases under investigation. Tabak Dec., Ex. A at 25 (December 23, 1985 SFPD Memo on Investigative Case File Management). Each case file must contain a Chronological Report of Investigation which lists all pertinent facts needed to document the investigation and to substantiate conclusions or recommendations, including exculpatory evidence. Id. at 27. The case file is maintained in the possession of the investigating officer, in the investigating officer's desk or in the section case file cabinets. Id. at 35 (March 7, 1990 SFPD Memo on Processing Of Cases Referred to Inspectors Bureau). At some point the investigation file or a copy of it, including all exculpatory information, is turned over to the district attorney's office. Balogh Reply Dec., Ex. 81, Tabak Depo. at 99-100.

6

United States District Court

For the Northern District of California

witnesses or records indicating that a reward was ever offered or paid to anyone in connection with the Shannon murder investigation. Tabak Dec. at ¶ 5.  No record indicates that any SWP reward funds were ever paid to Hendrix or Sanders in any case.  Id.

On October 11, 1999, Sanders received a check in the amount of $1,250 from the SFPD's Contingent Fund B for the purpose of "witness expenses."  Purcell Dec., Ex. 23, October and December, 1989 Ledger Pages for Contingent Fund B.  On December 1, 1989, Hendrix received a check in the amount of $160 from Contingent Fund B for the purpose of a "witness agreement."  Id.  Contingent Fund B is a discretionary fund the Chief of Police uses in the investigation and detection of crime.  Goldberg Dec. at ¶ 3.  The Chief of Police or his designee must approve all reimbursements and advances to police officers paid from this fund.  Id.  All requests for payments from Contingent Fund B must be documented and the documentation must be routed through the chain of command to the Chief of Police for approval.  Id.  This procedure was in effect in 1989 and has not changed since then.  Id.  Defendants' witness declares that Contingent Fund B has never been used for rewards, and that the payments noted in the ledger were for witness expenses unrelated to the October 4, 1989 memo requesting a reward from the SWP.  Goldberg Dec. at ¶ 5.

In a 2005 declaration, Masina states that she moved to Samoa shortly after Shannon was killed and that, as far as she knows, her transportation expenses to fly from Samoa to San Francisco for the preliminary hearings and trial were paid by the SFPD.  Wong Dec., Ex. UU, Masina Dec. at ¶ 14.

7

The Fiscal Division has worked diligently to try to locate all supporting documentation for the October payment to Sanders and the December payment to Hendrix, but it has only been able to locate bank statements; the request memos, cancelled checks and any related receipts could not be found. Id. The documents were likely destroyed years ago as part of the SFPD's standard documentation retention and destruction policy. Id.

The information about the Contingent Fund B disbursements was not given to Plaintiffs' trial attorneys.

In an October 31, 1989 recorded interview with Hendrix and Sanders, Masina told them the following information. Purcell Dec., Ex. 26. After midnight on August 19, 1989, Masina and her friend Pauline Maluina were parked in the Lovers' Lane parking lot at the top of Visitacion Avenue in a stolen car eleven-year old Masina was driving. Masina said she saw three cars and a truck enter the parking lot. The drivers and the passengers in the vehicles were young, African American men. She heard one boy say to another, "Buck, come here." After the cars had been parked for about ten minutes, Shannon's car went by on Visitacion. Then the three cars and the truck left the parking lot and began to chase Shannon in the car he was driving. Masina drove out of the parking lot and followed the cars down the hill without losing sight of Shannon's car. She said she parked the stolen car on the street near where Shannon had crashed his car and ran to a Super Fair parking lot. She got separated from her friend Pauline at this point. At the Super Fair parking lot, she saw Shannon being beaten by a gang of boys. Then one boy went to the trunk of his car and got a shotgun.

8

**United States District Court**

For the Northern District of California

Masina heard four or five shots, saw the boy shoot at Shannon, but didn't know whether any of the shots hit Shannon or were shot in the air.  After Shannon was shot, all the boys got back in their cars and left.  Masina then went to Shannon who said, "Get Patrick."  Then Masina left the scene.

At the interview, Sanders showed Masina eight photographs. From them she picked two, one of Tennison and one of Goff.  Masina said that Tennison was one of the boys who were beating Shannon and Goff was the person who shot Shannon.

On November 28, 1989, Hendrix located Masina's friend, fourteen-year old Pauline Maluina, at Visitacion Valley High School and interviewed her in the presence of her father and the principal.  Purcell Dec., Ex. 29, November 28, 1989 Police Interview with Pauline Maluina.  At the interview, Pauline told Hendrix that she and Masina were walking around and saw some people beating up somebody.  Then Shannon "came out looking all frightened.  All of a sudden there's a car right next to them. Someone got the gun and shot him right there and me and Masina we just ran and we hopped on a bus.  We went down 24th and Mission." Id. at 2.  She and Masina were walking and talking slowly.  Id. at 4.  Right after one shot was fired, she and Masina ran because they thought the shooter was going to point the gun at them and shoot them.  Id. at 5.

At the interview, Hendrix showed Pauline eight San Francisco police ID-type photos.  Pauline identified two of the people in the photos as being at the scene.  One of the people she picked was Tennison.  She said he was not the person who was in charge of the

shotgun.  Id. at 13.  The other person Pauline identified was an individual named Wayland Gibson, who was also known as "Buck."  Id. at 12.

Hendrix and Sanders brought the case to the San Francisco District Attorney's Office, which decided to prosecute Plaintiffs. On November 28, 1989, a warrant was issued for the arrest of Goff; on December 1, 1989, a warrant was issued for the arrest of Tennison.

The case against Plaintiffs was originally prosecuted by Assistant District Attorney Al Giannini.  In December, 1989, Giannini filed a California Welfare and Institutions Code § 707 petition to have Tennison referred to adult court for prosecution in the Shannon homicide.  Kaiser Dec., Ex. B, May 24, 1990 Butterworth Declaration.  On February 21, 1990, the case was transferred to Assistant District Attorney Butterworth.  The section 707 hearing took place on March 27, 1990 and April 2, 1990; Hendrix and Pauline testified.  Tennison's attorney, San Francisco Assistant Public Defender Jeff Adachi cross-examined them.  The petition was granted.  Tennison was arrested on April 5, 1990. Tennison's preliminary hearing was set for April 23, 1990.  Goff was arraigned on April 9, 1990 and his preliminary hearing was set for May 1, 1990.

On April 22, 1990, the day before Tennison's preliminary hearing, Pauline arrived from Hawaii, where she was then living, to meet with Butterworth before she testified at the hearing.  Kaiser Dec., Ex. B, May 24, Butterworth Dec. at 1.  Pauline, her mother, Butterworth and Hendrix were at the meeting.  Kaiser Dec., Ex. A,

United States District Court
For the Northern District of California

Butterworth Depo. at 162. Butterworth had asked Pauline to come to the meeting to prepare her for her testimony at the preliminary hearing. Id. Butterworth had Pauline read the testimony she gave at Tennison's section 707 hearing and told her there were discrepancies between what she had testified to and what Masina had said in her tape-recorded interview with the police. Purcell Dec., Ex. 30, April 23, 1990 Police Interview of Pauline Maluina at 2. Pauline then told Butterworth that she had not been at the scene of Shannon's homicide. Id. She said that she had lied "because she didn't want to get into any more trouble" and she owed Masina something. Id. at 2, 4. Pauline said that she had been able to pick out Tennison's photo from the photos Hendrix had shown her at the November, 1989 interview "because Masina told me to pick the one that looked the biggest, and the largest one out of all the pictures." Id. at 3. Pauline also said that she learned all the details of Shannon's shooting from Masina before she spoke to Hendrix in November. Id. at 4. After he heard Pauline's recantation, Butterworth sent Pauline and her mother back to their hotel. Wong Dec., Ex. O, Butterworth Depo. at 178. Then Butterworth spoke with Hendrix and they decided to bring Pauline back the next day to see if she would still say that she wasn't at the murder scene. Id.

The next day, April 23, 1990, Pauline returned with her mother. Id. Butterworth told Pauline that, based upon what she had said the previous day, he wanted to do a follow-up interview which was going to be tape-recorded. Id. at 190. Butterworth told Pauline, "Do you understand that based upon what you told Inspector

11

United States District Court
For the Northern District of California

Hendrix and myself yesterday, that the case against Mr. Tennison has been compromised and as a result, uh, we're not going to be able to proceed with the preliminary hearing or with the prosecution at this point?  Do you understand that?"  Purcell Dec., Ex. 30, April 23, 1990 Police Interview of Pauline Maluina at 6. Pauline responded that she did understand.  Id.  Butterworth asked, "And is the reason you are telling us the information you are telling us today because that's the truth or is it just because you are afraid to testify against Mr. Tennison?"  Id.  Pauline responded, "It's the truth."  Id.

After this interview, Butterworth dismissed the case against Tennison and then had a conference with other members of the homicide unit of the district attorney's office, including the head of the unit, to decide how to proceed.  Wong Dec., Ex. O, Butterworth Depo. at 192.  During that meeting, it was determined that Pauline would be given a polygraph test.  Id. at 194.  The goal of the polygraph was to see if, in the face of the polygraph examination, Pauline would persist in her claim that she had not been at the scene of Shannon's murder.  Id. at 194.  Another decision that was made was to talk to Masina.  Id. at 197.

On April 23, 1990, Hendrix called Masina who was then living in Samoa.  Balogh Reply Dec. at ¶ 7, Ex. 59, photocopies of two audiotapes labeled "Masina Fauolo 4/23/90" and "M. Fauolo 4/23/90." These are two copies of an original audiotape of Hendrix and Masina's conversation.  These copies were not produced to Plaintiffs' trial counsel nor were they produced in response to subpoenas issued in Tennison's federal habeas case.  Balogh Dec. at

12

¶ 7.  They were produced from Butterworth's files in December,
2004, in response to Tennison's subpoena in this case.  Id.  The
original audiotape of Hendrix' conversation with Masina has never
been produced.  Id.[4]

Plaintiffs employed forensic audio expert Richard Sanders to
enhance the sound quality of the audiotapes because they are
difficult to hear.  Richard Sanders Dec. at 1.  Only Hendrix' voice
can be heard on the audiotapes.  Id. at 5.  Even with the
enhancement, only about one-third of Hendrix' conversation contains
recognizable words.  Id.  Richard Sanders made a transcript of the
audible portion of the tape.  Id.  He states that the only
knowledge he had when making the transcript was the names of the
people who might be involved in the discussion.  Id.  About ten
minutes into the audiotape, the words, "Can you ever see this
reward?" can be heard.  Id., Ex. 2, Transcript of Audiotape at 3,
line 10:58.

The Inspectors employed audio expert Durand R. Begault to
review Richard Sanders' declaration and its attached exhibits.
Begault Dec. at ¶ 5.  Begault states that even with enhancement of
the tape, except for an occasional word or phrase such as "OK" or
"JJ," it is mostly impossible to determine reliably what exact
words Hendrix is saying.  Id. at ¶ 14.  Begault states that the

---

[4]Tennison indicates that, because this evidence was only
produced in response to the subpoena in this case, allegations that
the Inspectors suppressed the tape of Hendrix' April 23, 1990
conversation with Masina is not included in his complaint.
Tennison argues that he informed the Inspectors of this Brady claim
in his responses to their interrogatories and, because the
Inspectors have not moved for summary judgment on this claim, it
remains for trial.

United States District Court

For the Northern District of California

word "reward" is not spoken anywhere on the tape and thus Richard
Sanders' transcript of the tape is inaccurate.  Id. at 18.
Begault's best estimate of the phrase Richard Sanders transcribes
as, "Can you ever see this reward" is "Have you ever seen this
before?"  Begault's colleague heard, "Have you ever seen this one?"

On April 24, 1990, Pauline returned to the police station
without her mother and she was given a polygraph test.  Kaiser
Dec., Ex. 1, Butterworth Depo. at 202.  Butterworth had a few brief
words with Pauline before she was polygraphed, but they did not say
anything of substance.  Id.  Butterworth did not speak to Pauline
after the polygraph.  Id.  SFPD Inspector Henry Hunter administered
the polygraph.  Purcell Dec., Ex. 33, April 27, 1990 Memorandum
from Henry Hunter to Hendrix and Sanders.  Pauline responded to
Hunter's questions by saying that she had not witnessed the Shannon
murder and that Masina had told her to lie about being there.  Id.
Hunter determined that the polygraph results were inconclusive.
Id.  Hunter told Pauline that if she had changed her original story
because of fear of retaliation, she should not do so because the
police would give her protection.  Id.  Hendrix placed Hunter's
memo summarizing the results of Pauline's polygraph in the police
case file which was available to Butterworth.  Hendrix Dec. ¶ 22.
Butterworth testified that he never saw the memo.  Wong Dec., Ex.
O, Butterworth Depo. at 207.  Butterworth testified that he told
Jeff Adachi, Tennison's defense counsel, about the polygraph.  Id.
Butterworth could not remember if he told Barry Melton, Goff's
defense counsel, about the polygraph.  Id. at 208.  Adachi declares
that he was not made aware that Pauline was subjected to a

14

polygraph examination.  Adachi Dec. at ¶ 12.

After the polygraph, Hendrix put Pauline in a private room and arranged for her to talk by phone to Masina, who was in Samoa. Hendrix Dec. at ¶ 23.  Hendrix left Pauline in the room alone to talk to Masina and did not monitor or record the call.  During the call, Masina got mad at Pauline and told her how stupid she was. Purcell Dec., Ex. 31, Pauline's Trial Testimony at 194.  After Pauline talked to Masina, Pauline retracted her recantation. Hendrix Dec. at ¶ 23.  On April 24, 1990, Hendrix and Sanders interviewed Pauline on tape and documented the retraction of her recantation.  Id.; Purcell Dec., Ex. 34, April 24, 1990 Police Interview with Pauline Maluina.  Hendrix and Sanders gave this tape to Butterworth.  Hendrix Dec. at ¶ 23.

In a declaration dated June, 2003, Pauline states that, during the phone call, Masina pressured her to return to her earlier, untrue statements and told Pauline additional details about the false testimony she wanted Pauline to give. June, 2003 Maluina Dec. at ¶ 14.  At her deposition, Pauline stated that, although Masina had never hurt or threatened her, Pauline had seen the damage Masina had done to other people and she didn't want that happening to her.  Wong Dec., Ex. M, Maluina Depo. at 249-50.  Pauline stated that Masina told her to tell the truth, but Pauline interpreted Masina as saying "tell my truth."  Id. at 282-83.

Pauline testified that, when Butterworth first heard that she was recanting her prior testimony, he got upset and yelled, "How could you say that you weren't there?  You told us that you were there."  Id. at 79.  Later, she clarified that Butterworth got

upset and raised his voice like a parent talking to his child.  <u>Id.</u>
at 77, 88-89.  She also said that Butterworth looked frustrated and
then he called in Hendrix.  <u>Id.</u> at 78.  Pauline said that
Butterworth and Hendrix pushed her toward going back to her
original testimony by not listening to her when she told them she
was not at the murder scene.  <u>Id.</u> at 96.  She felt that Butterworth
and Hendrix did not protect her in that they did not listen to her.
<u>Id.</u> at 371-72.  Pauline testified that she had asked to take a
polygraph test.  <u>Id.</u> at 94.

Tennison's preliminary hearing was held on June 18, 1990.
Achiron Reply Dec., Ex. D.  Only Masina testified, but the court
heard testimony that Pauline had recanted and that Masina had
spoken to her after she recanted.  <u>Id.</u> at 105.  Tennison
Preliminary Hearing at 104-05.  At Goff's preliminary hearing,
Butterworth called only Masina, but Goff called Pauline as a
defense witness.  Achiron Reply Dec., Ex. C, Goff Preliminary
Hearing at 101-11.  Pauline was examined on the discrepancies
between her testimony and Masina's, her recantation and her
telephone call to Masina regarding her recantation.  <u>Id.</u>  The
court, in both cases, found probable cause.  <u>Id.</u> at 118-19; Achiron
Reply Dec., Ex. D, Tennison's Preliminary Hearing at 118-19.

Masina and Pauline testified at Plaintiffs' consolidated
trial.  On October 3, 1990, a jury found Plaintiffs guilty of
murder and conspiracy to commit murder.

II. Pre-Trial Events -- Chante Smith

On January 3, 1990, Chante Smith contacted Sanders.  Purcell
Dec., Ex. 45, Sanders' notes of January 3, 1990 Smith conversation;

16

Sanders Dec. ¶ 9; Wong Dec. Ex. F, <u>Matter of Goff and Tennison</u>, Transcript of Administrative Hearing (Transcript of § 4900 Hearing) at 87.  Smith said she had information that she had heard on the street and she provided Sanders with a list of names of people she had heard were at the scene of the Shannon murder, including a person named Luther Blue.  Sanders Dec. ¶ 9; Smith Dec. ¶ 8, Wong Dec., Ex. F, Transcript of § 4900 Hearing at 87.  Smith also said that Sanders had arrested the wrong people and that Lavinsta Ricard[5] had shot Shannon.  Smith Dec. ¶ 8.  Smith also told Sanders that the car chase started at the Seven-Eleven store, which is located east of the Super Fair Market where Shannon was shot, whereas Lovers' Lane, where Masina and Pauline had said the car chase started, is located west of the Super Fair Market.  Smith Dec. ¶ 8; <u>see</u> Purcell Dec., Ex. 20, Map.  Smith also described several of the cars involved in the car chase.  Smith Dec. ¶ 8.  Years later, on July 24, 1992, Smith told Butterworth and Sanders that she had actually witnessed Shannon's murder.  Purcell Dec., Ex. 47, Chante Smith's July 24, 1992 Police Interview at 2-32.  She said she had not told Sanders that she was a witness to the murder because she was afraid she would go to jail and that Ricard or Blue would harm her.  Wong Dec., Ex. F, Transcript of § 4900 Hearing at 94-95; Purcell Dec., Ex. 47, Chante Smith's July 24, 1992 Police Interview at 40, 62.  Blue and Ricard were friends and Smith heard that Blue had paid someone $10,000 to kill her so that she could not reveal that Ricard shot Shannon.  <u>Id.</u> at 40.

---

[5]Smith used Ricard's street name, Lavinsta.  Apparently, his true name is Lovinsky.

Because of these threats, Smith left the home she shared with her mother in San Francisco and moved to Richmond and then to Daly City. Id. at 65. Only Smith's mother knew how to get in touch with her. Id.

Sanders made a hand-written note of the Smith interview and put it in the police case file, which was made available to Butterworth. Sanders Dec. at ¶ 9; Wong Dec., Ex. I, Sanders' Note dated 1/3/90. The handwritten note has the word "Chante" written at the top left and the top center has the words "Re: 'Coolie' 187 PC,"[6] and under this is a telephone number. Id. Under this heading appear the words, "Luther Blue, 'Coug Nut' Lakeview 'Rapper', 'Louie Lou,' Record Title: 'Scandelous [sic]', Laventa or Vista, Troy Barnes drives a Black Skylark, Mad Hatter, Mark Anthony, Shardedee, 'The Ill Mannered Posse,' and 'We're going over to Sunnydale and start some shit.'" Id.

After Smith's initial contact with Sanders, Sanders came to Smith's house, they sat in the parking lot and Smith told Sanders about her knowledge of the people and the cars involved in Shannon's murder. Purcell Dec., Ex. 47, Smith's July 24, 1992 Police Interview at 61. Sanders sent three officers from the GTF to Smith's house to show her pictures of a truck similar to the one she had described to Sanders. Id. She was asked to identify the truck because she had told Sanders that, after Shannon had been shot, she had seen people involved in the shooting at the Sundial,

---

[6]Coolie was Shannon's street name. 187 PC refers to California Penal Code § 187 which provides the definition of murder.

18

United States District Court
For the Northern District of California

a park in Hunter's Point, and she had seen a truck there.  Id. at 62-63.

On February 8, 1990, after Smith had spoken to Sanders, Hendrix and Lewis interviewed Lovinsky Ricard.  Purcell Dec., Ex. 37, Transcript of February 8, 1990 Police Interview with Lovinsky Ricard.  Hendrix named the people mentioned by Smith and asked Ricard if he knew any of them.  Ricard denied knowing any of them. Id. at 7-12.  Hendrix asked Ricard if he was present when Shannon was shot.  Id. at 14.  Ricard replied, "No."  Id.  Hendrix told Ricard that someone had told the police that Ricard had shot Shannon to avenge the death of Cheap Charlie and asked Ricard if he shot Shannon.  Id. at 16-17.  Ricard again denied shooting Shannon. Id. at 17.  Toward the end of the interview Hendrix told Ricard, "I'm saying your name came up in this investigation, with Cooley. Someone says you were there at the scene.  Now, I don't think this person would have a grudge with you.  I don't think this person would do it maliciously or try to damage you in any way because it doesn't appear to be that type of individual.  However, it's something that has to be explained, one way or another.  And we'd be less than diligent, sworn to do our duty if we didn't pursue, check it out."  Id. at 22-23.

On February 9, 1990, Sanders and Gittens interviewed Luther Blue.  Wong Dec., Ex. S, Transcript of February 9, 1990 police interview with Luther Blue.  Sanders informed Blue that his name had come up in connection with the Shannon homicide.  Id. at 4. Blue said that he had never heard anything about the Shannon incident.  Id. at 5.  Later in the interview, Blue stated that he

19

had heard that Shannon had been shot, but that he was not there.
Id. at 10.  Sanders stated,

> Now we're gonna get to the bottom of Roderick Shannon
> being shot.  Now, we know and its [sic] obvious to you,
> or it should be, that somebody has talked to us . . . I
> believe you were there, 'cause I believe the person who
> told me. . . . But what I'm saying son the people we
> talked to told us exactly what happened.  They told us
> about the truck.  We know who the truck belongs to.  We
> know about the truck.  We know about the chase, we know
> that he was -- the person just out drove him, Roderick,
> he didn't know much about drivin' cars.  After he wrecked
> the car they chased him and when they made that turn, he
> thought behind that market . . . there used to be a lower
> fence . . . he thought if he could get over the fence he
> could get in the backyard and get away.  Only when he got
> up there they caught him.  There were people standing
> around.  So, can you tell me . . . why these individuals
> would say 'yeah, Luther was there,' they didn't say you
> were doing nothing . . .

Id. at 21, 23-24.

Blue replied, "I don't know why they'd say I was there."  Id.
at 24.  Sanders stated, "I believe the people who talked to me.  I
believe you were there.  You were there . . . and I can understand
you being afraid, that's no . . . Son, that is no crime to be
afraid. . . ."  Id. at 25.  Later, Sanders stated,

> Now tell me, if I were to tell you that on the night of
> the incident you were at the 7-11 on Third Street . . .
> You became possed up with a group of other young men and
> gave chase to an automobile driven by -- actually you
> didn't know who it was driven by, they thought it was
> Patrick's car.  Roderick Shannon was Patrick's cousin.
> Gave chase to the car.  The car, lost it, picked it up
> again, chased it until it ran the fence and then the
> truck backed down the street -- that was some pretty
> skillful driving.  And when the witnesses told us about
> that -- that took some pretty skillful driving.  All the
> time, the people that were in the truck, and in the other
> vehicles, they all knew each other.  Everybody knew
> everybody else -- And you were there.  You were there
> Luther.  Tell you what I'm going to do, son . . . I'm
> going to give you time to think about it. . . . Meanwhile
> we are going to continue our investigation.

20

1    <u>Id.</u> at 27.

2        Butterworth testified that Sanders' January 3, 1990 note was

3    in his file, but that he would not have known from the names listed

4    on the note what role these individuals played or why they were

5    identified.  Wong Dec. Ex. O, Butterworth Dep. at 113, 116.

6    Butterworth said that this list of names, without any other

7    information, would be valueless because, in a homicide

8    investigation, everything is contextual.  <u>Id.</u> at 117.  Butterworth

9    learned the significance of the document in the review of the

10   petition for writ of habeas corpus.  <u>Id.</u>  Butterworth has no

11   personal knowledge whether Sanders' note was produced to Adachi,

12   but he testified that it was in the district attorney's file, and

13   therefore it would have been turned over to Adachi in the initial

14   discovery package.  <u>Id.</u> at 113.

15       Adachi declares that he never received any information or

16   documentation regarding the information Smith provided to Sanders.

17   Adachi Dec. at ¶ 4.  Adachi states that he never received a copy of

18   Sanders' handwritten note.  <u>Id.</u>  He states that the first time he

19   received the note was in June, 2002, when Tennison's present

20   attorney gave him a copy of it.  <u>Id.</u> at ¶ 5.  Adachi states that

21   had he known that Smith had stated that the car chase started at

22   the Seven-Eleven, which was inconsistent with Masina and Pauline's

23   story, he would have had a legitimate alternative theory for the

24   case that would have proven the girls were lying, he could have

25   identified a woman named "Chante" who had information about a list

26   of potential witnesses or suspects and he would have been able to

27

28                                   21

follow up on the dead-end police interviews of Lovinsky Ricard on February 8, 1990, and of Luther Blue on February 14, 1990.  Id.

Melton declares that he never received any information, oral or written, about the police interview with Smith in which she named Ricard.  Melton Dec. at ¶ 4.

In Smith's 1992 police interview, Butterworth and Sanders questioned her about her interaction with Plaintiffs.  Smith stated that she had gone out with Goff about twice, that they were friends but that they were not dating.  Purcell Dec., Ex. 47, 1992 Smith Interview at 39, 60.  Smith only knew Goff as Antoine or Sodapop, his street name; she did not know his last name.  Id. at 42. Before Plaintiffs' trial, Smith was contacted by some of Tennison's and Goff's friends who told her that Tennison and Goff, independently, wanted her to testify or talk to their attorneys. Id. at 41, 66-67.  Smith told Plaintiffs' friends that she had been threatened and couldn't take the risk.  Id. at 41.  Smith stated that she had worked as an operator for Pacific Bell in Burlingame and, after Plaintiffs' trial, when they were incarcerated in the county jail, she handled several collect calls placed separately by Tennison and Goff.  Id. at 66.  At that time, Smith did not know Tennison's name.  Id. at 42.  When Tennison realized that the operator was Smith, he asked her to talk to himself or his attorney, but Smith said she would not come forward because she was afraid of getting into trouble.  Id. at 42, 44.  Neither Tennison nor Goff had Smith's home number, so they did not know how to find her.  Id. at 45.

At Tennison's motion for new trial, Bruce Tennison testified

United States District Court

For the Northern District of California

that Adachi had asked him to find a woman by the name of Chauntey White to ask her if she knew anything about the Shannon homicide. Wong Dec., Ex. E, Transcript of New Trial Motion at 228. Bruce Tennison could not find her because he did not have a number for her. Id.

In her 1992 interview, Smith stated that if Plaintiffs' attorneys had served her with a subpoena, she would have come in and talked to them. Purcell Dec., Ex. 47, 1992 Smith Interview at 45. She reiterated this statements in her testimony at the § 4900 hearing. Wong Dec., Ex. F., Transcript of § 4900 Hearing at 163, 165, 167.

At the § 4900 hearing, Goff testified that, before Shannon's murder, Goff had gone out with Smith twice. Wong Dec., Ex. F, Transcript of § 4900 Hearing at 640. Goff testified that a month or two after the murder, he was among a crowd of people who were listening to a person named Lovinsky Ricard brag about shooting Shannon. Id. at 580. Goff heard Ricard mention Smith's name in connection with Shannon's murder, and the next time Goff saw Smith, he asked her if she knew anything about the murder. Id. at 582-83, 641. Smith told Goff that she didn't have anything to do with the murder, and Goff never said anything else about it to her. Id. at 582. Goff believed he told Melton about Smith. Id. at 595, 677. Goff did not tell Tennison any of the information he knew about Ricard and Smith. Id. at 639. After he was convicted, but prior to being sentenced, Goff had two or three telephone conversations with Smith and he asked her to talk to his lawyer because his friend had told him that she may have been at the murder scene.

23

1   <u>Id.</u> at 673-74.

2   III.  Post-Trial Events -- Lovinsky Ricard

3      On November 7, 1990, shortly after Plaintiffs had been

4 convicted, Lovinsky Ricard was arrested, on a bench warrant, by

5 SFPD officers Lewis and Gittens, two members of the GTF who were

6 working on the Shannon murder with Hendrix and Sanders.  Purcell

7 Dec., Ex. 19, Lewis Depo. at 18, 31; Purcell Dec., Ex. 38, Lovinsky

8 Ricard's November 7, 1990 Police Interview at 2.  Ricard

9 voluntarily told them that he had shot Shannon.  <u>Id.</u> at 34.  Lewis

10 and Gittens read Ricard his <u>Miranda</u> warnings and questioned him

11 about the Shannon homicide.  <u>Id.</u> at 14.  The interview was audio-

12 taped.  Ricard stated that, on the night of the murder, he had been

13 hanging out, drinking with others and riding with friends in a

14 convertible.  <u>Id.</u> at 15.[7]  Ricard did not want to name the others

15 who were present, stating that he did not want them to be arrested

16 or involved in the case.  <u>Id.</u> at 17-18.  Ricard said that he had

17 started thinking about his friend Cheap Charlie, who had just been

18 killed, and he was talking about what he would do about it.  <u>Id.</u> at

19 3.  He had a shotgun with him.  <u>Id.</u>  He went with his friends in

20 the convertible to a Seven-Eleven store and there he decided to

21 join other people in the back of a pick-up truck.  <u>Id.</u> at 6.  He

22 saw a black car and he recognized the driver as one of the group

23 who he thought had killed Cheap Charlie.  <u>Id.</u>  A car chase began

24 and, from the back of the truck, Ricard shot at the black car.  <u>Id.</u>

25 _____

26     [7]At her July 24, 1992 police interview, Smith stated that, on
the night of the Shannon murder, she had been driving a convertible
with Ricard and two other passengers.  Purcell Dec., Ex. 47, Smith

27 Police Interview at 3-4, 68.

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

The driver threw the car in reverse and went backward.  Id.  Then
the driver of the truck threw the truck in reverse and drove
backward chasing the car.  Id.  During the chase, Ricard was
shooting at the car.  Id. at 6-7.  The driver ran the car up on the
curb and into the fence, and jumped out of the car and started
running.  Id. at 7.  Some of the people who had been chasing the
black car caught the driver and were beating him in a corner.  Id.
Ricard jumped out of the back of the truck with the gun and, when
he pointed the gun at Shannon, everybody cleared back and Ricard
shot him.  Id.  Then everybody scattered.  Id.  Ricard jumped back
in the truck and the truck and all the cars drove away.  Id. at 7-
8.  The gun he used had been stolen, so there was no possibility
that the police would find it.  Id. at 8.  Ricard stated that he
was confessing because he had been feeling bad that two of his
friends were going down for something he did and now he was trying
to do the right thing.  Id. at 13-14, 15.  Ricard stated that he
knew Tennison and Goff well and they were not at the scene of the
murder.  Id. at 15.  Ricard said the convertible he was originally
riding in that evening, before he got into the pick-up truck,
pulled up to the scene after the shooting was over.  Id. at 18.
Several times Lewis asked Ricard for the names of people who could
verify any part of his story; Ricard refused to name other people
because he didn't want to bring them into it.  Id. at 25-28.

At his 2001 deposition, Lewis testified that Ricard's
description of the car chase was consistent with everything else he
had heard about it, that during the course of the chase, the person
being chased had put his car in reverse and gone backwards for some

25

distance.  Purcell Dec., Ex. 19, December 3, 2001 Lewis Depo. at

65.  After Ricard confessed, Lewis believed that Ricard murdered

Shannon.  Id. at 82.  Lewis testified that he advised Hendrix and

Sanders that Ricard had confessed on tape and "they said they would

consider the information that I gave them through the interview and

it would be determined from there, from others other than myself,

how they would go further."  Id. at 86.  Lewis stated that he gave

the Inspectors a copy or the original of the audiotape, but not a

written transcript, so they would have to play and listen to the

tape to determine what was on it.  Id.  Lewis was sure he gave them

some kind of narrative regarding the content of the tape.  Id. at

88.

At his 2005 deposition, Lewis testified that on November 7,

1990, after he interviewed Ricard, he made a copy of the audiotape

of the interview.  Wong Dec., Ex. R, May 10, 2005 Lewis Depo. at

66.  Lewis was asked, "Once you concluded the Ricard interview and

you had the audiotape of it, what did you do with that tape?"  He

answered:

> My recall is that I made a copy of it and either put it
> in room 400, which is like the operation center for the
> police department, so when the different bureau chiefs or
> lieutenants come in they can forward that information to
> whomever in their unit needed it.  Or I would write a
> note -- and I recall having done this on occasion -- I
> don't remember that I did it on this occasion -- and
> either put it under the door so that they could get it
> first thing in the morning.  Because we work
> predominantly nights.

Id.

Then the following exchange took place:

Q: When you say "put it under the door," do you mean the
door to Inspectors Hendrix' and Sanders' office?

United States District Court

For the Northern District of California

A: The door to the homicide detail, yes.

Q: And that was where Inspector Hendrix and Sanders had their desks, in the homicide detail?

A: Yes.

Q: And is your recollection that you did this immediately after taking the confession?

A: That evening before I left the building, yes.

. . .

Q: Do you recall talking to Inspector Hendrix or Inspector Sanders about what Ricard had said during the November, 1990 interview?

A: The next day I believe I talked to them.

Q: What did you say?

A: "Did you hear the tape?"

Q: And were you talking to both Inspector Hendrix and Inspector Sanders or just one of them?

A: I don't recall, but I think it was Napoleon.

Q: And when you asked him "Did you hear the tape" what did he say?

A: As I recall, he said, "Yeah, I listened to it, but it was -- you know, your boy has got to come in and lay it all out.  He has got to do better than -- than this."

Q: So, he gave you the impression he had listened to the tape?

A: Yes, as I recall I believe so.

. . .

A: Or maybe I told him about the content of the tape.  I don't know that he sat and listened to the whole thing. Maybe I came away with that impression.  But I was excited about it.  I told him why.  And he said, you know --

Q: He made specific suggestions about additional information that he would like to see Ricard provide?

A: And he said that while it was a good interview, he was

27

1    still very vague on specifics.  And so he -- as I recall,
2    he told me that if he was going to do this then
     -- then he would be -- he would need a gun, named
     additional suspects, vehicles, or something tangible to
3    turn this thing around.

4    Id. at 66-68.

5        At his 2001 deposition, Sanders testified that he received the

6    tape of the Ricard confession within a day or two after it was

7    made.  Purcell Dec., Ex. 40, Sanders Depo. at 126.  Sanders stated

8    that "the first thing I did -- we did -- was compare the two tapes.

9    And they were diabolically [sic] opposed.  One, he had nothing to

10   do with it, and on this one he's -- in this interview, he's

11   confessing.  Further, in analyzing his statements in the November

12   7th statement, . . . there were just all kinds of unverifiable,

13   flawed facts in his case.  So with this, we wanted to talk to him

14   again.  And was -- and to talk to Mr. Lovinsky again.  But he was

15   then covered by an attorney, and he didn't want to talk anymore."

16   Id.  In answer to the question whether he withheld the copy of the

17   tape from Butterworth, Sanders replied, "No, this was something

18   that was paramount.  We got ahold [sic] of him right away and we

19   had to talk to him about it, told him we were investigating it."

20   Id.

21       In his June 2, 2005 declaration submitted in support of his

22   motion for summary judgment, Sanders states that he learned of

23   Ricard's taped confession from Butterworth in May, 1991.  Sanders

24   Dec. at ¶ 10.  At the time, Butterworth was involved in litigating

25   Tennison's motion for new trial and asked Sanders to investigate

26   the statements made by Ricard on the tape.  Id. at 10.  Sanders

27   states that he never received a copy of the tape from Lewis and

28                                    28

never had a copy in his possession.   Id.

     At his January 18, 2005 deposition, Hendrix testified that he learned of the Ricard confession from Sanders, but could not remember when Sanders told him about it.   Purcell Dec., Ex. 1, Hendrix Depo. at 57, 63.   Hendrix testified that he never listened to the audiotape of the confession.   Id. at 63.   Hendrix testified that he and Sanders were responsible for turning over evidence connected to the Shannon homicide to the district attorney because it was their case.   Id. at 64.   He testified that he never took any steps to turn the tape of Ricard's confession over to Butterworth, because it was never in his possession.   Id.   He stated that he felt it was Lewis and Gittens' responsibility to turn the tape over to Butterworth because they took the confession and made the tape. Id. at 67.   Hendrix felt angry at Lewis and Gittens for not calling Sanders and himself to conduct the Ricard interview, because the Shannon case was Sanders' and Hendrix' responsibility, and if there was a development in it, he and Sanders should have been contacted. Id. at 67, 70-71.   After he learned of the taped confession, Hendrix didn't care about the tape, he just wanted to find Ricard and he and Sanders took steps to try to locate him.   Id. at 67, 70, 72.   They located Ricard's father and a girl who was keeping company with Ricard and went to the places where Ricard usually hung out, on the street corners and up in the projects.   Id. Ricard's father told them that Ricard had left town and there was no sense in them looking for him.   Id. at 72-73.   Hendrix testified that he and Sanders tried to locate Ricard over a period of months. Id. at 73.   During this time Hendrix never informed Butterworth of

their efforts to locate Ricard.   Id.

In his June 2, 2005 declaration submitted in support of his motion for summary judgment, Hendrix states that he first became aware of Ricard's taped confession from Sanders who said that he had learned of it from Butterworth.  Hendrix Dec. at ¶ 10.  Hendrix states that he never had a copy of the Ricard taped statement in his possession.   Id.

Butterworth testifies that he first learned of Ricard's confession in May, 1991 when he ran into Lewis in the cafeteria in the Hall of Justice.  Butterworth Dec. at ¶ 23.  At that time, Butterworth was in the midst of the hearing on Tennison's motion for a new trial.   Id.  Lewis informed Butterworth that he had a tape-recorded interview with Ricard admitting that he killed Shannon.   Id.  Butterworth told Lewis that he did not have a copy of the audiotape and asked Lewis to give him a copy, which Lewis did.   Id.  Butterworth contacted Sanders and informed him of the taped Ricard confession.   Id.  Sanders responded that he was not aware of any statement in which Ricard admitted killing Shannon. Id.  Butterworth immediately informed Tennison's defense counsel of the taped statement, and he included it in his new trial motion. Id.  Butterworth asked Sanders to assist him in responding to the new trial motion; Hendrix was not available to work on it.   Id. Sanders did some follow-up work to check out some of the statements Ricard had made on the tape, such as visiting a store mentioned by Ricard to see what type of shotgun ammunition the store sold.   Id. After he reviewed Ricard's statement with Sanders, Butterworth concluded that Ricard's confession was not credible.   Id.

United States District Court

For the Northern District of California

Butterworth helped Sanders prepare a declaration regarding Ricard's confession, which he submitted to the court.  Id.

Very soon after the jury verdict against Tennison, Tennison heard from friends that Ricard might be implicated in the Shannon murder.  Wong Dec., Ex. E., Transcript of New Trial Motion at 132. Tennison gave this information to Adachi.  Id. at 142-43.  Adachi, eventually found Ricard and convinced him to make a videotaped confession, which he did anonymously with a hood over his head. Purcell Dec., Ex. 41, Adachi Dec. at ¶ 4.  Because the Public Defender's Office was representing Ricard in a separate matter, Adachi's supervisors informed him that he was required to withdraw from representing Tennison, with the new trial motion pending.  Id. While he was representing Tennison, no one from the district attorney's office or the SFPD informed him of Ricard's November 7, 1990 taped confession to police.  Id. at 6.  On March 1, 1991, Adachi was replaced as Tennison's counsel by LeRue Grim.  On May 17, 1991, the second-to-last day of the hearing on Tennison's new trial motion, Butterworth informed Grim of the Ricard tape. Melton, Goff's attorney, was not informed by anyone from the district attorney's office or the SFPD of the November 7, 1990 Ricard taped confession.  Melton Dec. at ¶ 6.

Tennison's motion for a new trial was based, in part, on the tape of Ricard's anonymous confession that Adachi had made.  Wong Dec., Ex. GG, October 8, 1990 California court of appeal decision in People v. Tennison, appeal no. A054353 at 5.  At the hearing on the motion, Adachi, based on his attorney-client obligations to Ricard, refused to disclose the identity of the videotaped

31

interviewee, but testified that he made the tape in conjunction with Tennison's case and he provided the tape to Tennison's new counsel.  Wong Dec., Ex. E, Transcript of New Trial Motion at 16 passim, 91-94, 102-03.  In order to authenticate the video-tape of the anonymous confession, Tennison and Adachi testified about how they found out that Ricard was involved in the Shannon murder.  Id. at 47-48, 133 passim.  Grim, Tennison's attorney at the new trial proceeding, explained that the testimony was not offered for the truth of the matter, but to show a cumulative, causal chain that led to Tennison's discussion with Adachi regarding Ricard.  Id. at 132.  Tennison stated that in the beginning of October, 1990, about a week after he was convicted, his friends, who thought he would be acquitted because they knew that he was not involved, told him that two people, Lavista Ricard and Luther Blue, were involved in the murder.  Id.  Tennison called Ricard from the county jail.  Id. at 133.  Ricard told Tennison that he had been among the people who had chased Shannon and that he had fired a shot at him.  Id. at 136.  Tennison asked Ricard to come forward and admit to being the shooter and Ricard agreed to speak to Tennison's lawyer.  Id. at 138.  About a week later, Tennison told Adachi about his conversation with Ricard.  Id. at 140.  In November, 1990, Adachi told Tennison that he'd called Ricard several times, but hadn't received an answer.  Id. at 141-42.  Tennison also asked his brother, Bruce Tennison, to speak to Adachi about tracking down Ricard.  Id. at 142.  Tennison met with Adachi later in November, 1990, and Adachi told him he had talked to Ricard over the phone and Ricard had admitted to the crime.  Id. at 142-43.  Adachi set

**United States District Court**
For the Northern District of California

up a meeting with Ricard, but Ricard failed to show up.  Id. at

143-44.  In about December, 1990, Tennison met Luther Blue, who was

also in jail.  Id. at 144.  Blue told Tennison that he had

witnessed the Shannon homicide and that he was willing to testify

to help Tennison, but when Adachi questioned Blue, he denied

knowing anything about the shooting.  Id. at 145-46.  Tennison

stated that Blue told him that homicide inspectors had interviewed

Ricard who made a taped statement admitting that he shot Shannon.

Id. at 170.  Blue also mentioned that a person named Chauntey White

was connected with the murder.  Id.  Tennison testified that in

November or December, 1990, his brother, Bruce Tennison, told him

that he had talked to Ricard and Ricard told Bruce that Ricard had

made a statement to the police admitting to the crime.  Id. at 205.

Adachi testified that Tennison had given him Ricard's name, address

and telephone number very soon after the verdict or even during the

trial.  Id. at 75.

The trial court denied Tennison's motion on the grounds that

the tapes of the two Ricard confessions were legally inadmissible

and, even if they were admissible, Ricard's statements contained so

many inconsistencies that they could not be considered to be

trustworthy.  People v. Tennison, appeal no. A05453 at 6.  The

appellate court affirmed.  Regarding the admissibility of Ricard's

confessions, the court stated that Tennison had "made no showing

that he had diligently attempted to obtain Ricard's attendance at

the hearing on the motion for new trial, or that he would be

legally unavailable to testify at a new trial, a prerequisite for

application of the declaration against interest exception [to the

hearsay rule].” Id. at 7.  Regarding the trustworthiness of the confession, the court stated,

> Ricard's refusal to provide the police or Adachi any names and his inability to account for the whereabouts of the gun undermine his credibility because his version of the incident cannot be corroborated.  Likewise the inconsistencies between his two statements, between his statements and the evidence at trial, and between his statements and appellant's testimony cast doubt on their trustworthiness.  For instance, Ricard stated that he fired once, but the medical evidence established two shots to the victim's body and witnesses referred to multiple gunshots. . . . Ricard stated that he came forward because 'two of my friends' were going down for the crime, but appellant testified he did not know Ricard, had never seen him, and had only first spoken with him on the telephone after the verdict.  Given such inconsistencies, the court did not err in determining Ricard's statements were untrustworthy and thus inadmissible.

Id. 7-8.

At the § 4900 hearing, Goff testified that, about three to four weeks after Shannon was shot, he heard rumors on the street that Ricard may have had something to do with the murder.  Wong Dec., Ex. F, Transcript of § 4900 Hearing at 579.  Goff had also heard rumors that the chase started at a Seven-Eleven store.  Id. at 578.  Goff testified that a month or two after the murder, he had been among a crowd of people who were listening to Ricard brag about shooting Shannon.  Id. at 580.  Goff assumed that Ricard was lying because he didn't think the real shooter would brag about it on the street.  Id. at 582.  Goff knew Ricard because they lived in the same neighborhood, but they weren't friends.  Id. at 636.  About a month after he was charged with committing the Shannon murder, Goff told Melton that he had heard Ricard brag about shooting Shannon and Melton replied that he would look into it.

34

1  Id. at 595.

2  IV. Plaintiffs' Claims

3      In their complaints, Tennison and Goff allege that Butterworth

4  participated in the suppression of material, exculpatory evidence,

5  and manufactured evidence by pressuring Pauline to retract her

6  recantation.  Tennison and Goff allege the following claims against

7  the Inspectors:  (1) they participated in the suppression of

8  material, exculpatory and impeachment evidence that probably would

9  have led to Tennison's and Goff's acquittal; and (2) they actively

10 solicited perjured testimony while deliberately ignoring and

11 failing to investigate exculpatory evidence.

12                      LEGAL STANDARD

13 I. Summary Judgment

14     Summary judgment is properly granted when no genuine and

15 disputed issues of material fact remain, and when, viewing the

16 evidence most favorably to the non-moving party, the movant is

17 clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

18 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

19 Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

20 1987).

21     The moving party bears the burden of showing that there is no

22 material factual dispute.  Therefore, the court must regard as true

23 the opposing party's evidence, if supported by affidavits or other

24 evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815

25 F.2d at 1289.  The court must draw all reasonable inferences in

26 favor of the party against whom summary judgment is sought.

27 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

28                              35

587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991), <u>cert. denied</u>, 502 U.S. 994 (1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. <u>Celotex</u>, 477 U.S. at 323.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that

United States District Court

For the Northern District of California

no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue.  UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991).  Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible."  Id.  This standard does not change merely because resolution of the relevant issue is "highly fact specific."  Id.

II. Constitutional Claims Under 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States."  Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983).  Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).  In order to state a claim under § 1983, Plaintiffs must allege two elements:  (1) the violation of a right secured by the Constitution or laws of the United States, and (2) the alleged violation was committed by a person acting under the color of State law.  West v. Atkins, 487 U.S. 42, 48 (1988)(citations omitted).

An individual defendant is liable for money damages under § 1983 only if the defendant personally participated in or

37

United States District Court

For the Northern District of California

otherwise proximately caused the unconstitutional deprivations of which the plaintiff complains. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988). To establish individual liability, a plaintiff must allege one of the following: (1) the defendant personally participated in or ordered the constitutional violation; (2) the defendant, acting in a supervisory capacity, failed to train properly or supervise personnel, resulting in the violation; (3) the defendant was responsible for an official policy or custom which caused the violation; or (4) the defendant knew of the violation and failed to prevent it. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home, 723 F.2d 675, 680 (9th Cir. 1984).

PRELIMINARY PROCEDURAL MATTERS

I. Motion To Strike

Citing Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991), Foster v. Arcata Assocs., 772 F.2d 1453, 1462 (9th Cir. 1985) and Radobenko v. Automated Equip. Corp., 520 F.2d 540, 543-33 (9th Cir. 1975), Plaintiffs move to strike Hendrix' and Sanders' declaration statements that they did not learn of the November 7, 1990 Ricard confession until May, 1991, on the ground that these statements contradict their prior deposition testimony. Hendrix and Sanders have not filed an opposition to this motion.

In Radobenko, the Ninth Circuit held that a party who had been examined at length by deposition could not create an issue of fact on a motion for summary judgment by submitting an affidavit contradicting his own prior testimony because this would greatly diminish the utility of summary judgment as a method for screening

38

United States District Court

For the Northern District of California

sham issues of fact.  Kennedy, 952 F.2d at 266 (citing Radobenko,

520 F.2d at 543-44)).  In Kennedy, the Ninth Circuit clarified that

the rule enunciated in Radobenko does not automatically dispose of

every case in which a contradictory affidavit is submitted to

explain portions of prior deposition testimony and that, before

striking a declaration, the district court must make a factual

finding that the contradiction was actually a sham.  Id. at 266-67.

     As explained above, at Sanders' 2001 deposition given in the

habeas corpus case, he stated that he received the information

about the November 7, 1990 Ricard confession within a day or two

after November 7, 1990 and that he immediately turned the tape over

to Butterworth.  In his June 2, 2005 declaration, Sanders states

that he first learned of the Ricard confession in May, 1991 from

Butterworth.  The statement in Sanders' declaration does not

explain or clarify his deposition testimony; it directly

contradicts it and its only purpose would be to create a sham

dispute of fact to survive summary judgment.  Therefore, the motion

to strike this statement is granted.

     At Hendrix' January 18, 2005 deposition, he testified that he

received the information about the Ricard confession from Sanders

sometime after November, 1990, and that after Sanders told him

about the confession, they spent months attempting to locate Ricard

to ask him questions about the Shannon homicide.

     In his June 2, 2005 declaration, Hendrix states that he

learned of the Ricard tape from Sanders, who had learned of it from

Butterworth.  Hendrix also testified that he did not investigate

the confession.

United States District Court

For the Northern District of California

Hendrix' declaration statement that he learned of Ricard's confession from Sanders does not contradict his prior deposition testimony; therefore it is not stricken.  However, his declaration statement that Sanders learned of the tape from Butterworth is inadmissible hearsay and it is stricken on this basis.  Hendrix' declaration statement that he did not investigate the confession directly contradicts his deposition testimony; it does not clarify or explain his testimony.  Therefore, this statement is stricken.

Plaintiffs also move to strike Sanders' declaration that he believed the Ricard confession to be false because gang members often confessed to crimes they didn't commit to create doubt about the original suspect's role in the crime.  Sanders Dec. at ¶ 12. Plaintiffs point to Sanders' 2001 deposition in the habeas case, where the question was put to him, "Did you ever have a gang member confess to a crime he didn't do?"  Sanders responded, "Confess to crime he didn't . . . no.  It's hard enough to get them on the crimes that they do."  Balogh Reply Dec., Ex. 63, Sanders 2001 Depo. at 96.  However, in a declaration dated June 24, 1991, submitted in Tennison's new trial motion, Sanders stated that Ricard's confession, "which is totally incapable of independent corroboration, does little more than represent an effort to confuse and pervert the criminal justice system . . . members of the gangs will often attempt to manipulate the system to their collective advantage, even after one of their friends has been convicted. . . .  They know that a completely uncorroborated, factually flawed statement, even if made to a police officer, cannot properly be the basis for a criminal prosecution."  Purcell Dec., Ex. 48, Sanders'

40

June 24, 1991 Dec. at 2-3.  Because Sanders made a statement in 1991 that was similar to the one he made in his 2005 declaration, the 2005 statement is not a sham to survive summary judgment. Therefore, Plaintiffs' motion to strike Sanders' statement about gang members' confessions is denied.

Plaintiffs' motion to strike is therefore GRANTED in part and DENIED in part.

II. Request To Submit Statement of Facts

In their reply brief, the Inspectors request leave to submit a statement of disputed and undisputed facts with citations to evidence, pursuant to Civil Local Rule 56-2(a).  They argue that this is necessary because there are many misstatements of facts in Plaintiffs' briefs.  A separate statement of facts is unnecessary: the Court looks at the evidence cited by the parties to support their arguments and determines the accuracy of the statements of fact in the briefs.  Therefore, the Inspectors' request to submit a separate statement of disputed and undisputed facts is DENIED.

III. Evidentiary Objections

The Inspectors object to statements in Plaintiffs' briefs as mischaracterizations of the evidence and object to various pieces of evidence.  The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence.  The Court will not discuss each objection individually.  To the extent that the Court has relied on evidence to which the Inspectors object, such evidence has been found admissible and the objections are overruled.

41

**United States District Court**
For the Northern District of California

IV. Effect of Habeas Corpus Order

Citing Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc., 204 F.3d 867, 877 (9th Cir. 2000), the Inspectors argue that the Court's August 26, 2003 Habeas Order has no preclusive effect in this action because the Inspectors were not parties to the habeas case and were not in privity with the respondent in the habeas case or the State of California.  Plaintiffs do not respond to this argument.

The Inspectors are correct that the doctrine of collateral estoppel that precludes the relitigation of issues previously decided requires that the parties in the second action be the same as or in privity with the parties in the prior proceeding.  The Inspectors also are correct that they were not in privity with the respondent in the habeas case and that the habeas respondent did not present a good deal of the evidence submitted by the Inspectors or make some of the arguments that the Inspectors make here.

Therefore, the Court concludes that the findings and conclusions in the Habeas Order do not have any preclusive effect on the issues in this case.  However, in certain instances, the facts and arguments addressed in the Habeas Order are identical to those presented here.  In those instances, the Court may reach the same conclusions it did in the Habeas Order.

DISCUSSION

In their separate motions, Tennison and Goff move for partial summary adjudication on the liability and causation elements of their claims that the Inspectors suppressed three pieces of material, exculpatory evidence:  (1) Ricard's taped confession;

42

(2) Smith's statements corroborating Ricard's confession; and

(3) the Inspectors' request for $2,500 from the SFPD's SWP to pay a

witness in the Shannon murder case.  Butterworth moves for summary

judgment on the grounds that he is absolutely or qualifiedly immune

from liability on all of Plaintiffs' claims.  The Inspectors move

for summary judgment on all of Plaintiffs' causes of action on the

grounds that: (1) there is no evidence that they violated

Plaintiffs' rights by suppressing material information; (2) there

is no evidence that they fabricated witness testimony; and (3) they

are either absolutely or qualifiedly immune from liability for all

alleged constitutional violations.

I. Butterworth's Motion for Summary Judgment

Butterworth argues that he is entitled to summary judgment

because at all relevant times he was acting in the role of a

prosecutor and thus is entitled to absolute immunity.  He argues,

in the alternative, that he is entitled to qualified immunity on

all claims.  Tennison's opposition addresses only Butterworth's

conduct in questioning Pauline on April 22, 23, and 24, 1990.

Goff's opposition addresses only Butterworth's failure to disclose

the Ricard confession to him.  Therefore, the Court grants

Butterworth's motion for summary judgment on all of Plaintiffs'

other claims.

A. The Questioning of Pauline

1. Absolute Immunity

"An official seeking absolute immunity bears the burden of

showing that such immunity is justified for the function in

question." Genzler v. Longanbach, 410 F.3d 630, 636 (9th Cir.

2005) (quoting <u>Burns v. Reed</u>, 500 U.S. 478, 486 (1991)).  The presumption is that qualified, rather than absolute, immunity is sufficient to protect government employees in the performance of their official duties.  <u>Milstein v. Cooley</u>, 257 F.3d 1004, 1008 (9th Cir. 2001) (citing <u>Burns</u>, 500 U.S. at 486-87).

A prosecutor performing an advocate's role is an officer of the court entitled to absolute immunity.  <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 272-73 (1993).  Prosecutors therefore are absolutely immune from liability for their conduct as "advocates" during the initiation of a criminal case and its presentation at trial.  <u>Id.</u>; <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430-31 (1976) (prosecutor entitled to absolute immunity from suit alleging that he knowingly used perjured testimony and suppressed material exculpatory evidence at trial); <u>Burns</u>, 500 U.S. at 490-91 & n.6 (prosecutors absolutely immune for their conduct before grand juries and in presenting evidence at probable-cause hearings for a search warrant).

Prosecutors are entitled only to qualified, not absolute, immunity when they perform administrative or investigatory, rather than advocacy, functions.  <u>Kalina v. Fletcher</u>, 522 U.S. 118, 122-31 (1997).  Thus, in determining immunity, the court examines the nature of the function performed, not the identity of the actor who performed it.  <u>Id.</u> at 127.  Absolute immunity requires that the activities at issue be "intimately associated with the judicial phase of the criminal process."  <u>Imbler</u>, 424 U.S. at 430.

Prosecutors are not acting as advocates, and therefore are not entitled to absolute immunity, before they have probable cause to

44

have anyone arrested.  <u>Buckley</u>, 509 U.S. at 274; <u>Herb Hallman</u>
<u>Chevrolet, Inc. v. Nash-Holmes</u>, 169 F.3d 636, 643 (9th Cir. 1999).
However, even after probable cause has been established,
prosecutors are absolutely immune only for quasi-judicial
functions, not investigatory or administrative actions.  <u>Broam v.</u>
<u>Bogan</u>, 320 F.3d 1023, 1030-31 (9th Cir. 2003); <u>Genzler</u>, 410 F.3d at
638.

    Activities in preparation for trial, such as the interview of
witnesses, may be investigatory or advocatory in nature.  <u>Genzler</u>,
410 F.3d at 638.  The timing of the prosecutor's conduct is a
relevant, but not determinative, factor.  <u>Id.</u> at 639-40.

    Tennison presents several grounds for his contention that
Butterworth was acting as an investigator when questioning Pauline
and thus is not entitled to absolute immunity.  First, citing
<u>Buckley</u>, 509 U.S. at 274, Tennison argues that Butterworth did not
have probable cause to believe that Tennison was involved in the
Shannon homicide when he questioned Pauline.  Tennison bases this
on the fact that the November 28, 1989 warrant for Tennison's
arrest was predicated upon Hendrix' affidavit in which Hendrix
swore that Pauline corroborated Masina's account of the shooting
incident.  <u>See</u> Balogh Reply Dec., Ex. 57, Arrest Warrant for
Tennison and Hendrix Affidavit.  Tennison argues that Hendrix'
affidavit was false because Pauline's statement to the police was
inconsistent with Masina's story.

    Pursuant to <u>Buckley</u>, 509 U.S. at 274, if at the time
Butterworth interviewed Pauline probable cause to arrest Tennison
was lacking, Butterworth was acting as an investigator, and not as

45

an advocate.

The Court concludes that on April 22, 1990, there was probable cause to arrest Tennison.  As noted by Butterworth, the information in Hendrix' affidavit regarding Pauline's corroboration of Masina's story, which Tennison states was false, was presented to the court in both Tennison's and Goff's probable cause hearings.  See Achiron Reply Dec., Ex. D, Tennison Preliminary Hearing; Ex. C, Goff Preliminary Hearing.  At Tennison's preliminary hearing only Masina testified, but the court heard testimony that Pauline had recanted and that Masina had spoken to her after she recanted.  At Goff's preliminary hearing, Butterworth called only Masina, but Goff called Pauline as a defense witness.  Pauline was examined on the discrepancies between her testimony and Masina's, her recantation and her telephone conversation with Masina regarding her recantation.  The court, in both cases, found probable cause.

Because the accuracy of the information contained in Hendrix' arrest warrant affidavit was tested in court and the court found probable cause, Tennison's argument that Hendrix' affidavit was insufficient to establish probable cause to arrest is unpersuasive.

Tennison next argues that, even if there was probable cause for his initial arrest, there was no probable cause after Pauline recanted on April 22, 1990.  Tennison cites Butterworth's deposition at p.p. 327-328 to establish that, after Pauline recanted, Butterworth conceded that he needed Pauline to establish probable cause.  However, Butterworth did not concede this at his deposition.  Butterworth stated that he had to cancel the preliminary hearing scheduled for April 23, 1990 because Pauline's

United States District Court

For the Northern District of California

recantation "raised some question in my mind as to how valuable a witness she was going to be and whether I wanted to rely upon her for a probable cause finding. And if she were to testify at a preliminary hearing and recant, the only way I would have gotten a holding would be to have impeached her with her prior inconsistent statement. And I wasn't comfortable doing that, given the record of the 707 hearing. . . . I know that I wasn't comfortable proceeding in the face of her recantation. And I didn't have any other witnesses who were in a position to make an identification, so it wasn't really a difficult call at that point [to cancel the preliminary hearing]." Wong Dec., Ex. O, Butterworth Depo. at 327-328. Thus, Butterworth did not cancel the preliminary hearing because he believed probable cause was lacking, but because Masina was unavailable as a witness. When Masina was available as a witness, she alone testified at Tennison's rescheduled probable cause hearing. Tennison's argument that probable cause was extinguished by Pauline's recantation is not persuasive.

Tennison argues that even if probable cause did exist during Butterworth's questioning of Pauline, Butterworth was acting as an investigator because his purpose in interviewing Pauline was to persuade Pauline to change her story so that it would be consistent with Masina's.

As discussed in <u>Gensler</u>, 410 F.3d at 639, timing is an important element in determining whether the prosecutor is engaging in investigatory police activity or acting as a prosecutor. Here, the timing weighs in favor of concluding that Butterworth was acting as a prosecutor rather than an investigator. When Pauline

came to meet with Butterworth on April 22, 1990, the judicial proceedings against Tennison were underway.  The section 707 hearing regarding Tennison was held in March and April, 1990, with Pauline as a witness.  Tennison was arrested on April 5, 1990 and his preliminary hearing was set for April 23, 1990.  That Butterworth met with Pauline immediately before Tennison's preliminary hearing indicates that Butterworth was meeting with her in his role as a prosecutor marshaling evidence, not as an investigator looking for clues and evidence to establish probable cause.

Tennison argues that after Pauline recanted and Butterworth continued interviewing her, his questioning was investigative in nature and coerced her to change her testimony.

Intimidating and coercing a witness to change her testimony are not advocacy and are not entitled to absolute immunity.  Moore v. Valder, 65 F.3d 189, 194 (D.C. Cir. 1996) (quoted with approval in Gensler, 410 F.3d at 638).  Intimidating a witness to change testimony is "a misuse of investigative techniques legitimately directed at exploring whether witness testimony is truthful and complete and whether the government has acquired all incriminating evidence."  Id.

Although Pauline testified that Butterworth, as well as Hendrix and Masina, told her what to say at the trial, she explained that Butterworth communicated this to her by not wanting to hear her recantation, by not listening to her.  Although she stated that Butterworth yelled at her, she also indicated she interpreted Butterworth's behavior toward her to be like a parent

United States District Court
For the Northern District of California

talking to a child.  Pauline's testimony does not provide evidence that Butterworth coerced or intimidated her.

Taking the evidence in the light most favorable to Plaintiffs, Plaintiffs have failed to raise a triable issue of material fact that Butterworth was not acting in his capacity as prosecutor at all times during his interaction with Pauline on April 20 through April 22, 1990 and thus is entitled to absolute immunity. Therefore, Butterworth's motion for summary judgment on Tennison's claim regarding Pauline's interviews on April 20 through April 22, 1990 is GRANTED.  Nonetheless, the Court discusses whether, even if Butterworth was not acting as a prosecutor, but was acting as an investigator, he is entitled to qualified immunity.

2. Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The threshold question is whether, if all factual disputes were resolved in favor of the party asserting the injury, the evidence would show the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  Id.  On the other hand, if a violation could be made out on the allegations, the next step is to ask whether the constitutional right in issue was clearly established.  Id.  The

United States District Court
For the Northern District of California

question here is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Id. If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  Id.

The Ninth Circuit engages in a two-part test to determine if the right was clearly established at the time of the allegedly impermissible conduct.  Franklin v. Fox, 312 F.3d 423, 437 (9th Cir. 2002).  First, it must be determined if the law that governs the official's conduct was clearly established.  Id.  It is not necessary that a prior decision rule "the very action in question" unlawful for a right to be clearly established.  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Indeed, some wrongs are self-evident and a "right can be clearly established on the basis of 'common sense.'"  Lee v. Gregory, 363 F.3d 931, 935 (9th Cir. 2004).  The plaintiff bears the burden of proving that the right was clearly established at the time of the allegedly impermissible conduct.  Maraziti v. First Interstate Bank, 953 F.2d 520, 523 (9th Cir. 1992).

The next question is whether, under that clearly established law, a reasonable official could have believed his conduct was lawful.  Act Up!/Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir. 1993).  The defendant bears the burden of establishing that his or her actions were reasonable, Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1450 (9th Cir. 1995), and the defendant's good faith or subjective belief in the legality of his or her actions is irrelevant.  Alford v. Haner, 333 F.3d 972, 978-79 (9th Cir. 2003).

50

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

Thus, the Court must decide first whether, if the facts Plaintiffs allege are true, Butterworth committed a constitutional violation.  If so, the Court must then decide if the law was clearly established at the time of the conduct at issue, and if so, whether Butterworth's conduct was objectively reasonable.

Tennison contends that Butterworth's conduct in regard to Pauline violated his constitutional right to be free from criminal charges based on deliberately fabricated false evidence.

Individuals have a constitutional due process right to be free from criminal charges based upon deliberately fabricated false evidence.  <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (<u>en banc</u>).  To prevail on this claim, a plaintiff, at a minimum, must show that (1) the officer continued his investigation despite the fact he knew or should have known that the suspect was innocent or (2) the officer used investigative techniques that were so coercive and abusive that he knew or should have known that they would yield false information.  <u>Id.</u> at 1076; <u>Cunningham v. Perez</u>, 345 F.3d 802, 811-12 (9th Cir. 2003) (that officer continued to interview suspected child sex abuse victims after they initially denied abuse not so coercive or abusive that he knew or should have known he would receive false information).  There is no constitutional right to have witnesses interviewed in a particular manner or to have the investigation carried on in a particular way.  <u>Devereaux</u>, 263 F.3d at 1075.  Therefore, suggestive interview tactics alone do not amount to a constitutional violation.  <u>Gausvik v. Perez</u>, 345 F.3d 813, 817 (9th Cir. 2003) (officer's continued questioning of alleged sexual abuse victims after victims initially

1  denied abuse and telling alleged victim she could not leave until
2  she admitted abuse not so coercive and abusive that officer knew or
3  should have known that he would receive false information).

4      In regard to the first <u>Devereaux</u> prong, after Pauline recanted,
5  it was incumbent upon Butterworth to gather information to determine
6  whether Pauline or Masina was being truthful.  Furthermore, although
7  Pauline recanted, it does not necessarily follow that, on this
8  basis, Butterworth knew or should have know that Tennison was
9  innocent.  As noted above, Butterworth dismissed Tennison's case
10 after Pauline's recantation because Masina, the only other witness,
11 was in Samoa, and thus was not available to testify at Tennison's
12 preliminary hearing, which was scheduled for the next day.  Because
13 Pauline never stated that she saw Goff at the crime scene, she was
14 not needed as a witness at Goff's preliminary hearing, and her
15 recantation was not relevant to his case.  Plaintiffs have produced
16 no evidence to demonstrate that Butterworth knew or should have
17 known that Tennison was innocent at that point and should not have
18 continued investigating.  Thus, the first <u>Devereaux</u> prong does not
19 apply.

20     In regard to the second <u>Devereaux</u> prong, the evidence shows
21 that when Pauline recanted, Butterworth raised his voice and
22 confronted her.  However, Pauline testified that Butterworth's
23 frustration with her reminded her of how a parent would reprimand a
24 child and that Butterworth never told her what to say.  Furthermore,
25 Butterworth's contact with Pauline was relatively brief.  He met
26 with her for approximately half an hour on April 22nd, half an hour
27 on April 23rd and a few minutes on April 24th.  Almost the entire

28                              52

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   interview on April 23rd was recorded and nothing in the interview

2   was coercive.  Therefore, assuming the facts Tennison alleges are

3   true, and taking them in the light most favorable to Tennison, the

4   Court finds that Tennison has failed to show that Butterworth

5   violated his constitutional right to be free from being charged on

6   the basis of deliberately fabricated evidence.  Therefore,

7   Butterworth is entitled to summary judgment on the basis of

8   qualified as well as absolute immunity on this claim.

9       Even if Tennison had established a constitutional violation,

10  Butterworth would be entitled to qualified immunity.  At the time of

11  the events at issue, the law was clearly established.  However, a

12  reasonable person could have believed that the actions taken by

13  Butterworth, under the circumstances, were lawful.

14      Thus, summary judgment is GRANTED in Butterworth's favor on

15  Tennison's claim on the basis of qualified as well as absolute

16  immunity.

17      D. Failure to Provide Ricard Confession to Goff

18      Butterworth argues that he is entitled to absolute

19  prosecutorial immunity for his failure to turn Ricard's confession

20  over to Goff after Goff's conviction.  Relying on Houston v. Partee,

21  978 F.2d 362, 367 (7th Cir. 1992), Goff argues that Butterworth is

22  not shielded by absolute immunity because he was no longer involved

23  in Goff's prosecution when he learned of the Ricard confession

24      A prosecutor may be absolutely immune for post-conviction

25  conduct, but only if the conduct is an exercise of prosecutorial

26  discretion, and is not purely investigatory or administrative.

27  Broam, 320 F.3d at 1030-31; see Carter v. Burch, 34 F.3d 257 (4th

28                                      53

Cir. 1994) (upholding absolute immunity for prosecutor who withheld exculpatory evidence while handling defendant's post-conviction motions and direct appeal).

Butterworth argues that, on May 17, 1991, the date he became aware of the Ricard confession, he was opposing Tennison's motion for a new trial and therefore was acting as a prosecutor.  This may be true in regard to Tennison's post-conviction proceedings, but it does not establish that Butterworth was acting as a prosecutor in regard to Goff's post-conviction proceedings.  The cases against Tennison and Goff were consolidated for trial, but the post-trial proceedings were litigated separately:  Goff's post-conviction new trial motion was filed on October 19, 1990; it was denied on October 31, 1990; on August 9, 1991, he filed an opening brief in his direct appeal of his conviction.  Because no post-conviction proceedings were pending in the trial court in Goff's case at the time Butterworth received the tape of Ricard's confession, Butterworth was not acting as a prosecutor in regard to Goff.  Because the Attorney General represents the people of the State on appeal, even though Goff's appeal was pending, Butterworth would not have been involved in it.

In Houston, the plaintiffs were convicted of committing the gang-related murder of Ronnie Bell.  Houston, 978 F.2d at 363.  While the plaintiffs' appeals were pending, certain State and federal prosecutors, including the one who had prosecuted the plaintiffs, learned during an investigation of the gang's activities that the Bell murder had been committed by three other individuals, not by the plaintiffs.  Id. at 364.  None of the prosecutors

United States District Court

For the Northern District of California

disclosed this information to the plaintiffs or their attorneys, even though they knew it was relevant to the plaintiffs' pending appeals. Id. Four years after the plaintiffs' conviction, the plaintiffs' attorneys found out about the exculpatory evidence on their own and filed post-conviction petitions which were granted. Id. at 363, 365. The plaintiffs sued the prosecutors. The defendant prosecutors had not been involved in the plaintiffs' appeals. Id. at 366. The prosecutors asserted absolute immunity on the plaintiffs' civil § 1983 claims against them on the ground that absolute immunity attached during the plaintiffs' prosecution and continued indefinitely. Id. at 365-66. The court rejected this argument and concluded that, at the time the defendant prosecutors learned about the exculpatory evidence, they were functioning as investigators, not as prosecutors, and thus were not entitled to absolute immunity. Id. at 367.

Butterworth argues that Houston is distinguishable because the prosecutors in that case were involved in a new investigation that led to the exculpatory information. Butterworth points out that he was not acting as an investigator, but learned of the exculpatory evidence in his role as prosecutor in Tennison's case.

This argument is unavailing because, even if he was not acting as an investigator, neither was he acting as a prosecutor on Goff's case. Accordingly, Butterworth's motion for summary judgment based upon absolute immunity is DENIED. Butterworth does not move for summary judgment based on qualified immunity.

55

II. Plaintiffs' and Inspectors' Cross Motions for Summary
    Judgment on § 1983 Claims Based on <u>Brady</u> Violations

Plaintiffs argue that they are entitled to summary adjudication that the Inspectors deprived them of due process by violating their <u>Brady</u> rights, and that this caused them damage. The Inspectors argue that they are entitled to summary judgment on the ground that there is no evidence that they violated Plaintiffs' constitutional rights and, if they did, they are absolutely or qualifiedly immune from liability.

A. Legal Standard for § 1983 Claims Based on <u>Brady</u> Violation

In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> The government has a duty to disclose <u>Brady</u> material even if the defense fails to ask for it. <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976). The duty under <u>Brady</u> encompasses impeachment evidence as well as exculpatory evidence. <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). The government's promise of a benefit to a witness must be disclosed under <u>Brady</u>. <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).

In the criminal context, "[t]here are three components of a true <u>Brady</u> violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

**United States District Court**
For the Northern District of California

<u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id.</u> at 682.  The evidence need not be sufficient affirmatively to prove the defendant innocent; it need only be favorable and material.  <u>Gantt v. Roe</u>, 389 F.3d 908, 912 (9th Cir. 2004).  Materiality is measured in terms of the collective effect of the suppressed material, not item by item.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 436 (1995).

> If the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.  On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt.

<u>Agurs</u>, 427 U.S. at 112-13.

The obligation to disclose under <u>Brady</u> "is the obligation of the government, not just the obligation of the prosecutor." <u>United States v. Blanco</u>, 392 F.3d 382, 393 (9th Cir. 2004).  The prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995).  A prosecutor's duty under <u>Brady</u> necessarily requires the cooperation of other government agents who might possess <u>Brady</u> material.  <u>Blanco</u>, 392 F.3d at 388.  Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. <u>Id.</u> at 393-94.

**United States District Court**
For the Northern District of California

In the criminal context, there is no intent requirement to establish a _Brady_ claim; whether non-disclosure was negligent or by design, it is the responsibility of the prosecutor.  _Brady_, 373 U.S. at 87.

The parties agree that to establish a civil rights claim based upon a _Brady_ violation, the plaintiff must establish that the defendant intended to violate the plaintiff's constitutional right. However, they disagree on the level of intent that must be established.  Citing _Cunningham v. City of Wenatchee_, 345 F.3d 802, 812 (9th Cir. 2003), the Inspectors argue that bad faith must be shown and Plaintiffs argue that intent to violate a constitutional right is all that is required.

_Cunningham_ was a civil rights case based, among other things, on the defendants' failure to preserve and gather evidence that might have exonerated the plaintiff in his criminal case.  _Id._  The Inspectors argue that _Cunningham_ addressed a _Brady_ claim, pointing to the court's cursory summary in the beginning of the opinion that the complaint alleged that the defendants concealed exculpatory evidence.  _See id._ at 806.  However, in its analysis of this claim, the court described it as the defendants' failure to preserve and gather potentially exculpatory evidence by failing to document interrogations, failing to keep a record of witnesses' statements and failing to gather physical evidence.  _Id._ at 812.  The court then analyzed the claim under _Arizona v. Youngblood_, not _Brady_.  _Id._

The Supreme Court in _Arizona v. Youngblood_, 488 U.S. 51 (1988), distinguished the claim before it, that the government lost evidence that could have been exculpatory, from a _Brady_ claim, concluding

that a <u>Youngblood</u> claim, unlike a <u>Brady</u> claim, requires a showing of bad faith. <u>Youngblood</u>, 488 U.S. at 57. The Supreme Court explained:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in <u>Brady</u>, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

<u>Id.</u>

Therefore, <u>Cunningham</u> does not support the Inspectors' contention that the Ninth Circuit requires bad faith to establish a § 1983 claim based on a <u>Brady</u> violation.

The Inspectors also rely on <u>Daniels v. Williams</u>, 474 U.S. 327 (1986), which held that "the Due Process Clause is simply not implicated by a <u>negligent</u> act of an official causing unintended loss of or injury to life, liberty, or property." <u>Id.</u> at 328 (emphasis in original). However, <u>Daniels</u> did not require bad faith for a due process violation, it simply required more than negligence.

Circuit courts are divided on the question of whether a plaintiff must show bad faith to establish a civil rights claim based on a <u>Brady</u> violation. <u>Compare</u> <u>McMillian v. Johnson</u>, 88 F.3d 1554, 1567 (11th Cir. 1996) (in a § 1983 action, holding that investigators have a duty to disclose under <u>Brady</u>, irrespective of good or bad faith) <u>with</u> <u>Jean v. Collins</u>, 221 F.3d 656, 660 (4th Cir. 2000) (<u>en banc</u>) (in a § 1983 action, affirming, by an equally divided court, district court dismissal of complaint on ground that it merely alleged negligent conduct on the part of defendants and

that bad faith was required to hold police officers liable for due process violations); and <u>Villasana v. Wilhoit</u>, 368 F.3d 976, 980 (8th Cir. 2004) (in a § 1983 action, holding that bad faith required in <u>Brady</u> claims against law enforcement officials other than prosecutor).

Because neither the Supreme Court nor the Ninth Circuit has addressed this issue, this Court must decide whether police investigators are civilly liable for <u>Brady</u> violations only if they act in bad faith.

Based upon the fact that <u>Brady</u> makes the non-disclosure of exculpatory evidence a violation of the Due Process Clause irrespective of the good or bad faith of the non-disclosing officer, this Court concludes that bad faith is not required to establish a civil <u>Brady</u> violation. Based upon <u>Daniels</u>, 474 U.S. at 331, which held that a due process violation requires only a deliberate decision on the part of a government official to deprive a person of life, liberty or property, the Court concludes that, to prove a § 1983 claim based on <u>Brady</u> against the Inspectors, Plaintiffs must establish only that they deliberately withheld exculpatory evidence from Butterworth.

B. Suppression of Ricard Confession

There is no dispute that the November 7, 1990 Ricard confession was exculpatory. The Inspectors argue that Plaintiffs' <u>Brady</u> claim based on the Ricard confession fails because the Inspectors lacked the requisite intent to deprive Plaintiffs of a constitutional right, because Plaintiffs knew of Ricard's involvement and because the confession was not material in that it was inadmissible.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1          1. Inspectors' State of Mind

2      Questions involving state of mind are generally issues of fact

3 that are inappropriate for summary judgment.  <u>Braxton-Secret v. A.H.</u>

4 <u>Robins Co.</u>, 769 F.2d 528, 531 (9th Cir. 1985).

5      The Inspectors point out that there is no dispute that they

6 first learned about Ricard's confession second-hand, after

7 Plaintiffs' convictions, not as a result of their own investigation,

8 and that there is no evidence that they took any action to hide the

9 confession.  They argue that this establishes that they had no

10 intent to deprive Plaintiffs of a fair trial by failing to inform

11 Butterworth of the confession.  Plaintiffs contend that the

12 Inspectors' knowledge of the Ricard confession and their failure to

13 inform Butterworth of it is sufficient to show that the Inspectors

14 intentionally withheld it.

15      Disputed issues of material facts regarding whether the

16 Inspectors acted intentionally prevent the granting of summary of

17 adjudication of this issue to either party.  In Plaintiffs' favor is

18 the evidence that the Inspectors learned of the Ricard confession

19 soon after it was made and did not turn it over to Butterworth.

20      However, the Inspectors' failure to turn over the tape to

21 Butterworth may have been a negligent, rather than an intentional,

22 act.  There is some evidence that the Inspectors did not intend to

23 deny Plaintiffs the use of the tape.  The Inspectors may have

24 thought, as Hendrix stated in his deposition, that Lewis or Gittens

25 would deliver the tape to Butterworth.  Further, the Inspectors

26 investigated the confession, which could be found inconsistent with

27 an intent to conceal it.  Finally, there is no evidence that the

28

Inspectors took any affirmative acts to conceal the confession.

2. Plaintiffs' Knowledge of Ricard's Involvement

Citing United States v. Dupuy, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985) and United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991), the Inspectors argue that Plaintiffs' knowledge of Ricard's alleged involvement in the Shannon murder precludes their Brady-based § 1983 claim.

"Where defendants had within their knowledge the information by which they could have ascertained the supposed Brady material, there is no suppression by the government." Dupuy, 760 F.2d at 1502 n.5; Aichele, 941 F.2d at 764 (same). If the government provides to the defense the means of obtaining the exculpatory evidence, there is no Brady violation. Dupuy, 760 F.2d at 1502, n.5. A defendant cannot claim a Brady violation if his counsel was "aware of the essential facts enabling him to take advantage of any exculpatory evidence." United States v. Shaffer, 789 F.2d 682, 690 (9th Cir. 1986); see, e.g., United States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (where government discloses all information necessary for defense to discover alleged Brady material on its own, government is not guilty of suppressing evidence). "Any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." Dupuy, 760 F.2d at 1502, n.5 (quoting Giles v. Maryland, 386 U.S. 66, 96 (1967) (White, J., concurring)).

However, the availability of particular information through the defendant himself does not negate the government's duty to disclose. United States v. Howell, 231 F.3d 615, 625 (9th Cir. 2000).

62

United States District Court

For the Northern District of California

"Defendants often mistrust their counsel, and even defendants who cooperate with counsel cannot always remember all of the relevant facts or realize the legal importance of certain occurrences." Id. Therefore, defense counsel is entitled to plan trial strategy on the basis of full disclosure by the government, regardless of the defendant's knowledge or memory of the disclosed information. Id.

The Inspectors point to statements made by Tennison at the hearing on his motion for new trial and statements made by Goff at the § 4900 hearing showing that Plaintiffs knew of Ricard's involvement in the murder before the Inspectors did.

Tennison's testimony at the hearing on his motion for new trial indicates that, at least five months before the hearing, he had heard of Ricard's involvement with the Shannon murder and shortly thereafter heard that Ricard had made a taped confession to the police. Tennison testified that he told Adachi that he knew Ricard had committed the crime, but it is not clear that he told Adachi that he had heard that Ricard had confessed to the police on tape. Goff's testimony at the § 4900 hearing indicates that he had heard Ricard brag about shooting Shannon and had told Melton this very soon after he had been charged with the murder. There is no evidence that Goff or Melton knew that Ricard had given a taped confession to the police.

Thus, the evidence shows that Plaintiffs and their attorneys suspected that Ricard was the shooter, before the trial in Goff's case and before the new trial proceeding in Tennison's case. However, it is not clear whether the attorneys knew of Ricard's taped confession to the police. The evidentiary value of Ricard's

taped confession to the police, after being <u>Mirandized</u>, surpasses any evidence that Plaintiffs could have given about their knowledge of Ricard's involvement.

Disputed issues of material facts prevent summary adjudication for either side on the issue of whether the extent of Plaintiffs' attorneys' knowledge of Ricard's involvement excused the prosecution from disclosing the tape.

### 3. Admissibility of the Ricard Confession

The Inspectors move for summary adjudication that, even if they intentionally failed to inform Butterworth of Ricard's confession, the confession was not material because it was inadmissible hearsay.

To support a claim under <u>Brady</u>, the withheld information must be material. <u>Brady</u>, 373 U.S. at 87. To be material, the withheld information, or evidence acquired through it, must be admissible. <u>United States v. Kennedy</u>, 890 F.2d 1056, 1059-60 (9th Cir. 1989).

The Inspectors point out that the confession was not admitted at the hearing on Tennison's motion for new trial because the confession was hearsay and Tennison's attorney did not establish that Ricard was unavailable to testify, as required for the declaration-against-interest exception to the hearsay rule. The Inspectors further argue that, even if Tennison's attorney had been able to show Ricard was unavailable, the court of appeal found that Ricard's confession was not sufficiently trustworthy to have qualified as a declaration against interest.

Plaintiffs respond that the trial court and the court of appeal found Ricard's confession to be inadmissible and untrustworthy because the courts did not have a full factual record before them.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    In favor of Plaintiffs' argument, at the time the trial court
2    and the court of appeal made their decisions that Ricard's
3    confession to the police was inadmissible and unreliable, Smith's
4    corroborating statements were not part of the record.  In addition,
5    if the confession had been turned over to Plaintiffs in a timely
6    manner, Adachi's interview of an anonymous person would not have
7    been introduced into evidence to confuse matters.  However, as noted
8    by the Inspectors, Ricard's confession suffered from internal
9    inconsistencies and, therefore, the courts might have found it
10   inadmissible even with Smith's statements and without the anonymous
11   confession.

12   The Court finds that disputed issues of material fact preclude
13   a determination of whether the State courts would have found
14   Ricard's confession admissible if all relevant facts had been timely
15   disclosed.  Therefore, the cross-motions for summary adjudication of
16   the issue of admissibility of the confession are DENIED.

17   In summary, based upon disputed issues of material facts as
18   discussed above, the cross-motions for summary adjudication of
19   whether the Inspectors violated Plaintiffs' due process rights under
20   Brady are DENIED.

21   The Inspectors argue that even if they committed a
22   constitutional violation, they are absolutely or qualifiedly immune
23   from liability.

24        4. Absolute Immunity

25   Peace officers and other investigators are protected by
26   absolute immunity when performing prosecutorial or quasi-judicial
27   functions, typically by assisting the prosecutor to prepare the case

28                                    65

United States District Court

For the Northern District of California

1  after probable cause for arrest has been established. KRL v. Moore,

2  384 F.3d 1104, 1113 (9th Cir. 2003).  As noted above, the absolute

3  immunity inquiry is focused on the nature of the function performed,

4  not the identity of the actor who performed it.  Forrester v. White,

5  484 U.S. 219, 229 (1988).

6      The Inspectors argue that they were not acting in an

7  investigative capacity in November, 1990, when Ricard confessed,

8  because the investigation had long ended, the Inspectors' only role

9  at that time was to assist Butterworth in his duties as a

10  prosecutor, and Plaintiffs had already been convicted.  However,

11  these facts do not end the inquiry.  As stated in Gensler, 410 F.3d

12  at 639, timing is relevant, but is not dispositive of the

13  classification of the defendant's activity.

14      At his deposition, Sanders testified that he received the

15  Ricard confession within a day or two after it was made, immediately

16  began investigating it and informed Butterworth of the

17  investigation.[8]  At his deposition, Hendrix testified that he

18  learned of the Ricard confession from Sanders, that they immediately

19  took steps to locate Ricard, and that he never informed Butterworth

20  of the confession.[9]  Butterworth testified that he never learned

21  about the Ricard confession from the Inspectors; instead he was

22  informed about it by Lewis, whom he happened to meet accidentally in

23  the cafeteria, months after it had been given.

24  ─────────────────────

25      [8]Sanders' inconsistent statement in his declaration that he
    first learned of Ricard's confession from Butterworth has been
26  stricken.

27      [9]Hendrix' inconsistent statement in his declaration that he
    did not investigate the confession has been stricken.

28
                                66

**United States District Court**
For the Northern District of California

1   Thus, their own testimony leads to the conclusion that the

2   Inspectors were acting in an investigative capacity after they

3   learned of the Ricard confession, not in a quasi-judicial or

4   prosecutorial capacity.  Accordingly, absolute immunity does not

5   shield the Inspectors from <u>Brady</u> liability for withholding the

6   Ricard confession.  The Inspectors' motion for summary judgment on

7   this ground is DENIED.

8           (2) Qualified Immunity

9               (a) Clearly Established Law

10   At the time the Inspectors learned of Ricard's November, 1990

11   confession to the police, the law regarding the constitutional duty

12   of law enforcement officials to turn over exculpatory evidence was

13   clearly established.  The seminal Supreme Court cases establishing

14   this duty were decided in 1963 and 1976.  <u>See</u> <u>Brady v. Maryland</u>, 373

15   U.S. at 87; <u>Agurs</u>, 427 U.S. at 107.

16   Citing <u>Broam v. Bogan</u>, 320 F.3d 1023, 1032 (9th Cir. 2003), the

17   Inspectors argue that there was no clearly established law that a

18   police officer has a legal duty to investigate and provide post-

19   conviction, second-hand information to the prosecution or the

20   defense.

21   In <u>Broam</u>, the court stated that once probable cause to arrest

22   has been established, a law enforcement officer has no

23   constitutional duty to investigate independently every claim of

24   innocence, whether the claim is based on mistaken identity or lack

25   of the requisite intent.  <u>Id.</u>  However, the court did not hold, as

26   the Inspectors argue, that a law enforcement officer has no

27   constitutional duty to turn over to the prosecution material

28

exculpatory evidence in his possession.  In fact, Broam indicated

the opposite, that "an officer is not entitled to a qualified

immunity defense, however, where exculpatory evidence is ignored

that would negate a finding of probable cause."  Id.  The Ninth

Circuit has also stated:

> There is no ambiguity in our law.  The obligation under
> Brady and Giglio is the obligation of the government, not
> merely the obligation of the prosecutor. . . .
> 'Exculpatory evidence cannot be kept out of the hands of
> the defense just because the prosecutor does not have it,
> where an investigating agency does.'

Blanco, 392 F.3d at 393-94 (internal citations omitted).

Relying on Villasana, 368 F.3d at 979 (citing Imbler v.

Pachtman, 424 U.S. 409, 427 (1976)), the Inspectors next argue that,

because only the prosecutor has a duty to disclose evidence to the

defense, Plaintiffs cannot seek § 1983 damages for an alleged Brady

violation from non-prosecutors who do not have absolute

prosecutorial immunity.

The Inspectors mischaracterize the holding of Villasana.

Villasana did not hold that investigators cannot be civilly liable

for a Brady violation; it addressed the standard that should apply

to such claims.  Id. at 980.  Courts have held investigators liable

for failing to disclose material exculpatory evidence to the

prosecutor.  See McMillian v. Johnson, 88 F.3d 1554, 1567 (11th Cir.

1996) (although investigators have no Brady obligation to turn over

exculpatory evidence to the defense, they have a duty, under Brady,

to turn over such evidence to the prosecutor); Newsome v. McCabe,

256 F.3d 747, 752 (7th Cir. 2001) (under a qualified immunity

analysis, concluding that it was clearly established in 1979 and

68

1  1980 that police could not withhold from prosecutors exculpatory

2  information); <u>Jones v. City of Chicago</u>, 856 F.2d 985, 993 (7th Cir.

3  1988) (in § 1983 case, upholding jury verdict against defendant

4  police officers on ground that jury could have found defendants

5  concealed from prosecutors facts material to decision whether to

6  prosecute plaintiff).

7  Thus, clearly established law would inform a reasonable officer

8  that Ricard's confession should have been turned over to the

9  prosecutor, who in turn would be responsible for providing it to

10  defense counsel.

11  (b) Reasonable Conduct

12  Again relying on <u>Villasana</u>, 368 F.3d at 978, the Inspectors

13  argue that they are entitled to qualified immunity because they

14  reasonably believed that Butterworth was responsible for providing

15  any exculpatory evidence to defense counsel, and they were not. As

16  discussed above, this argument is a mischaracterization of well-

17  established law regarding the duty of law enforcement officials to

18  turn over all exculpatory evidence to the prosecutor; the Inspectors

19  fail to explain how Butterworth could have disclosed Ricard's

20  confession to Plaintiffs if the Inspectors never told him about it.

21  The Inspectors argue that because they never had possession of

22  the tape of the Ricard confession, they could not have suppressed

23  it. Furthermore, they argue that "a reasonable officer could have

24  believed that Lewis, the SFPD officer who actually took Ricard's

25  confession, would have advised Butterworth of the confession."

26  The Inspectors cannot avoid responsibility for their obligation

27  by assuming that a subordinate fulfilled it. At his deposition,

28

United States District Court

For the Northern District of California

Hendrix testified that he and Sanders were responsible for turning over evidence connected to the Shannon homicide to the district attorney because it was their case and that it was Lewis and Gittens' responsibility to get the tape of the Ricard confession either to the district attorney or to Sanders or himself.  Lewis testified that he did get the tape to the Inspectors.  He testified that, immediately after he took Ricard's confession, he informed the Inspectors of it by putting a copy of the taped confession in a place where the Inspectors would receive it, and that he spoke to Hendrix about the confession the next day.  Sanders testified that he received the tape of Ricard's confession within a day or two of November 7, 1990, the date it was made.

Viewing the evidence in the light most favorable to Plaintiffs, it was the Inspectors' responsibility to inform Butterworth of the confession, and they did not have reason to believe that Lewis or Gittens did so.  Therefore, these facts do not demonstrate the Inspectors acted reasonably under the circumstances.

Next, the Inspectors argue that they are protected by qualified immunity because Butterworth learned of the confession and provided it to Plaintiffs' defense attorneys in sufficient time for it to be considered by the trial and appellate courts and the failure to inform Butterworth of the confession earlier did not violate clearly established law of which a reasonable officer would have been aware.

Due process requires the disclosure of exculpatory material in sufficient time to permit the defendant to make effective use of the material.  LaMere v. Risley, 827 F.2d 622, 625 (9th Cir. 1987).  In determining whether the timing of the disclosure satisfied due

United States District Court

For the Northern District of California

1  process, a court considers the prosecution's reasons for late

2  disclosure and whether the defendant had an opportunity to make use

3  of the disclosed material.  Id.

4       In its August 26, 2003 Habeas Order, the Court explained why

5  the delay in turning over the Ricard confession was prejudicial to

6  Tennison.  Purcell Dec., Ex. 52, August 26, 2003 Order at 100-102.

7  In the habeas proceeding, the respondent had not explained why the

8  Inspectors did not inform Butterworth of the confession.  The only

9  explanation the Inspectors make here, that it was Lewis'

10 responsibility, is insufficient when viewing the facts in the light

11 most favorable to Plaintiffs.  Although the Court's ruling in the

12 habeas case has no preclusive effect on the issues in this case,

13 because the facts are the same, the Court adopts the reasoning in

14 the August 26, 2003 Habeas Order regarding prejudice to Tennison due

15 to the delay in receiving Ricard's confession.  Furthermore, Goff

16 was similarly prejudiced by the delay in his receipt of the

17 confession, because he could have immediately used it as the basis

18 of his State appeals and habeas petitions.[10]  As discussed

19 previously, although the State courts found the confession to be

20 unreliable, they did so without the benefit of all of the withheld

21 Brady material and they compared it to the anonymous Ricard

22 confession obtained by Adachi that would not have been submitted if

23

24       [10]As discussed previously in relation to Butterworth's motion
    for summary judgment, Butterworth did not turn over the Ricard
25  confession to Goff.  However, Butterworth's actions are not
    relevant to whether the Inspectors are protected by qualified
26  immunity.  Therefore, for this discussion, it is assumed that the
    Inspectors would have fulfilled their responsibilities if they had
27  turned the tape over to Butterworth.

28

**United States District Court**

For the Northern District of California

1  the taped Ricard confession to the police had been timely turned

2  over to both Plaintiffs.

3      Therefore, the fact that eventually Butterworth learned of the

4  confession from Lewis and then informed Tennison of it does not

5  excuse the Inspectors from their duty to turn the tape over in

6  sufficient time for Plaintiffs to make use of it.  These facts fail

7  to demonstrate that the Inspectors acted reasonably under the

8  circumstances.

9      Accordingly, the Court DENIES the cross-motions for summary

10  adjudication of this claim and DENIES the Inspectors' motion for

11  summary judgment of absolute or qualified immunity.

12      B. Suppression of Smith's Statement

13      The Inspectors argue that Plaintiffs' <u>Brady</u> claim based on

14  Smith's information fails because the information is not

15  exculpatory, the Inspectors lacked the requisite intent to deprive

16  Plaintiffs of a constitutional right and Plaintiffs' knowledge of

17  Smith's involvement means the Inspectors did not suppress the

18  confession.

19          (1) Exculpatory Information

20      The Inspectors argue that Smith's information is not

21  exculpatory on the ground that, before 1992, Smith did not tell the

22  police that she had witnessed Shannon's murder.  They argue that her

23  January 3, 1990 phone call to Sanders was mysterious because she

24  only identified herself as "Chante" and provided only a contact

25  phone number.  They point out that they interviewed the five

26  individuals who she had heard were present at the murder and learned

27  nothing about the murder.  The Inspectors, pointing to Sanders' note

28                                72

as evidence, also argue that Smith did not say that Tennison and Goff were not at the murder scene.

In her 1995 declaration, Smith states that she told Sanders in 1990 that he had arrested the wrong people for the Shannon murder because she had heard that Ricard had shot Shannon and that Tennison and Goff were not present at any point during the homicide.  Smith Reply Dec. at ¶ 8.  The fact that Sanders did not write this information in his note does not prove that Smith did not provide it.

Furthermore, the Inspectors' characterization of Smith's call as mysterious is inconsistent with the evidence that the Inspectors knew Smith and her friends before the Shannon murder.  For instance, at Smith's 1992 interview, Sanders asked her how long she had known himself and Hendrix, and Smith replied that she had known them for a couple of years, from before the Shannon murder.  Purcell Dec., Ex. 47, 1992 Smith Interview at 76.  Sanders stated, "We know all of your, a lot of your buddies, and people who hang out with you on the street, is that correct?"  Id.  Smith replied, "Yes."  Id.  At his 2001 deposition, Sanders testified that he and Hendrix knew Smith, just as they knew many of the young people in her neighborhood, and that they had questioned her about a number of the gang-related murders that had occurred in her neighborhood.  Balogh Reply Dec., Ex. 63, 2001 Sanders Depo. at 143-44.

Further, the Inspectors' follow-up interview of Luther Blue after Smith disclosed his name to Sanders indicates that she told Sanders that the car chase started at the Seven-Eleven.  This was exculpatory because it cast doubt on Masina's testimony that the car

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

chase started at Lovers' Lane.  Finally, if Smith's information had been disclosed, she could have testified at Tennison's motion for new trial, and important parts of Ricard's confession would have been corroborated, which would have been a significant factor in the trial judge's analysis of whether Ricard's confession was trustworthy.  It is reasonable to infer that, after Ricard confessed, Smith would have no reason to fear retaliation from Ricard or Blue if she testified that she had been an eyewitness to Shannon's shooting.

Therefore, the information Smith relayed to Sanders in 1990 was exculpatory.

(2) Intent

The Inspectors argue that Sanders' January 3, 1990 note about the Smith interview was in Butterworth's file and this negates any inference that Sanders intended to bury information connected to Smith.[11]  Also, according to the Inspectors, the fact that they interviewed the five individuals Smith named and put notes of those interviews in the file demonstrates that they had no intention to withhold any of Smith's information.  Lastly, to support their claim that Sanders' note was sufficient to fulfill his Brady obligation, the Inspectors point to Adachi's and Melton's testimony that, had they seen Sanders' note, they would have been alerted to Smith and her information.

---

[11]The Inspectors actually argue that the facts show that Sanders did not act in bad faith.  As discussed above, Plaintiffs must show that the Inspectors deliberately intended to withhold Brady material; it is not necessary to show they acted in bad faith.

United States District Court

For the Northern District of California

1    Plaintiffs respond that they never saw Sanders' note and, even
2 if they had, it was insufficient to alert anyone to Smith's identity
3 or the substance of her statements because it omitted Smith's last
4 name, and her statements that Ricard had committed the murder, that
5 Plaintiffs were not at the murder scene, and that the car chase
6 started at the Seven-Eleven store.  As evidence that Sanders' note
7 was insufficient under Brady, Plaintiffs cite Butterworth's
8 testimony that he could not ascertain its significance.  Plaintiffs
9 also argue that Sanders' intent to suppress Smith's information is
10 demonstrated by the fact that he made no notes of his further
11 contacts with Smith which would have alerted Plaintiffs to the
12 significance of her information, nor are there notes that members of
13 the GTF interviewed Smith regarding her knowledge of the truck that
14 was thought to be involved in the car chase.

15    Because Butterworth testified that Sanders' note was in his
16 file and therefore it would have been turned over to Plaintiffs'
17 attorneys, but Plaintiffs' attorneys testified that they did not
18 receive the note, there is a dispute about whether Sanders included
19 the note in the file he gave Butterworth.  And, even if Sanders gave
20 the note to Butterworth, it was cryptic and failed to disclose
21 significant details.  The fact that Adachi and Melton thought the
22 note was important does not mean the note was sufficient as written.
23 The Inspectors' insistence that they did not know Smith or the
24 people she mentioned is belied by other testimony where the
25 Inspectors admit they knew Smith before the Shannon murder, knew the
26 people with whom she associated and knew that she said that the car
27 chase started at the Seven-Eleven store instead of Lovers' Lane.

28                                75

United States District Court

For the Northern District of California

The Inspectors do not address Plaintiffs' argument that Sanders made no notes of his further contacts with Smith or of the interviews of Smith by members of the GTF.  Therefore, Sanders' note did not fulfill his <u>Brady</u> obligations.  However, a fact-finder could infer that Sanders thought the note was sufficient.  As noted above, questions involving state of mind are generally inappropriate for summary judgment.  Therefore, there are disputed issues of material fact regarding intent and the cross-motions for summary adjudication of this issue are DENIED.

> (3) Plaintiffs' Knowledge of Smith

The Inspectors argue that they are not liable for a <u>Brady</u>-based § 1983 violation because Plaintiffs independently knew of Smith and that she might have information about the Shannon murder, and thus Plaintiffs' attorneys could have discovered the alleged <u>Brady</u> material on their own.

> (a) Tennison's Knowledge of Smith

Citing Smith's 1992 police interview, the Inspectors claim that Tennison knew Smith because she talked to him before his trial and he asked her to be a witness for him at his trial.  The Inspectors argue that Tennison or Adachi could have found Smith and learned of her information before trial.  This argument is unpersuasive.  At her 1992 interview, Smith stated that she barely knew Tennison and that she only spoke with him coincidentally when she worked as an operator and Tennison placed a telephone call from jail.  Although Tennison asked her to speak to his attorney about the Shannon homicide, she declined because she feared that she would be killed by Ricard or Blue if she did so.  She explained that, because she

feared for her life, she asked her family not to give her telephone number or address to Plaintiffs and that she moved from her former address to ensure that her whereabouts would be secret. Smith's statements are corroborated by the testimony at the hearing on Tennison's motion for new trial. At the time of the hearing, the only information known to Tennison was that a person named Chauntey White may have witnessed the Shannon murder; even though Tennison's brother searched for her, he was unable to locate her.

This evidence establishes that Tennison had some vague information about Smith, that he diligently searched for her, but that the search was unsuccessful. On the basis of this evidence, the Court cannot find that Tennison's attorney had the knowledge and means to obtain Smith's information on his own.

(b) Goff's Knowledge of Smith

The Inspectors cite Goff's deposition and his testimony at the § 4900 hearing to show that he had a close romantic relationship with Smith before the Shannon murder, that after the murder he heard she might have been involved and that he told Melton this. The evidence shows that Goff was not romantically involved with Smith; they just knew each other from the neighborhood, they had gone to the movies together once or twice, but Smith did not even know Goff's last name. A few weeks after the murder but before he was arrested, Goff heard Ricard mention Smith's name in connection with the murder. Goff asked Smith about her involvement, but when she denied knowing anything, he did not pursue the subject. Goff had also heard that the car chase started at the Seven-Eleven. After he was arrested, Goff gave his attorney this information. After the

77

1  trial, Goff coincidentally had a brief conversation with Smith in

2  her role as operator when he was placing a call from jail.  Goff

3  asked Smith to talk to his attorney and Smith refused.

4      Unlike Tennison, Goff had heard immediately after he was

5  arrested about Smith's connection to the murder and that the car

6  chase started at the Seven-Eleven and he informed his attorney of

7  this.  On the basis of this evidence, the Court finds that there are

8  disputes of material fact regarding whether Goff's attorney  had

9  sufficient information to have found Smith and her exculpatory

10 information on his own.

11     In summary, based upon disputed issues of material facts, the

12 cross motions for summary adjudication on liability are DENIED.

13         (4) Absolute Immunity

14     Although the Inspectors make a blanket argument that they are

15 absolutely immune from all of Plaintiffs' claims, they do not

16 specifically argue that absolute immunity applies to Plaintiffs'

17 Brady claim regarding Smith and the information she provided.

18 Therefore, absolute immunity is DENIED in regard to this claim.

19         (5) Qualified Immunity

20     The Inspectors argue that, even if they committed a

21 constitutional violation, they are qualifiedly immune from

22 liability.  As discussed above, the law regarding the duty of police

23 to turn over exculpatory evidence to the prosecutor was clearly

24 established at the time these events occurred.  Thus, the Court

25 addresses whether the Inspectors' conduct was reasonable under the

26 clearly established law.

27     As discussed above, the Court has found that the information

28
                                    78

United States District Court

For the Northern District of California

Smith told the Inspectors was exculpatory and that Sanders' handwritten note of his first interview with Smith was insufficient to fulfill his <u>Brady</u> obligation.  For all the reasons stated above, the Inspectors' failure to alert Butterworth to this information so that he, in turn, could have informed Plaintiffs of it, cannot be summarily adjudicated to be objectively reasonable under clearly established law.  Therefore, the Inspectors' motion for summary adjudication of qualified immunity is DENIED.

C. Request for Money From Secret Witness Program

(1) Exculpatory Evidence

The Inspectors argue that there is no constitutional violation for failing to disclose the SWP memo to Butterworth because the information is not exculpatory in that no one received any reward money.  Plaintiffs argue that the memo is exculpatory because it had impeachment and investigative value.  They argue that the exculpatory nature of the memo is reinforced by the April 23, 1990 conversation between Hendrix and Masina, which shows that Hendrix discussed a reward with Masina, and by the two entries from the ledger of Contingent Fund B indicating payments to Sanders and Hendrix in the total amount of approximately $1,400.

Although Masina declares that she was not offered a reward and did not receive one, the enhanced tape of the April 23, 1990 conversation between Hendrix and Masina is evidence that Hendrix may have discussed a reward with Masina.  As acknowledged by Hendrix, a reward taints a witness' testimony at trial.  Purcell Dec., Ex. 15, Hendrix Depo. at 124.  The audio experts' disagreement about whether the word "reward" is mentioned by Hendrix raises a factual issue for

79

**United States District Court**
For the Northern District of California

1   a jury to decide.

2       Also, the Inspectors do not explain the whereabouts of the

3   original audio tape nor how copies of the audio tape came to be in

4   such poor condition.

5       Spoliation of evidence, defined as "the destruction or

6   significant alteration of evidence, or the failure to preserve

7   property for another's use as evidence in pending or reasonably

8   foreseeable litigation," supports an inference that the evidence was

9   unfavorable to the party responsible for its destruction. Byrni v.

10  Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2nd Cir. 2001).

11  An inference of spoliation, in combination with some evidence for

12  the plaintiff, can allow the plaintiff to survive summary judgment.

13  Medical Lab Mgmt. Consultants v. American Broadcasting Cos., Inc.,

14  306 F.3d 806, 825 (9th Cir. 2002).

15      Here, the fact that the audio tape was not disclosed, and the

16  original was not preserved, for use as evidence in Plaintiffs'

17  criminal case or their future habeas petitions, which were

18  reasonably foreseeable to the Inspectors, raises an inference that

19  the conversation on the audio tape was unfavorable to the Inspectors

20  and the criminal case against Plaintiffs.  This, in conjunction with

21  the evidence of the SWP memo, contributes to the inference that, at

22  the very least, a reward was discussed with Masina.[12]  Thus, the SWP

23  ─────────────────

24      [12]The withdrawals from Contingent Fund B might contribute to
    this finding.  On the other hand, a fact-finder could credit
    Goldberg's testimony that the money was used for witness travel.

25  The ledger entry of the $1,250 payment indicates it was for witness
    expenses and the payment was made in early October, 1999 when

26  Masina traveled from Samoa to the United States to provide an in-
    person taped statement of her account of Shannon's homicide.  See

27  Masina Dec. and Wong Dec., Ex. LL, Tennison's Preliminary Hearing

28                                  80

United States District Court

For the Northern District of California

memo could be found to be exculpatory.  The Inspectors' argument that the SWP memo is inadmissible hearsay is unpersuasive; armed with the memo, Plaintiffs' trial counsel could have asked the Inspectors about it at trial and used it to impeach them if they denied making the request from the SWP.

The Court concludes that there are disputed issues of fact regarding whether the SWP memo was exculpatory.

(2) Intent

The Inspectors argue that they did not intend to withhold the SWP memo, as evidenced by the fact that they placed it in the police case file where Butterworth could access it and turn it over to Plaintiffs.

Officer Tabak, San Francisco's Rule 30(b)(6) witness on police procedures, testified that it is standard procedure for the police to turn over everything to the district attorney's office.  The district attorney discloses everything to the defense.  Balogh Dec., Ex. 81, Tabak Depo. at 48.  Tabak also stated that it is not SFPD's policy for the investigator who is aware of exculpatory evidence to leave it in the police case file and assume that if the district attorney is interested, he would come to the SFPD where the file is located and look at it.  Id. at 99.  Instead, Tabak stated, the investigator should make an effort within a reasonable amount of time to reveal that exculpatory information to the district attorney.  Id.

Tabak's testimony is sufficient to raise a dispute of fact

_____

at 54 (Shortly after the Shannon homicide, Masina left the United States to live in Samoa).

regarding whether the Inspectors negligently or intentionally withheld the memo by placing it in the police case file instead of turning it over to Butterworth.

Because there are disputes of material fact regarding whether the SWP memo was exculpatory and whether the Inspectors intended to withhold it, the cross motions for summary judgment on the issue of liability are DENIED.

(3) Qualified Immunity[13]

The Inspectors argue that even if they committed a constitutional violation, qualified immunity protects them from liability.

As discussed above, at the time this conduct took place the law regarding the Inspectors' duty to turn over to the prosecutor exculpatory information was well-established.  If the SWP memo was exculpatory, a reasonable officer would know that it was necessary to turn it over directly to the district attorney.  Therefore, disputed facts regarding the memo's exculpatory value preclude summary judgment on whether the Inspectors' conduct was reasonable under the circumstances.  The Inspectors' motion for summary judgment of qualified immunity for failure to disclose the SWP memo is DENIED.

D. Luther Blue's Interviews and Pauline's Polygraph

Only the Inspectors move for summary judgment on these claims. They argue that they fulfilled their Brady obligations by providing the video tapes of each of their two interviews with Luther Blue to

---

[13]The Inspectors do not argue that absolute immunity applies to this claim.

82

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Butterworth, that Butterworth himself ordered Pauline's polygraph and that they informed him of the results.  Tennison concedes that the Inspectors' conduct in regard to the Blue interviews and Pauline's polygraph are not independent grounds for liability under Brady.  Tennison Opp. at 57.  Goff does not address the Blue interview.  Goff argues that the polygraph was material exculpatory evidence, but doesn't address how the Inspectors could be liable for failure to disclose it to Butterworth given that Butterworth knew of it.  Therefore, the Court GRANTS the Inspectors' motion for summary judgment on Plaintiffs' Brady claims to the extent they are based on suppression of the Blue interviews and Pauline's polygraph.

E. Materiality

Plaintiffs argue that they are entitled to summary judgment on the element of materiality on all of their Brady claims.

As discussed above, in the context of a Brady violation, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Bagley, 473 U.S. at 682.

In the Habeas Order, the Court undertook an extensive review of the case the prosecution presented against Tennison to the jury and concluded that it was weak.  Habeas Order at 72-80.  The Inspectors do not present additional evidence on this issue nor do they argue that the prosecution's case was strong.  Therefore, the Court adopts here the finding that the prosecution's case against Tennison was weak.  The Court also finds the prosecution's case against Goff was weak because there was only one eyewitness who identified Goff, instead of two eyewitnesses who identified Tennison.

83

United States District Court

For the Northern District of California

1    However, because materiality is to be considered in terms of

2 the collective effect of the suppressed evidence, it is premature to

3 determine materiality before a jury resolves the disputed factual

4 issues as to what evidence is suppressed and who is liable for it.

5 Therefore, even though the case against Plaintiffs was weak, the

6 Court will not summarily adjudicate the materiality of the

7 suppressed evidence.

8    F. Causation

9    The parties cross-move for summary adjudication as to whether

10 the Inspectors' alleged failure to disclose exculpatory evidence to

11 the prosecutor caused Plaintiffs' injury.

12    To establish a civil rights violation, the plaintiff must show

13 that the defendant's unconstitutional conduct was the actual and

14 proximate cause of the plaintiff's injuries. White v. Roper, 901

15 F.2d 1501, 1505 (9th Cir. 1990); Van Ort v. Estate of Stanewich, 92

16 F.2d 831, 836-37 (9th Cir. 1996); Arnold v. Int'l Business Machines

17 Corp., 637 F.2d 1350, 1355 (9th Cir. 1981). The defendant's conduct

18 is the actual cause of the injury only if the injury would not have

19 occurred "but for" that conduct. White, 901 F.2d at 1505. If it is

20 established that the conduct was one of the causes of the

21 plaintiff's injury, the next question is whether the conduct is the

22 proximate cause of the injury. Id. at 1506. The defendant's

23 conduct is not the proximate cause of the injury if another cause

24 intervenes and supercedes the defendant's liability for the

25 subsequent events. Id.; Van Ort, 92 F.2d at 837 (traditional tort

26 law defining intervening causes that break the chain of proximate

27 causation applies in § 1983 actions); Arnold, 637 F.2d at 1355

28

United States District Court

For the Northern District of California

(same).  Whether the conduct of another person is an intervening cause of the plaintiff's injuries depends upon what was reasonably foreseeable to the defendant at the time.  <u>White</u>, 901 F.2d at 1505. Foreseeable intervening causes will not supersede the defendant's responsibility.  <u>Id.</u>

The Inspectors offer many reasons for their argument that they are not the legal or the proximate cause of Plaintiffs' injuries: witnesses were untruthful during the investigation, Plaintiffs' defense counsel failed to investigate and present an adequate defense, the courts ruled adversely on the allegedly suppressed Ricard confession and Plaintiffs failed to use their own knowledge of the alleged facts to defend themselves.

Plaintiffs respond that the Habeas Order provides the best template for analysis of causation.  However, in the habeas case the issue of causation was not addressed.

As discussed above in the context of liability, the Court has found disputed issues of material facts in regard to many of the same arguments the Inspectors raise here.  The factual dispute is compounded here because the Inspectors' ability to foresee any of the alleged intervening events must be determined.  Therefore, the Court finds that disputed issues of material facts preclude summary adjudication for either side of the issue of causation.

III. The Inspectors' Motion for Summary Judgment on Fabrication of Evidence and Continued Investigation Claim

Only the Inspectors move for summary judgment on Plaintiffs' claim that the Inspectors fabricated evidence in their interviews of Masina and Pauline and continued their investigation of Plaintiffs

85

even though they knew or should have known that Plaintiffs were innocent.

### (A) Absolute Immunity

The Inspectors argue that Hendrix is absolutely immune from Tennison's claim that he allegedly coerced Pauline into committing perjury during the April, 1990 interviews.[14]

As discussed in relation to Butterworth's motion for summary judgment, the Court has found that Butterworth acted as a prosecutor and not as an investigator during the April 20 through April 22, 1990 interviews of Pauline about her recantation.  At these interviews, Hendrix was working primarily at Butterworth's direction.  However, Butterworth testified that he did not direct Hendrix to arrange the telephone conversation between Pauline and Masina after Pauline took the polygraph examination.  Hendrix has not pointed to any contrary evidence.  Therefore, Hendrix was not under Butterworth's direction when he arranged the phone call and cannot claim that he was acting as a prosecutor in doing so.  Thus, Hendrix is absolutely immune from Plaintiffs' claim regarding his actions during the April 20 through April 22, 1990 interviews of Pauline, except for his conduct in setting up the phone call between Masina and Pauline.

### (B) Constitutional Violation

As discussed above, to prevail on a fabrication of evidence claim, a plaintiff, at a minimum, must show that (1) the officer continued his investigation despite the fact he knew or should have

---

[14]Sanders was not present at the interviews and Pauline did not testify about Goff.

United States District Court

For the Northern District of California

known that the suspect was innocent or (2) the officer used

investigative techniques that were so coercive and abusive that he

knew or should have known that they would yield false information.

<u>Devereaux</u>, 263 F.3d at 1076.  Suggestive interview tactics alone do

not amount to a constitutional violation.  <u>Gausvik</u>, 345 F.3d at 817.

(1) Phone Call Between Pauline and Masina

Plaintiffs argue that it was coercive for Hendrix to allow

Pauline to participate in an unmonitored conversation with Masina,

the person Pauline said had pressured her to lie.  As evidence, they

point to Hendrix' deposition testimony that good interview

techniques require witnesses to be interviewed separately and that

he himself never put witnesses in a room together allowing them to

talk over their respective testimony.  Wong Dec., Ex. B, 2005

Hendrix Depo. at 37-40.

In his declaration, Hendrix states that, after the polygraph,

Pauline asked him if she could speak to Masina, who was then living

in Samoa.  Hendrix states he arranged the call and didn't monitor it

because he "believed the girls were friends, and did not see

anything improper in allowing two witnesses who had already given

statements about the murder to speak."  Hendrix Dec. at ¶ 23.

Butterworth testified that he was not concerned that Pauline spoke

with Masina over the telephone because Masina was in Samoa at the

time so it was unlikely that she would be able to pressure or coerce

Pauline.  Wong Dec., Ex. O, Butterworth Depo. at 334-35.

Butterworth also stated that Hendrix had told him that Pauline had

asked to speak to Masina and Butterworth thought it was unlikely

that Pauline would make such a request if she felt threatened by

United States District Court

For the Northern District of California

Masina.  Id. at 335.  Pauline stated that it was not her idea to speak to Masina, that Hendrix just handed her the phone and said that there was a phone call for her from Masina.  Wong Dec., Ex. M, Pauline Depo. at 98-99.

Thus, there is a dispute of fact regarding whether Pauline asked to speak to Masina.  However, even if Pauline had requested to speak to Masina, it can be inferred that Hendrix knew or should have known that this unmonitored phone call could yield false information.  Thus, a jury could find that Hendrix committed a constitutional violation.  However, Tennison has not carried his burden of showing there is clearly established law regarding allowing witnesses to talk to each other.  Thus, even if a constitutional violation was committed, a reasonable officer in Hendrix' position would not have been aware that he was violating Plaintiffs' constitutional rights.  The Inspectors' motion for summary adjudication that Hendrix is qualifiedly immune on this claim is GRANTED.

(2) Continued Investigation

Opposing the Inspectors' motion for summary adjudication that they did not commit a constitutional violation in this regard, Plaintiffs argue that, because it was obvious that Masina and Pauline were lying, the Inspectors knew it.  No other credible evidence tied Plaintiffs to Shannon's murder and thus, Plaintiffs argue, the Inspectors continued their investigation of Plaintiffs despite the fact that they knew that Plaintiffs were innocent.

The Inspectors argue that no evidence shows that they knew Plaintiffs were innocent and point to a great deal of evidence that

88

United States District Court

For the Northern District of California

shows that they reasonably believed, based on the statements of Masina and Pauline, that Plaintiffs were guilty.  The Inspectors point out that there were sufficient reasons for them to believe that Masina was credible because: (1) her account of the murder never changed; (2) she had no motive to make up this story; (3) neighborhood witnesses corroborated the chase route and vehicles she described; (4) she admitted to having been in a stolen car, even though she could have faced criminal liability; (5) other witnesses corroborated aspects of her story; (6) the forensic evidence established that Shannon received two shots from a shotgun, consistent with what Masina described; (7) police found Shannon's body in the corner of the parking lot as Masina had described it; (8) Masina did not benefit from testifying against Plaintiffs; (9) Masina put herself and her family at risk by testifying; and (10) a neighborhood witness indicated that she saw a Filipina girl matching Masina's description who did not look like she belonged with the rest of the individuals who were near the scene of the shooting.  The Inspectors argue that there were sufficient reasons for them to believe Pauline because:  (1) during her first police interview, she identified Tennison from a photo line-up; (2) at that same interview, she identified an individual named Wayland Gibson, whose street name was "Buck," as having been present at the murder and Masina had said she heard someone say, "Buck, come here," just before the car chase began; (3) Pauline's story that Masina forced her to lie did not add up because shortly after the murder Pauline moved to Hawaii and Masina moved to Samoa and it was not reasonable to believe Masina could have exerted influence from thousands of

miles away; (4) Pauline's denial that she was in a stolen car before the murder did not mar her credibility because she may have been afraid this would get her into trouble; and (5) she may have recanted her original story because she was afraid of retaliation.

As Plaintiffs point out, some of the reasons the Inspectors give for believing Masina and Pauline are questionable.  For instance, as the Court noted in the October 26, 2003 Habeas Order, the Inspectors' theory that neighborhood witnesses corroborated Masina's story is weak given that some neighborhood witnesses contradicted aspects of her statement and that Masina's and Pauline's stories were inconsistent with each other.  See Purcell Dec., Ex. 52, August 26, 2003 Habeas Order at 72, 77-79. Nonetheless, even if Pauline and Masina were lying, that is not sufficient evidence that Plaintiffs were innocent to compel a conclusion that the Inspectors continued their investigation of Plaintiffs when they knew or should have known them to be innocent.

Plaintiffs have cited no case in which a claim like this one prevailed.  Although Devereaux, 263 F.3d at 1074-75, held that there is a clearly established constitutional due process right not to be criminally charged on the basis of false evidence deliberately fabricated by the government, it found that the defendants had not violated such a right.  Id at 1077, 1079.  The plaintiff in Devereaux had based his constitutional claim on the first Devereaux prong: coercive interview techniques.  The Court has found only three cases addressing the second Devereaux prong of continued investigation, and all those cases have held the defendant did not commit a constitutional violation.  See Cunningham, 345 F.3d at 811-

90

12 (continued investigation not unconstitutional); <u>Milstein</u>, 208 F. Supp. 2d at 1123-24 (defendants entitled to qualified immunity due to insufficient evidence to support claim that they knew or should have known plaintiff was innocent); <u>Guerrero v. City and County of San Francisco</u>, 2003 WL 22749099, *10 (N.D. Cal 2003) (no reasonable juror could find that defendant knew or should have known that plaintiff was innocent).

Although the information the Inspectors uncovered in their investigation was contradictory and somewhat inconsistent, no evidence supports Plaintiffs' claim that the Inspectors knew or reasonably should have known that Plaintiffs were innocent.  In <u>Milstein</u>, 208 F. Supp. 2d at 1123, the plaintiff had been indicted by a Grand Jury and later held to answer after a preliminary hearing.  The court relied on these facts for its conclusion that there was evidence to support the defendants' belief that the plaintiff was guilty of the crimes charged.  <u>Id.</u>  Here, too, Plaintiffs were held to answer after preliminary hearings on the crimes charged.  Significantly, at Goff's preliminary hearing, the court found probable cause even though Pauline testified to her recantation.  Furthermore, although this Court granted Tennison's habeas petition, it did so based on <u>Brady</u> violations; the Court did not address the issue of Tennison's guilt or innocence.

The Court concludes that the Inspectors did not violate Plaintiffs' constitutional right to be free from being charged with fabricated evidence by continuing their investigation of Plaintiffs. Furthermore, even if the Inspectors' conduct constituted a violation, a reasonable officer in their position would not have

United States District Court

For the Northern District of California

known that they were violating Plaintiffs' constitutional rights.
Therefore, the Inspectors' motion for summary adjudication based on
their continuing investigation of Plaintiffs is GRANTED.

F. Punitive Damages

The Inspectors move for summary adjudication of Plaintiffs'
demand for punitive damages.

Punitive damages may be awarded in a § 1983 suit "when the
defendant's conduct is shown to be motivated by evil motive or
intent, or when it involves reckless or callous indifference to the
federally protected rights of others." Smith v. Wade, 461 U.S. 30,
56 (1983).  In Dang v. Cross, 422 F.3d 800, 807-08 (9th Cir. 2005),
the Ninth Circuit held that punitive damages may be awarded in
federal civil rights cases when the defendant's conduct is
oppressive or malicious or in reckless disregard of the plaintiff's
rights.  Malicious conduct is accompanied by ill will or spite or is
done for the purpose of injuring the plaintiff.  Id. at 809 (citing
Ninth Circuit Model Civil Jury Instruction 7.5).  Reckless conduct
in conscious disregard of the plaintiff's rights reflects complete
indifference to the plaintiff's safety or rights or is done in the
face of a perceived risk that the conduct will violate the
plaintiff's rights under federal law.  Id. (citing same jury
instruction).  Conduct is oppressive if it injures or damages the
plaintiff or violates the plaintiff's rights with unnecessary
harshness or severity as by misuse or abuse of authority or power or
by taking advantage of the plaintiff's weakness, disability or
misfortune.  Id. at 809-10.  Although the standard for compensatory
and punitive damages is overlapping, the distinction is that

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  compensatory damages are mandatory once a violation is found, but
2  the award of punitive damages requires a discretionary moral
3  judgment that the conduct merited the particular punitive award
4  imposed in addition to the compensatory award.  Larez v. City of Los
5  Angeles, 946 F.2d 630, 648-49 (9th Cir. 1991) (citing Smith, 461
6  U.S. at 52).

7  Relying on the same arguments discussed above, the Inspectors
8  contend that there is no evidence that they acted recklessly or
9  maliciously in regard to Plaintiffs' right to a fair trial.

10  Because the award of punitive damages turns on the intent of
11  the Inspectors, it, like other questions where motive is at issue,
12  cannot be resolved on summary judgment.  If the jury were to find
13  for Plaintiffs on the disputed facts and draw inferences in
14  Plaintiffs' favor, such findings could support an award of punitive
15  damages.  Plaintiffs have raised a disputed issue of fact regarding
16  whether the Inspectors acted oppressively, recklessly or with
17  callous disregard for Plaintiffs' constitutional rights.  Therefore,
18  the Inspectors' motion for summary adjudication on the request for
19  punitive damages is DENIED.

20                          CONCLUSION

21  Based on the foregoing, Plaintiffs' motion to strike (Docket
22  # 298) is GRANTED in part, Butterworth's motion for summary judgment
23  (Docket # 201) is GRANTED in part, the Inspectors' motion for
24  summary judgment (Docket # 215) is GRANTED in part, and Plaintiffs'
25  motions for partial summary adjudication (Docket ## 152, 155) are
26  DENIED.  The Inspectors' request to file a separate statement of
27  disputed and undisputed facts is DENIED (Docket # 215).  The only
28                                93

remaining claim against Butterworth is Goff's <u>Brady</u> claim for suppression of the Ricard confession.  The claims remaining against the Inspectors are Plaintiffs' <u>Brady</u> claims based on the suppression of Ricard's confession, Smith's statements, the SWP memo and Hendrix' April 23, 1990 phone call with Masina.

IT IS SO ORDERED.

Dated _____     2/2/06

_____
CLAUDIA WILKEN
United States District Judge

94