**United States District Court**
For the Northern District of California

1

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5

6  JOHN TENNISON,                          No. C 04-0574 CW
                                           Consolidated with
7          Plaintiff,                      No. C 04-1643 CW

8      v.                                  AMENDED ORDER
                                           GRANTING IN PART
9  CITY AND COUNTY OF SAN FRANCISCO; SAN   DEFENDANTS'
   FRANCISCO POLICE DEPARTMENT; PRENTICE   MOTIONS FOR
10 EARL SANDERS; NAPOLEON HENDRIX; and     SUMMARY JUDGMENT
   GEORGE BUTTERWORTH,                     AND DENYING
11                                         PLAINTIFFS'
                                           MOTION TO STRIKE
12         Defendants.                     AND PLAINTIFFS'
   _____ MOTIONS FOR
13                                         SUMMARY
   ANTOINE GOFF,                           ADJUDICATION
14
           Plaintiff,
15
       v.
16
   CITY AND COUNTY OF SAN FRANCISCO; SAN
17 FRANCISCO POLICE DEPARTMENT; PRENTICE
   EARL SANDERS; NAPOLEON HENDRIX; and
18 GEORGE BUTTERWORTH,

19         Defendants.
   _____/
20

21

22      This is a civil rights action arising from the investigation,

23 arrest and prosecution of Plaintiffs John Tennison and Antoine Goff

24 by Defendants Prentice Earl Sanders, Napoleon Hendrix (together,

25 the Inspectors) and George Butterworth.  Plaintiffs have filed

26 motions for partial summary adjudication of their Brady claims

27 against the Inspectors; the Inspectors oppose and cross-move for

28

summary judgment on all of Plaintiffs' claims.  Butterworth moves

separately for summary judgment.  The Inspectors move under Civil

Local Rule 56-2(a) to submit a statement of disputed facts.

Tennison moves to strike certain portions of the Inspectors'

declarations.  Goff joins in the motion to strike.  The Inspectors

have not filed an opposition to the motion to strike.  The matters

were heard on August 12, 2005.  Having considered the papers filed

by the parties and oral argument on the motions, the Court GRANTS

in part Butterworth's and the Inspectors' motions for summary

judgment and DENIES Plaintiffs' motion to strike, Plaintiffs'

motions for summary adjudication and the Inspectors' request to

submit a statement of disputed and undisputed facts.

PROCEDURAL BACKGROUND

On October 3, 1990, Plaintiffs, whose cases had been

consolidated for trial, were convicted by a jury of first degree

murder and conspiracy to commit murder in the shooting death of

Roderick Shannon.  Wong Dec., Ex. V. In the Matter of the Claim for

Compensation by Antoine Maurice Goff and John J. Tennison, November

4, 2004 decision of the California Victim Compensation and

Government Claims Board (Matter of Goff and Tennison).  Each

Plaintiff individually filed a motion for a new trial, both of

which were denied.  Each Plaintiff individually filed a direct

appeal and then a petition for a writ of habeas corpus.  The State

courts denied the direct appeals and the habeas petitions.  Each

Plaintiff individually filed a petition for writ of habeas corpus

in this Court.  On August 26, 2003, this Court issued an Order

Granting Tennison's Petition for Writ of Habeas Corpus based upon

2

United States District Court

For the Northern District of California

the suppression of material exculpatory evidence.  Purcell Dec.,
Ex. 52, August 26, 2003 Habeas Order.  Although the Court had not
ruled on Goff's petition, both Plaintiffs were released from
custody.  The San Francisco district attorney decided not to retry
them.  Purcell Dec., Exs. 53, 54; Goff Dec. ¶ 7; Exhibits B and C
submitted with Tennison's Complaint, October 27, 2003 State Court
Order declaring Tennison factually innocent of the murder of
Roderick Shannon.  In 2004, Plaintiffs brought claims pursuant to
California Penal Code § 4900[1] against the State of California
seeking compensation for alleged wrongful incarceration.  Wong
Dec., Ex. V, Matter of Goff and Tennison.  The Administrative Law
Judge of the Victims' Compensation Board ruled that Plaintiffs had
failed to establish by a preponderance of the evidence that they
were entitled to compensation and their claims were denied.  Id. at
10.  Tennison has appealed this decision to the California superior
court.  Balogh Dec. at ¶ 42.  Tennison's attorney anticipates that
the losing party will appeal the superior court's decision to the
California court of appeal.  Id.

                            FACTS
I. Pre-Trial Events -- Masina Fauolo and Pauline Maluina

     On August 19, 1989, Shannon was shot and killed in San
Francisco.  San Francisco Homicide Inspectors Sanders and Hendrix

---

[1]California Penal Code § 4900 et seq. provides the statutory
basis for the filing of a claim for injury sustained as a result of
an erroneous conviction and incarceration.  The claimant must prove
by a preponderance of the evidence that the "crime was not
committed by him, the fact that he did not, by any act or omission
on his part, either intentionally or negligently, contribute to the
bringing about of his arrest or conviction for the crime with which
he was charged. . ."  Cal. Penal Code § 4903.

3

had been assigned to focus on gang-related murders and worked with the Gang Task Force (GTF) with respect to any gang-related homicide.  The GTF was a group of officers in the San Francisco police department charged with stopping gang activity generally. Sanders and Hendrix headed the Shannon homicide investigation assisted by GTF members Michael Lewis, Neville Gittens and Leroy Lindo.

The evidence indicated that there had been a high-speed car chase that had ended with Shannon taking the evasive action of driving his car in reverse and then crashing his car backwards into a park fence along Visitacion Avenue.  One of the chasing vehicles was a pick-up truck that had gone into reverse to chase Shannon's car as it was driving in reverse.  Residents in the neighborhood of the shooting identified several cars involved in the chase, but could not identify any of the people involved.  The morning after the crash, SFPD Inspector Frank Falzon interviewed the owner of the car Shannon had been driving during the chase: his cousin, Patrick Barnett.  Balogh Reply Dec., Ex. 91, August 19, 1989 Barnett Interview at 1.  Falzon told Barnett that two cars and a large-sized pick-up truck were involved in the chase and asked him to find a witness to the murder.  Id. at 15-16.

On August 22, 1989, Masina Fauolo, an eleven-year old Samoan girl who lived in the Sunnydale section of San Francisco, called Hendrix and told him she had witnessed Shannon's killing.  She later described Shannon and herself as buddies, like brother and sister.  Over the next two months, Hendrix spoke to Masina every day.

4

United States District Court

For the Northern District of California

On October 4, 1989, Hendrix and Sanders submitted the following memorandum to their supervisor, Lieutenant Gerald J. McCarthy: "In order to encourage witnesses to come forward [in the Shannon homicide case], we request a reward of $2,500 from the Secret Witness Program. We feel this reward will generate information that will lead to the arrest and conviction of the perpetrator(s) of the homicide." Purcell Dec., Ex. 22, October 4, 1989 Memo. The Secret Witness Program (SWP) was a community-based reward fund that was administered by the San Francisco Chamber of Commerce (COC) in the 1980s to encourage individuals to provide confidentially information that would assist the police in solving crimes in San Francisco. Tabak Dec. at ¶ 4. Individuals could call the COC's hotline to provide such information. Id. Also, at the request of the SFPD, the COC would post rewards for information leading to the arrest, prosecution and conviction of criminal suspects. Id. Any reward payment would be made directly by the COC to the individual who provided the information, not to police officers. Id. The SFPD did not fund the SWP. Id. A request that a reward be posted by the SWP had to be approved by the requesting officer's superior officers, then forwarded to the COC for its consideration. Id.[2]

Hendrix and Sanders' request for a SWP reward was approved by three people. An undated copy of a note addressed to McCarthy, Hendrix and Sanders, which is xeroxed over the October 4, 1989 memo, reads, "Jerry: Per Mary Petrie, this request has been taken

---

[2]The SWP was discontinued in 1992. Tabak Dec. at ¶ 4.

5

care of and the reward is in place." The memo was not turned over to Plaintiffs' trial attorneys.

Sanders testified that he didn't personally give the SWP memo to Butterworth, the assistant district attorney handling the case, but that it was in the police case file[3] and if Butterworth had asked for the file, he would have seen it. Purcell Dec., Ex. 51, Sanders Depo. at 129-31. Asked whether he had informed the assistant district attorney about his request to the SWP, Hendrix replied, "I don't know that I did." Purcell Dec., Ex. 1, Hendrix Depo. at 25. Butterworth did not know of this memo and he did not produce it to Plaintiffs' defense counsel. Purcell Dec., Ex. 42, Butterworth Depo. at 100. Plaintiffs' defense counsel never learned of this request. Purcell Dec., Ex. 41, Adachi Dec. at ¶ 7; Melton Dec. at ¶ 5. Masina and Pauline Maluina, the other witness against Tennison, testified that they did not receive any money for testifying against Plaintiffs. Wong Dec., Ex. UU, Masina Dec. at ¶ 8-10; Wong Dec., Ex. M, Pauline Depo. at 137, 139.

Neither the SFPD nor the COC has been able to locate any witnesses or records indicating that a reward was ever offered or

_____

[3]The Bureau of Investigations of the SFPD maintains an investigative case file for all cases under investigation. Tabak Dec., Ex. A at 25 (December 23, 1985 SFPD Memo on Investigative Case File Management). Each case file must contain a Chronological Report of Investigation which lists all pertinent facts needed to document the investigation and to substantiate conclusions or recommendations, including exculpatory evidence. Id. at 27. The case file is maintained in the possession of the investigating officer, in the investigating officer's desk or in the section case file cabinets. Id. at 35 (March 7, 1990 SFPD Memo on Processing Of Cases Referred to Inspectors Bureau). At some point the investigation file or a copy of it, including all exculpatory information, is turned over to the district attorney's office. Balogh Reply Dec., Ex. 81, Tabak Depo. at 99-100.

paid to anyone in connection with the Shannon murder investigation. Tabak Dec. at ¶ 5.  No record indicates that any SWP reward funds were ever paid to Hendrix or Sanders in any case.  Id.

On October 11, 1999, Sanders received a check in the amount of $1,250 from the SFPD's Contingent Fund B for the purpose of "witness expenses."  Purcell Dec., Ex. 23, October and December, 1989 Ledger Pages for Contingent Fund B.  On December 1, 1989, Hendrix received a check in the amount of $160 from Contingent Fund B for the purpose of a "witness agreement."  Id.  Contingent Fund B is a discretionary fund the Chief of Police uses in the investigation and detection of crime.  Goldberg Dec. at ¶ 3.  The Chief of Police or his designee must approve all reimbursements and advances to police officers paid from this fund.  Id.  All requests for payments from Contingent Fund B must be documented and the documentation must be routed through the chain of command to the Chief of Police for approval.  Id.  This procedure was in effect in 1989 and has not changed since then.  Id.  Defendants' witness declares that Contingent Fund B has never been used for rewards, and that the payments noted in the ledger were for witness expenses unrelated to the October 4, 1989 memo requesting a reward from the SWP.  Goldberg Dec. at ¶ 5.

In a 2005 declaration, Masina states that she moved to Samoa shortly after Shannon was killed and that, as far as she knows, her transportation expenses to fly from Samoa to San Francisco for the preliminary hearings and trial were paid by the SFPD.  Wong Dec., Ex. UU, Masina Dec. at ¶ 14.

The Fiscal Division has worked diligently to try to locate

7

all supporting documentation for the October payment to Sanders and
the December payment to Hendrix, but it has only been able to
locate bank statements; the request memos, cancelled checks and any
related receipts could not be found.  Id.  The documents were
likely destroyed years ago as part of the SFPD's standard
documentation retention and destruction policy.  Id.

The information about the Contingent Fund B disbursements was
not given to Plaintiffs' trial attorneys.

In an October 31, 1989 recorded interview with Hendrix and
Sanders, Masina told them the following information.  Purcell Dec.,
Ex. 26.  After midnight on August 19, 1989, Masina and her friend
Pauline Maluina were parked in the Lovers' Lane parking lot at the
top of Visitacion Avenue in a stolen car eleven-year old Masina was
driving.  Masina said she saw three cars and a truck enter the
parking lot.  The drivers and the passengers in the vehicles were
young, African American men.  She heard one boy say to another,
"Buck, come here." After the cars had been parked for about ten
minutes, Shannon's car went by on Visitacion.  Then the three cars
and the truck left the parking lot and began to chase Shannon in
the car he was driving.  Masina drove out of the parking lot and
followed the cars down the hill without losing sight of Shannon's
car.  She said she parked the stolen car on the street near where
Shannon had crashed his car and ran to a Super Fair parking lot.
She got separated from her friend Pauline at this point.  At the
Super Fair parking lot, she saw Shannon being beaten by a gang of
boys.  Then one boy went to the trunk of his car and got a shotgun.
Masina heard four or five shots, saw the boy shoot at Shannon, but

8

United States District Court

For the Northern District of California

didn't know whether any of the shots hit Shannon or were shot in the air.  After Shannon was shot, all the boys got back in their cars and left.  Masina then went to Shannon who said, "Get Patrick."  Then Masina left the scene.

At the interview, Sanders showed Masina eight photographs.  From them she picked two, one of Tennison and one of Goff.  Masina said that Tennison was one of the boys who were beating Shannon and Goff was the person who shot Shannon.

On November 28, 1989, Hendrix located Masina's friend, fourteen-year old Pauline Maluina, at Visitacion Valley High School and interviewed her in the presence of her father and the principal.  Purcell Dec., Ex. 29, November 28, 1989 Police Interview with Pauline Maluina.  At the interview, Pauline told Hendrix that she and Masina were walking around and saw some people beating up somebody.  Then Shannon "came out looking all frightened.  All of a sudden there's a car right next to them.  Someone got the gun and shot him right there and me and Masina we just ran and we hopped on a bus.  We went down 24th and Mission." Id. at 2.  She and Masina were walking and talking slowly.  Id. at 4.  Right after one shot was fired, she and Masina ran because they thought the shooter was going to point the gun at them and shoot them.  Id. at 5.

At the interview, Hendrix showed Pauline eight San Francisco police ID-type photos.  Pauline identified two of the people in the photos as being at the scene.  One of the people she picked was Tennison.  She said he was not the person who was in charge of the shotgun.  Id. at 13.  The other person Pauline identified was an

9

United States District Court

For the Northern District of California

individual named Wayland Gibson, who was also known as "Buck."  <u>Id.</u> at 12.

Hendrix and Sanders brought the case to the San Francisco District Attorney's Office, which decided to prosecute Plaintiffs. On November 28, 1989, a warrant was issued for the arrest of Goff; on December 1, 1989, a warrant was issued for the arrest of Tennison.

The case against Plaintiffs was originally prosecuted by Assistant District Attorney Al Giannini.  In December, 1989, Giannini filed a California Welfare and Institutions Code § 707 petition to have Tennison referred to adult court for prosecution in the Shannon homicide.  Kaiser Dec., Ex. B, May 24, 1990 Butterworth Declaration.  On February 21, 1990, the case was transferred to Assistant District Attorney Butterworth.  The section 707 hearing took place on March 27, 1990 and April 2, 1990; Hendrix and Pauline testified.  Tennison's attorney, San Francisco Assistant Public Defender Jeff Adachi cross-examined them.  The petition was granted.  Tennison was arrested on April 5, 1990. Tennison's preliminary hearing was set for April 23, 1990.  Goff was arraigned on April 9, 1990 and his preliminary hearing was set for May 1, 1990.

On April 22, 1990, the day before Tennison's preliminary hearing, Pauline arrived from Hawaii, where she was then living, to meet with Butterworth before she testified at the hearing.  Kaiser Dec., Ex. B, May 24, Butterworth Dec. at 1.  Pauline, her mother, Butterworth and Hendrix were at the meeting.  Kaiser Dec., Ex. A, Butterworth Depo. at 162.  Butterworth had asked Pauline to come to

10

the meeting to prepare her for her testimony at the preliminary

hearing.  Id.  Butterworth had Pauline read the testimony she gave

at Tennison's section 707 hearing and told her there were

discrepancies between what she had testified to and what Masina had

said in her tape-recorded interview with the police.  Purcell Dec.,

Ex. 30, April 23, 1990 Police Interview of Pauline Maluina at 2.

Pauline then told Butterworth that she had not been at the scene of

Shannon's homicide.  Id.  She said that she had lied "because she

didn't want to get into any more trouble" and she owed Masina

something.  Id. at 2, 4.  Pauline said that she had been able to

pick out Tennison's photo from the photos Hendrix had shown her at

the November, 1989 interview "because Masina told me to pick the

one that looked the biggest, and the largest one out of all the

pictures."  Id. at 3.  Pauline also said that she learned all the

details of Shannon's shooting from Masina before she spoke to

Hendrix in November.  Id. at 4.  After he heard Pauline's

recantation, Butterworth sent Pauline and her mother back to their

hotel.  Wong Dec., Ex. O, Butterworth Depo. at 178.  Then

Butterworth spoke with Hendrix and they decided to bring Pauline

back the next day to see if she would still say that she wasn't at

the murder scene.  Id.

    The next day, April 23, 1990, Pauline returned with her

mother.  Id.  Butterworth told Pauline that, based upon what she

had said the previous day, he wanted to do a follow-up interview

which was going to be tape-recorded.  Id. at 190.  Butterworth told

Pauline, "Do you understand that based upon what you told Inspector

Hendrix and myself yesterday, that the case against Mr. Tennison

11

**United States District Court**
For the Northern District of California

has been compromised and as a result, uh, we're not going to be able to proceed with the preliminary hearing or with the prosecution at this point?  Do you understand that?"  Purcell Dec., Ex. 30, April 23, 1990 Police Interview of Pauline Maluina at 6. Pauline responded that she did understand.  <u>Id.</u>  Butterworth asked, "And is the reason you are telling us the information you are telling us today because that's the truth or is it just because you are afraid to testify against Mr. Tennison?"  <u>Id.</u>  Pauline responded, "It's the truth."  <u>Id.</u>

After this interview, Butterworth dismissed the case against Tennison and then had a conference with other members of the homicide unit of the district attorney's office, including the head of the unit, to decide how to proceed.  Wong Dec., Ex. O, Butterworth Depo. at 192.  During that meeting, it was determined that Pauline would be given a polygraph test.  <u>Id.</u> at 194.  The goal of the polygraph was to see if, in the face of the polygraph examination, Pauline would persist in her claim that she had not been at the scene of Shannon's murder.  <u>Id.</u> at 194.  Another decision that was made was to talk to Masina.  <u>Id.</u> at 197.

On April 23, 1990, Hendrix called Masina who was then living in Samoa.  Balogh Reply Dec. at ¶ 7, Ex. 59, photocopies of two audiotapes labeled "Masina Fauolo 4/23/90" and "M. Fauolo 4/23/90." These are two copies of an original audiotape of Hendrix and Masina's conversation.  These copies were not produced to Plaintiffs' trial counsel nor were they produced in response to subpoenas issued in Tennison's federal habeas case.  Balogh Dec. at ¶ 7.  They were produced from Butterworth's files in December,

United States District Court

For the Northern District of California

2004, in response to Tennison's subpoena in this case.  <u>Id.</u>  The original audiotape of Hendrix' conversation with Masina has never been produced.  <u>Id.</u>[4]

Plaintiffs employed forensic audio expert Richard Sanders to enhance the sound quality of the audiotapes because they are difficult to hear.  Richard Sanders Dec. at 1.  Only Hendrix' voice can be heard on the audiotapes.  <u>Id.</u> at 5.  Even with the enhancement, only about one-third of Hendrix' conversation contains recognizable words.  <u>Id.</u>  Richard Sanders made a transcript of the audible portion of the tape.  <u>Id.</u>  He states that the only knowledge he had when making the transcript was the names of the people who might be involved in the discussion.  <u>Id.</u>  About ten minutes into the audiotape, the words, "Can you ever see this reward?" can be heard.  <u>Id.</u>, Ex. 2, Transcript of Audiotape at 3, line 10:58.

The Inspectors employed audio expert Durand R. Begault to review Richard Sanders' declaration and its attached exhibits.  Begault Dec. at ¶ 5.  Begault states that even with enhancement of the tape, except for an occasional word or phrase such as "OK" or "JJ," it is mostly impossible to determine reliably what exact words Hendrix is saying.  <u>Id.</u> at ¶ 14.  Begault states that the word "reward" is not spoken anywhere on the tape and thus Richard

---

[4]Tennison indicates that, because this evidence was only produced in response to the subpoena in this case, allegations that the Inspectors suppressed the tape of Hendrix' April 23, 1990 conversation with Masina is not included in his complaint.  Tennison argues that he informed the Inspectors of this <u>Brady</u> claim in his responses to their interrogatories and, because the Inspectors have not moved for summary judgment on this claim, it remains for trial.

United States District Court
For the Northern District of California

Sanders' transcript of the tape is inaccurate.  <u>Id.</u> at 18.
Begault's best estimate of the phrase Richard Sanders transcribes
as, "Can you ever see this reward" is "Have you ever seen this
before?"  Begault's colleague heard, "Have you ever seen this one?"

On April 24, 1990, Pauline returned to the police station
without her mother and she was given a polygraph test.  Kaiser
Dec., Ex. 1, Butterworth Depo. at 202.  Butterworth had a few brief
words with Pauline before she was polygraphed, but they did not say
anything of substance.  <u>Id.</u>  Butterworth did not speak to Pauline
after the polygraph.  <u>Id.</u>  SFPD Inspector Henry Hunter administered
the polygraph.  Purcell Dec., Ex. 33, April 27, 1990 Memorandum
from Henry Hunter to Hendrix and Sanders.  Pauline responded to
Hunter's questions by saying that she had not witnessed the Shannon
murder and that Masina had told her to lie about being there.  <u>Id.</u>
Hunter determined that the polygraph results were inconclusive.
<u>Id.</u>  Hunter told Pauline that if she had changed her original story
because of fear of retaliation, she should not do so because the
police would give her protection.  <u>Id.</u>  Hendrix placed Hunter's
memo summarizing the results of Pauline's polygraph in the police
case file which was available to Butterworth.  Hendrix Dec. ¶ 22.
Butterworth testified that he never saw the memo.  Wong Dec., Ex.
O, Butterworth Depo. at 207.  Butterworth testified that he told
Jeff Adachi, Tennison's defense counsel, about the polygraph.  <u>Id.</u>
Butterworth could not remember if he told Barry Melton, Goff's
defense counsel, about the polygraph.  <u>Id.</u> at 208.  Adachi declares
that he was not made aware that Pauline was subjected to a
polygraph examination.  Adachi Dec. at ¶ 12.

United States District Court

For the Northern District of California

After the polygraph, Hendrix put Pauline in a private room and arranged for her to talk by phone to Masina, who was in Samoa. Hendrix Dec. at ¶ 23.  Hendrix left Pauline in the room alone to talk to Masina and did not monitor or record the call.  During the call, Masina got mad at Pauline and told her how stupid she was. Purcell Dec., Ex. 31, Pauline's Trial Testimony at 194.   After Pauline talked to Masina, Pauline retracted her recantation. Hendrix Dec. at ¶ 23.  On April 24, 1990, Hendrix and Sanders interviewed Pauline on tape and documented the retraction of her recantation.  Id.; Purcell Dec., Ex. 34, April 24, 1990 Police Interview with Pauline Maluina.  Hendrix and Sanders gave this tape to Butterworth.  Hendrix Dec. at ¶ 23.

In a declaration dated June, 2003, Pauline states that, during the phone call, Masina pressured her to return to her earlier, untrue statements and told Pauline additional details about the false testimony she wanted Pauline to give. June, 2003 Maluina Dec. at ¶ 14.  At her deposition, Pauline stated that, although Masina had never hurt or threatened her, Pauline had seen the damage Masina had done to other people and she didn't want that happening to her.  Wong Dec., Ex. M, Maluina Depo. at 249-50.  Pauline stated that Masina told her to tell the truth, but Pauline interpreted Masina as saying "tell my truth."  Id. at 282-83.

Pauline testified that, when Butterworth first heard that she was recanting her prior testimony, he got upset and yelled, "How could you say that you weren't there?  You told us that you were there."  Id. at 79.  Later, she clarified that Butterworth got upset and raised his voice like a parent talking to his child.  Id.

15

at 77, 88-89.  She also said that Butterworth looked frustrated and then he called in Hendrix.  Id. at 78.  Pauline said that Butterworth and Hendrix pushed her toward going back to her original testimony by not listening to her when she told them she was not at the murder scene.  Id. at 96.  She felt that Butterworth and Hendrix did not protect her in that they did not listen to her.  Id. at 371-72.  Pauline testified that she had asked to take a polygraph test.  Id. at 94.

Tennison's preliminary hearing was held on June 18, 1990.  Achiron Reply Dec., Ex. D.  Only Masina testified, but the court heard testimony that Pauline had recanted and that Masina had spoken to her after she recanted.  Id. at 105.  Tennison Preliminary Hearing at 104-05.  At Goff's preliminary hearing, Butterworth called only Masina, but Goff called Pauline as a defense witness.  Achiron Reply Dec., Ex. C, Goff Preliminary Hearing at 101-11.  Pauline was examined on the discrepancies between her testimony and Masina's, her recantation and her telephone call to Masina regarding her recantation.  Id.  The court, in both cases, found probable cause.  Id. at 118-19; Achiron Reply Dec., Ex. D, Tennison's Preliminary Hearing at 118-19.

Masina and Pauline testified at Plaintiffs' consolidated trial.  On October 3, 1990, a jury found Plaintiffs guilty of murder and conspiracy to commit murder.

II. Pre-Trial Events -- Chante Smith

On January 3, 1990, Chante Smith contacted Sanders.  Purcell Dec., Ex. 45, Sanders' notes of January 3, 1990 Smith conversation; Sanders Dec. ¶ 9; Wong Dec. Ex. F, Matter of Goff and Tennison,

Transcript of Administrative Hearing (Transcript of § 4900 Hearing) at 87.  Smith said she had information that she had heard on the street and she provided Sanders with a list of names of people she had heard were at the scene of the Shannon murder, including a person named Luther Blue.  Sanders Dec. ¶ 9; Smith Dec. ¶ 8, Wong Dec., Ex. F, Transcript of § 4900 Hearing at 87.  Smith also said that Sanders had arrested the wrong people and that Lavinsta Ricard[5] had shot Shannon.  Smith Dec. ¶ 8.  Smith also told Sanders that the car chase started at the Seven-Eleven store, which is located east of the Super Fair Market where Shannon was shot, whereas Lovers' Lane, where Masina and Pauline had said the car chase started, is located west of the Super Fair Market.  Smith Dec. ¶ 8; see Purcell Dec., Ex. 20, Map.  Smith also described several of the cars involved in the car chase.  Smith Dec. ¶ 8.  Years later, on July 24, 1992, Smith told Butterworth and Sanders that she had actually witnessed Shannon's murder.  Purcell Dec., Ex. 47, Chante Smith's July 24, 1992 Police Interview at 2-32.  She said she had not told Sanders that she was a witness to the murder because she was afraid she would go to jail and that Ricard or Blue would harm her.  Wong Dec., Ex. F, Transcript of § 4900 Hearing at 94-95; Purcell Dec., Ex. 47, Chante Smith's July 24, 1992 Police Interview at 40, 62.  Blue and Ricard were friends and Smith heard that Blue had paid someone $10,000 to kill her so that she could not reveal that Ricard shot Shannon.  Id. at 40.  Because of these threats, Smith left the home she shared with her

---

[5]Smith used Ricard's street name, Lavinsta.  Apparently, his true name is Lovinsky.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

mother in San Francisco and moved to Richmond and then to Daly City. <u>Id.</u> at 65. Only Smith's mother knew how to get in touch with her. <u>Id.</u>

Sanders made a hand-written note of the Smith interview and put it in the police case file, which was made available to Butterworth. Sanders Dec. at ¶ 9; Wong Dec., Ex. I, Sanders' Note dated 1/3/90. The handwritten note has the word "Chante" written at the top left and the top center has the words "Re: 'Coolie' 187 PC,"[6] and under this is a telephone number. <u>Id.</u> Under this heading appear the words, "Luther Blue, 'Coug Nut' Lakeview 'Rapper', 'Louie Lou,' Record Title: 'Scandelous [sic]', Laventa or Vista, Troy Barnes drives a Black Skylark, Mad Hatter, Mark Anthony, Shardedee, 'The Ill Mannered Posse,' and 'We're going over to Sunnydale and start some shit.'" <u>Id.</u>

After Smith's initial contact with Sanders, Sanders came to Smith's house, they sat in the parking lot and Smith told Sanders about her knowledge of the people and the cars involved in Shannon's murder. Purcell Dec., Ex. 47, Smith's July 24, 1992 Police Interview at 61. Sanders sent three officers from the GTF to Smith's house to show her pictures of a truck similar to the one she had described to Sanders. <u>Id.</u> She was asked to identify the truck because she had told Sanders that, after Shannon had been shot, she had seen people involved in the shooting at the Sundial, a park in Hunter's Point, and she had seen a truck there. <u>Id.</u> at

---

[6]Coolie was Shannon's street name. 187 PC refers to California Penal Code § 187 which provides the definition of murder.

18

**United States District Court**
For the Northern District of California

62-63.

On February 8, 1990, after Smith had spoken to Sanders, Hendrix and Lewis interviewed Lovinsky Ricard. Purcell Dec., Ex. 37, Transcript of February 8, 1990 Police Interview with Lovinsky Ricard. Hendrix named the people mentioned by Smith and asked Ricard if he knew any of them. Ricard denied knowing any of them. Id. at 7-12. Hendrix asked Ricard if he was present when Shannon was shot. Id. at 14. Ricard replied, "No." Hendrix told Ricard that someone had told the police that Ricard had shot Shannon to avenge the death of Cheap Charlie and asked Ricard if he shot Shannon. Id. at 16-17. Ricard again denied shooting Shannon. Id. at 17. Toward the end of the interview Hendrix told Ricard, "I'm saying your name came up in this investigation, with Cooley. Someone says you were there at the scene. Now, I don't think this person would have a grudge with you. I don't think this person would do it maliciously or try to damage you in any way because it doesn't appear to be that type of individual. However, it's something that has to be explained, one way or another. And we'd be less than diligent, sworn to do our duty if we didn't pursue, check it out." Id. at 22-23.

On February 9, 1990, Sanders and Gittens interviewed Luther Blue. Wong Dec., Ex. S, Transcript of February 9, 1990 police interview with Luther Blue. Sanders informed Blue that his name had come up in connection with the Shannon homicide. Id. at 4. Blue said that he had never heard anything about the Shannon incident. Id. at 5. Later in the interview, Blue stated that he had heard that Shannon had been shot, but that he was not there.

19

1   Id. at 10.  Sanders stated,

2       Now we're gonna get to the bottom of Roderick Shannon
        being shot.  Now, we know and its [sic] obvious to you,
3       or it should be, that somebody has talked to us . . . I
        believe you were there, 'cause I believe the person who
4       told me. . . . But what I'm saying son the people we
        talked to told us exactly what happened.  They told us
5       about the truck.  We know who the truck belongs to.  We
        know about the truck.  We know about the chase, we know
6       that he was -- the person just out drove him, Roderick,
        he didn't know much about drivin' cars.  After he wrecked
7       the car they chased him and when they made that turn, he
        thought behind that market . . . there used to be a lower
8       fence . . . he thought if he could get over the fence he
        could get in the backyard and get away.  Only when he got
9       up there they caught him.  There were people standing
        around.  So, can you tell me . . . why these individuals
10      would say 'yeah, Luther was there,' they didn't say you
        were doing nothing . . .

11  Id. at 21, 23-24.

12      Blue replied, "I don't know why they'd say I was there."  Id.

13  at 24.  Sanders stated, "I believe the people who talked to me.  I

14  believe you were there.  You were there . . . and I can understand

15  you being afraid, that's no . . . Son, that is no crime to be

16  afraid. . . ."  Id. at 25.  Later, Sanders stated,

17
        Now tell me, if I were to tell you that on the night of
18      the incident you were at the 7-11 on Third Street . . .
        You became possed up with a group of other young men and
19      gave chase to an automobile driven by -- actually you
        didn't know who it was driven by, they thought it was
20      Patrick's car.  Roderick Shannon was Patrick's cousin.
        Gave chase to the car.  The car, lost it, picked it up
21      again, chased it until it ran the fence and then the
        truck backed down the street -- that was some pretty
22      skillful driving.  And when the witnesses told us about
        that -- that took some pretty skillful driving.  All the
23      time, the people that were in the truck, and in the other
        vehicles, they all knew each other.  Everybody knew
24      everybody else -- And you were there.  You were there
        Luther.  Tell you what I'm going to do, son . . . I'm
25      going to give you time to think about it. . . . Meanwhile
        we are going to continue our investigation.

26  Id. at 27.

27

28                                    20

United States District Court
For the Northern District of California

Butterworth testified that Sanders' January 3, 1990 note was in his file, but that he would not have known from the names listed on the note what role these individuals played or why they were identified.  Wong Dec. Ex. O, Butterworth Dep. at 113, 116. Butterworth said that this list of names, without any other information, would be valueless because, in a homicide investigation, everything is contextual.  Id. at 117.  Butterworth learned the significance of the document in the review of the petition for writ of habeas corpus.  Id.  Butterworth has no personal knowledge whether Sanders' note was produced to Adachi, but he testified that it was in the district attorney's file, and therefore it would have been turned over to Adachi in the initial discovery package.  Id. at 113.

Adachi declares that he never received any information or documentation regarding the information Smith provided to Sanders. Adachi Dec. at ¶ 4.  Adachi states that he never received a copy of Sanders' handwritten note.  Id. He states that the first time he received the note was in June, 2002, when Tennison's present attorney gave him a copy of it.  Id. at ¶ 5.  Adachi states that had he known that Smith had stated that the car chase started at the Seven-Eleven, which was inconsistent with Masina and Pauline's story, he would have had a legitimate alternative theory for the case that would have proven the girls were lying, he could have identified a woman named "Chante" who had information about a list of potential witnesses or suspects and he would have been able to follow up on the dead-end police interviews of Lovinsky Ricard on February 8, 1990, and of Luther Blue on February 14, 1990.  Id.

21

United States District Court

For the Northern District of California

Melton declares that he never received any information, oral or written, about the police interview with Smith in which she named Ricard.  Melton Dec. at ¶ 4.

In Smith's 1992 police interview, Butterworth and Sanders questioned her about her interaction with Plaintiffs.  Smith stated that she had gone out with Goff about twice, that they were friends but that they were not dating.  Purcell Dec., Ex. 47, 1992 Smith Interview at 39, 60.  Smith only knew Goff as Antoine or Sodapop, his street name; she did not know his last name.  Id. at 42. Before Plaintiffs' trial, Smith was contacted by some of Tennison's and Goff's friends who told her that Tennison and Goff, independently, wanted her to testify or talk to their attorneys. Id. at 41, 66-67.  Smith told Plaintiffs' friends that she had been threatened and couldn't take the risk.  Id. at 41.  Smith stated that she had worked as an operator for Pacific Bell in Burlingame and, after Plaintiffs' trial, when they were incarcerated in the county jail, she handled several collect calls placed separately by Tennison and Goff.  Id. at 66.  At that time, Smith did not know Tennison's name.  Id. at 42.  When Tennison realized that the operator was Smith, he asked her to talk to himself or his attorney, but Smith said she would not come forward because she was afraid of getting into trouble.  Id. at 42, 44.  Neither Tennison nor Goff had Smith's home number, so they did not know how to find her.  Id. at 45.

At Tennison's motion for new trial, Bruce Tennison testified that Adachi had asked him to find a woman by the name of Chauntey White to ask her if she knew anything about the Shannon homicide.

Wong Dec., Ex. E, Transcript of New Trial Motion at 228.  Bruce
Tennison could not find her because he did not have a number for
her.  Id.

     In her 1992 interview, Smith stated that if Plaintiffs'
attorneys had served her with a subpoena, she would have come in
and talked to them.  Purcell Dec., Ex. 47, 1992 Smith Interview at
45.  She reiterated this statements in her testimony at the § 4900
hearing.  Wong Dec., Ex. F., Transcript of § 4900 Hearing at 163,
165, 167.

     At the § 4900 hearing, Goff testified that, before Shannon's
murder, Goff had gone out with Smith twice.  Wong Dec., Ex. F,
Transcript of § 4900 Hearing at 640.  Goff testified that a month
or two after the murder, he was among a crowd of people who were
listening to a person named Lovinsky Ricard brag about shooting
Shannon.  Id. at 580.  Goff heard Ricard mention Smith's name in
connection with Shannon's murder, and the next time Goff saw Smith,
he asked her if she knew anything about the murder.  Id. at 582-83,
641.  Smith told Goff that she didn't have anything to do with the
murder, and Goff never said anything else about it to her.  Id. at
582.  Goff believed he told Melton about Smith.  Id. at 595, 677.
Goff did not tell Tennison any of the information he knew about
Ricard and Smith.  Id. at 639.  After he was convicted, but prior
to being sentenced, Goff had two or three telephone conversations
with Smith and he asked her to talk to his lawyer because his
friend had told him that she may have been at the murder scene.
Id. at 673-74.

23

**United States District Court**
For the Northern District of California

1    III.  Post-Trial Events -- Lovinsky Ricard

2         On November 7, 1990, shortly after Plaintiffs had been

3    convicted, Lovinsky Ricard was arrested, on a bench warrant, by

4    SFPD officers Lewis and Gittens, two members of the GTF who were

5    working on the Shannon murder with Hendrix and Sanders.  Purcell

6    Dec., Ex. 19, Lewis Depo. at 18, 31; Purcell Dec., Ex. 38, Lovinsky

7    Ricard's November 7, 1990 Police Interview at 2.  Ricard

8    voluntarily told them that he had shot Shannon.  <u>Id.</u> at 34.  Lewis

9    and Gittens read Ricard his <u>Miranda</u> warnings and questioned him

10   about the Shannon homicide.  <u>Id.</u> at 14.  The interview was audio-

11   taped.  Ricard stated that, on the night of the murder, he had been

12   hanging out, drinking with others and riding with friends in a

13   convertible.  <u>Id.</u> at 15.[7]  Ricard did not want to name the others

14   who were present, stating that he did not want them to be arrested

15   or involved in the case.  <u>Id.</u> at 17-18.  Ricard said that he had

16   started thinking about his friend Cheap Charlie, who had just been

17   killed, and he was talking about what he would do about it.  <u>Id.</u> at

18   3.  He had a shotgun with him.  <u>Id.</u>  He went with his friends in

19   the convertible to a Seven-Eleven store and there he decided to

20   join other people in the back of a pick-up truck.  <u>Id.</u> at 6.  He

21   saw a black car and he recognized the driver as one of the group

22   who he thought had killed Cheap Charlie.  <u>Id.</u>  A car chase began

23   and, from the back of the truck, Ricard shot at the black car.  <u>Id.</u>

24   The driver threw the car in reverse and went backward.  <u>Id.</u>  Then

25   ─────────────────────

26        [7]At her July 24, 1992 police interview, Smith stated that, on
     the night of the Shannon murder, she had been driving a convertible
27   with Ricard and two other passengers.  Purcell Dec., Ex. 47, Smith
     Police Interview at 3-4, 68.

28                                      24

the driver of the truck threw the truck in reverse and drove backward chasing the car.  Id.  During the chase, Ricard was shooting at the car.  Id. at 6-7.  The driver ran the car up on the curb and into the fence, and jumped out of the car and started running.  Id. at 7.  Some of the people who had been chasing the black car caught the driver and were beating him in a corner.  Id.  Ricard jumped out of the back of the truck with the gun and, when he pointed the gun at Shannon, everybody cleared back and Ricard shot him.  Id.  Then everybody scattered.  Id.  Ricard jumped back in the truck and the truck and all the cars drove away.  Id. at 7-8.  The gun he used had been stolen, so there was no possibility that the police would find it.  Id. at 8.  Ricard stated that he was confessing because he had been feeling bad that two of his friends were going down for something he did and now he was trying to do the right thing.  Id. at 13-14, 15.  Ricard stated that he knew Tennison and Goff well and they were not at the scene of the murder.  Id. at 15.  Ricard said the convertible he was originally riding in that evening, before he got into the pick-up truck, pulled up to the scene after the shooting was over.  Id. at 18. Several times Lewis asked Ricard for the names of people who could verify any part of his story; Ricard refused to name other people because he didn't want to bring them into it.  Id. at 25-28.

At his 2001 deposition, Lewis testified that Ricard's description of the car chase was consistent with everything else he had heard about it, that during the course of the chase, the person being chased had put his car in reverse and gone backwards for some distance.  Purcell Dec., Ex. 19, December 3, 2001 Lewis Depo. at

65.   After Ricard confessed, Lewis believed that Ricard murdered Shannon.  Id. at 82.   Lewis testified that he advised Hendrix and Sanders that Ricard had confessed on tape and "they said they would consider the information that I gave them through the interview and it would be determined from there, from others other than myself, how they would go further." Id. at 86.   Lewis stated that he gave the Inspectors a copy or the original of the audiotape, but not a written transcript, so they would have to play and listen to the tape to determine what was on it.   Id.   Lewis was sure he gave them some kind of narrative regarding the content of the tape.   Id. at 88.

At his 2005 deposition, Lewis testified that on November 7, 1990, after he interviewed Ricard, he made a copy of the audiotape of the interview.   Wong Dec., Ex. R, May 10, 2005 Lewis Depo. at 66.   Lewis was asked, "Once you concluded the Ricard interview and you had the audiotape of it, what did you do with that tape?"   He answered:

> My recall is that I made a copy of it and either put it
> in room 400, which is like the operation center for the
> police department, so when the different bureau chiefs or
> lieutenants come in they can forward that information to
> whomever in their unit needed it.   Or I would write a
> note -- and I recall having done this on occasion -- I
> don't remember that I did it on this occasion -- and
> either put it under the door so that they could get it
> first thing in the morning.   Because we work
> predominantly nights.

Id.

Then the following exchange took place:

Q: When you say "put it under the door," do you mean the door to Inspectors Hendrix' and Sanders' office?

A: The door to the homicide detail, yes.

1    Q: And that was where Inspector Hendrix and Sanders had
2    their desks, in the homicide detail?

3    A: Yes.

4    Q: And is your recollection that you did this immediately
     after taking the confession?

5    A: That evening before I left the building, yes.

6    . . .

7    Q: Do you recall talking to Inspector Hendrix or
     Inspector Sanders about what Ricard had said during the
8    November, 1990 interview?

9    A: The next day I believe I talked to them.

10   Q: What did you say?

11   A: "Did you hear the tape?"

12   Q: And were you talking to both Inspector Hendrix and
     Inspector Sanders or just one of them?
13
     A: I don't recall, but I think it was Napoleon.
14
     Q: And when you asked him "Did you hear the tape" what
15   did he say?

16   A: As I recall, he said, "Yeah, I listened to it, but it
     was -- you know, your boy has got to come in and lay it
17   all out.  He has got to do better than -- than this."

18   Q: So, he gave you the impression he had listened to the
     tape?
19
     A: Yes, as I recall I believe so.
20
     . . .
21
     A: Or maybe I told him about the content of the tape.  I
22   don't know that he sat and listened to the whole thing.
     Maybe I came away with that impression.  But I was
23   excited about it.  I told him why.  And he said, you know
     --
24
     Q: He made specific suggestions about additional
25   information that he would like to see Ricard provide?

26   A: And he said that while it was a good interview, he was
     still very vague on specifics.  And so he -- as I recall,
27   he told me that if he was going to do this then

28                                 27

United States District Court

For the Northern District of California

1       -- then he would be -- he would need a gun, named
2       additional suspects, vehicles, or something tangible to
        turn this thing around.

3  <u>Id.</u> at 66-68.

4       At his 2001 deposition, Sanders testified that he received the

5  tape of the Ricard confession within a day or two after it was

6  made.  Purcell Dec., Ex. 40, Sanders Depo. at 126.  Sanders stated

7  that "the first thing I did -- we did -- was compare the two tapes.

8  And they were diabolically [sic] opposed.  One, he had nothing to

9  do with it, and on this one he's -- in this interview, he's

10  confessing.  Further, in analyzing his statements in the November

11  7th statement, . . . there were just all kinds of unverifiable,

12  flawed facts in his case.  So with this, we wanted to talk to him

13  again.  And was -- and to talk to Mr. Lovinsky again.  But he was

14  then covered by an attorney, and he didn't want to talk anymore."

15  <u>Id.</u>  In answer to the question whether he withheld the copy of the

16  tape from Butterworth, Sanders replied, "No, this was something

17  that was paramount.  We got ahold [sic] of him right away and we

18  had to talk to him about it, told him we were investigating it."

19  <u>Id.</u>

20      In his June 2, 2005 declaration submitted in support of his

21  motion for summary judgment, Sanders states that he learned of

22  Ricard's taped confession from Butterworth in May, 1991.  Sanders

23  Dec. at ¶ 10.  At the time, Butterworth was involved in litigating

24  Tennison's motion for new trial and asked Sanders to investigate

25  the statements made by Ricard on the tape.  <u>Id.</u> at 10.  Sanders

26  states that he never received a copy of the tape from Lewis and

27  never had a copy in his possession.  <u>Id.</u>

28
                                    28

At his January 18, 2005 deposition, Hendrix testified that he learned of the Ricard confession from Sanders, but could not remember when Sanders told him about it.   Purcell Dec., Ex. 1, Hendrix Depo. at 57, 63.   Hendrix testified that he never listened to the audiotape of the confession.   Id. at 63.   Hendrix testified that he and Sanders were responsible for turning over evidence connected to the Shannon homicide to the district attorney because it was their case.   Id. at 64.   He testified that he never took any steps to turn the tape of Ricard's confession over to Butterworth, because it was never in his possession.   Id.   He stated that he felt it was Lewis and Gittens' responsibility to turn the tape over to Butterworth because they took the confession and made the tape. Id. at 67.   Hendrix felt angry at Lewis and Gittens for not calling Sanders and himself to conduct the Ricard interview, because the Shannon case was Sanders' and Hendrix' responsibility, and if there was a development in it, he and Sanders should have been contacted. Id. at 67, 70-71.   After he learned of the taped confession, Hendrix didn't care about the tape, he just wanted to find Ricard and he and Sanders took steps to try to locate him.   Id. at 67, 70, 72.   They located Ricard's father and a girl who was keeping company with Ricard and went to the places where Ricard usually hung out, on the street corners and up in the projects.   Id. Ricard's father told them that Ricard had left town and there was no sense in them looking for him.   Id. at 72-73.   Hendrix testified that he and Sanders tried to locate Ricard over a period of months. Id. at 73.   During this time Hendrix never informed Butterworth of their efforts to locate Ricard.   Id.

In his June 2, 2005 declaration submitted in support of his motion for summary judgment, Hendrix states that he first became aware of Ricard's taped confession from Sanders who said that he had learned of it from Butterworth.  Hendrix Dec. at ¶ 10.  Hendrix states that he never had a copy of the Ricard taped statement in his possession.  Id.

Butterworth testifies that he first learned of Ricard's confession in May, 1991 when he ran into Lewis in the cafeteria in the Hall of Justice.  Butterworth Dec. at ¶ 23.  At that time, Butterworth was in the midst of the hearing on Tennison's motion for a new trial.  Id.  Lewis informed Butterworth that he had a tape-recorded interview with Ricard admitting that he killed Shannon.  Id.  Butterworth told Lewis that he did not have a copy of the audiotape and asked Lewis to give him a copy, which Lewis did.  Id.  Butterworth contacted Sanders and informed him of the taped Ricard confession.  Id.  Sanders responded that he was not aware of any statement in which Ricard admitted killing Shannon.  Id.  Butterworth immediately informed Tennison's defense counsel of the taped statement, and he included it in his new trial motion.  Id.  Butterworth asked Sanders to assist him in responding to the new trial motion; Hendrix was not available to work on it.  Id.  Sanders did some follow-up work to check out some of the statements Ricard had made on the tape, such as visiting a store mentioned by Ricard to see what type of shotgun ammunition the store sold.  Id.  After he reviewed Ricard's statement with Sanders, Butterworth concluded that Ricard's confession was not credible.  Id.  Butterworth helped Sanders prepare a declaration regarding Ricard's

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

confession, which he submitted to the court.   Id.

Very soon after the jury verdict against Tennison, Tennison heard from friends that Ricard might be implicated in the Shannon murder.   Wong Dec., Ex. E., Transcript of New Trial Motion at 132. Tennison gave this information to Adachi.   Id. at 142-43.   Adachi, eventually found Ricard and convinced him to make a videotaped confession, which he did anonymously with a hood over his head. Purcell Dec., Ex. 41, Adachi Dec. at ¶ 4.   Because the Public Defender's Office was representing Ricard in a separate matter, Adachi's supervisors informed him that he was required to withdraw from representing Tennison, with the new trial motion pending.   Id. While he was representing Tennison, no one from the district attorney's office or the SFPD informed him of Ricard's November 7, 1990 taped confession to police.   Id. at 6.   On March 1, 1991, Adachi was replaced as Tennison's counsel by LeRue Grim.   On May 17, 1991, the second-to-last day of the hearing on Tennison's new trial motion, Butterworth informed Grim of the Ricard tape. Melton, Goff's attorney, was not informed by anyone from the district attorney's office or the SFPD of the November 7, 1990 Ricard taped confession.   Melton Dec. at ¶ 6.

Tennison's motion for a new trial was based, in part, on the tape of Ricard's anonymous confession that Adachi had made.   Wong Dec., Ex. GG, October 8, 1990 California court of appeal decision in People v. Tennison, appeal no. A054353 at 5.   At the hearing on the motion, Adachi, based on his attorney-client obligations to Ricard, refused to disclose the identity of the videotaped interviewee, but testified that he made the tape in conjunction

with Tennison's case and he provided the tape to Tennison's new counsel.  Wong Dec., Ex. E, Transcript of New Trial Motion at 16 <u>passim</u>, 91-94, 102-03.  In order to authenticate the video-tape of the anonymous confession, Tennison and Adachi testified about how they found out that Ricard was involved in the Shannon murder.  <u>Id.</u> at 47-48, 133 <u>passim</u>.  Grim, Tennison's attorney at the new trial proceeding, explained that the testimony was not offered for the truth of the matter, but to show a cumulative, causal chain that led to Tennison's discussion with Adachi regarding Ricard.  <u>Id.</u> at 132.  Tennison stated that in the beginning of October, 1990, about a week after he was convicted, his friends, who thought he would be acquitted because they knew that he was not involved, told him that two people, Lavista Ricard and Luther Blue, were involved in the murder.  <u>Id.</u>  Tennison called Ricard from the county jail.  <u>Id.</u> at 133.  Ricard told Tennison that he had been among the people who had chased Shannon and that he had fired a shot at him.  <u>Id.</u> at 136.  Tennison asked Ricard to come forward and admit to being the shooter and Ricard agreed to speak to Tennison's lawyer.  <u>Id.</u> at 138.  About a week later, Tennison told Adachi about his conversation with Ricard.  <u>Id.</u> at 140.  In November, 1990, Adachi told Tennison that he'd called Ricard several times, but hadn't received an answer.  <u>Id.</u> at 141-42.  Tennison also asked his brother, Bruce Tennison, to speak to Adachi about tracking down Ricard.  <u>Id.</u> at 142.  Tennison met with Adachi later in November, 1990, and Adachi told him he had talked to Ricard over the phone and Ricard had admitted to the crime.  <u>Id.</u> at 142-43.  Adachi set up a meeting with Ricard, but Ricard failed to show up.  <u>Id.</u> at

United States District Court

For the Northern District of California

143-44.  In about December, 1990, Tennison met Luther Blue, who was also in jail.  Id. at 144.  Blue told Tennison that he had witnessed the Shannon homicide and that he was willing to testify to help Tennison, but when Adachi questioned Blue, he denied knowing anything about the shooting.  Id. at 145-46.  Tennison stated that Blue told him that homicide inspectors had interviewed Ricard who made a taped statement admitting that he shot Shannon. Id. at 170.  Blue also mentioned that a person named Chauntey White was connected with the murder.  Id.  Tennison testified that in November or December, 1990, his brother, Bruce Tennison, told him that he had talked to Ricard and Ricard told Bruce that Ricard had made a statement to the police admitting to the crime.  Id. at 205. Adachi testified that Tennison had given him Ricard's name, address and telephone number very soon after the verdict or even during the trial.  Id. at 75.

    The trial court denied Tennison's motion on the grounds that the tapes of the two Ricard confessions were legally inadmissible and, even if they were admissible, Ricard's statements contained so many inconsistencies that they could not be considered to be trustworthy.  People v. Tennison, appeal no. A05453 at 6.  The appellate court affirmed.  Regarding the admissibility of Ricard's confessions, the court stated that Tennison had "made no showing that he had diligently attempted to obtain Ricard's attendance at the hearing on the motion for new trial, or that he would be legally unavailable to testify at a new trial, a prerequisite for application of the declaration against interest exception [to the hearsay rule]."  Id. at 7.  Regarding the trustworthiness of the

33

1   confession, the court stated,

2       Ricard's refusal to provide the police or Adachi any
        names and his inability to account for the whereabouts of
3       the gun undermine his credibility because his version of
        the incident cannot be corroborated.  Likewise the
4       inconsistencies between his two statements, between his
        statements and the evidence at trial, and between his
5       statements and appellant's testimony cast doubt on their
        trustworthiness.  For instance, Ricard stated that he
6       fired once, but the medical evidence established two
        shots to the victim's body and witnesses referred to
7       multiple gunshots. . . . Ricard stated that he came
        forward because 'two of my friends' were going down for
8       the crime, but appellant testified he did not know
        Ricard, had never seen him, and had only first spoken
9       with him on the telephone after the verdict.  Given such
        inconsistencies, the court did not err in determining
10      Ricard's statements were untrustworthy and thus
        inadmissible.

11  <u>Id.</u> 7-8.

12      At the § 4900 hearing, Goff testified that, about three to

13  four weeks after Shannon was shot, he heard rumors on the street

14  that Ricard may have had something to do with the murder.  Wong

15  Dec., Ex. F, Transcript of § 4900 Hearing at 579.  Goff had also

16  heard rumors that the chase started at a Seven-Eleven store.  <u>Id.</u>

17  at 578.  Goff testified that a month or two after the murder, he

18  had been among a crowd of people who were listening to Ricard brag

19  about shooting Shannon.  <u>Id.</u> at 580.  Goff assumed that Ricard was

20  lying because he didn't think the real shooter would brag about it

21  on the street.  <u>Id.</u> at 582.  Goff knew Ricard because they lived in

22  the same neighborhood, but they weren't friends.  <u>Id.</u> at 636.

23  About a month after he was charged with committing the Shannon

24  murder, Goff told Melton that he had heard Ricard brag about

25  shooting Shannon and Melton replied that he would look into it.

26  <u>Id.</u> at 595.

27

28                                      34

IV. Plaintiffs' Claims

In their complaints, Tennison and Goff allege that Butterworth participated in the suppression of material, exculpatory evidence, and manufactured evidence by pressuring Pauline to retract her recantation.  Tennison and Goff allege the following claims against the Inspectors:  (1) they participated in the suppression of material, exculpatory and impeachment evidence that probably would have led to Tennison's and Goff's acquittal; and (2) they actively solicited perjured testimony while deliberately ignoring and failing to investigate exculpatory evidence.

LEGAL STANDARD

I. Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

35

1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991), cert. denied, 502 U.S. 994 (1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.  A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. Celotex, 477 U.S. at 323.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie

United States District Court
For the Northern District of California

showing in support of its position on that issue.  UA Local 343 v.

Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That

is, the moving party must present evidence that, if uncontroverted

at trial, would entitle it to prevail on that issue.  Id.; see also

Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th

Cir. 1991).  Once it has done so, the non-moving party must set

forth specific facts controverting the moving party's prima facie

case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's

"burden of contradicting [the moving party's] evidence is not

negligible."  Id.  This standard does not change merely because

resolution of the relevant issue is "highly fact specific."  Id.

II. Constitutional Claims Under 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 "provides a cause of action for the

'deprivation of any rights, privileges, or immunities secured by

the Constitution and laws' of the United States."  Wilder v.

Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C.

§ 1983).  Section 1983 is not itself a source of substantive

rights, but merely provides a method for vindicating federal rights

elsewhere conferred.  Graham v. Connor, 490 U.S. 386, 393-94

(1989).  In order to state a claim under § 1983, Plaintiffs must

allege two elements:  (1) the violation of a right secured by the

Constitution or laws of the United States, and (2) the alleged

violation was committed by a person acting under the color of State

law.  West v. Atkins, 487 U.S. 42, 48 (1988)(citations omitted).

An individual defendant is liable for money damages under

§ 1983 only if the defendant personally participated in or

otherwise proximately caused the unconstitutional deprivations of

1  which the plaintiff complains.  Leer v. Murphy, 844 F.2d 628, 634

2  (9th Cir. 1988).  To establish individual liability, a plaintiff

3  must allege one of the following: (1) the defendant personally

4  participated in or ordered the constitutional violation; (2) the

5  defendant, acting in a supervisory capacity, failed to train

6  properly or supervise personnel, resulting in the violation;

7  (3) the defendant was responsible for an official policy or custom

8  which caused the violation; or (4) the defendant knew of the

9  violation and failed to prevent it.  Taylor v. List, 880 F.2d 1040,

10  1045 (9th Cir. 1989); Ybarra v. Reno Thunderbird Mobile Home, 723

11  F.2d 675, 680 (9th Cir. 1984).

12               PRELIMINARY PROCEDURAL MATTERS

13  I. Motion To Strike

14       Citing Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th

15  Cir. 1991), Foster v. Arcata Assocs., 772 F.2d 1453, 1462 (9th Cir.

16  1985) and Radobenko v. Automated Equip. Corp., 520 F.2d 540, 543-33

17  (9th Cir. 1975), Plaintiffs move to strike Hendrix' and Sanders'

18  declaration statements that they did not learn of the November 7,

19  1990 Ricard confession until May, 1991, on the ground that these

20  statements contradict their prior deposition testimony.

21       In Radobenko, the Ninth Circuit held that a party who had been

22  examined at length by deposition could not create an issue of fact

23  on a motion for summary judgment by submitting an affidavit

24  contradicting his own prior testimony because this would greatly

25  diminish the utility of summary judgment as a method for screening

26  sham issues of fact.  Kennedy, 952 F.2d at 266 (citing Radobenko,

27  520 F.2d at 543-44)).  In Kennedy, the Ninth Circuit clarified that

28                               38

**United States District Court**
For the Northern District of California

the rule enunciated in <u>Radobenko</u> does not automatically dispose of every case in which a contradictory affidavit is submitted to explain portions of prior deposition testimony and that, before striking a declaration, the district court must make a factual finding that the contradiction was actually a sham. <u>Id.</u> at 266-67.

After having considered the Inspectors' July 1, 2006 motion for relief from this order, the Court concludes that none of the Inspectors' statements will be stricken.

II. Request To Submit Statement of Facts

In their reply brief, the Inspectors request leave to submit a statement of disputed and undisputed facts with citations to evidence, pursuant to Civil Local Rule 56-2(a). They argue that this is necessary because there are many misstatements of facts in Plaintiffs' briefs. A separate statement of facts is unnecessary: the Court looks at the evidence cited by the parties to support their arguments and determines the accuracy of the statements of fact in the briefs. Therefore, the Inspectors' request to submit a separate statement of disputed and undisputed facts is DENIED.

III. Evidentiary Objections

The Inspectors object to statements in Plaintiffs' briefs as mischaracterizations of the evidence and object to various pieces of evidence. The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence. The Court will not discuss each objection individually. To the extent that the Court has relied on evidence to which the Inspectors object, such evidence has been found admissible and the objections are overruled.

39

IV. Effect of Habeas Corpus Order

Citing <u>Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.</u>, 204 F.3d 867, 877 (9th Cir. 2000), the Inspectors argue that the Court's August 26, 2003 Habeas Order has no preclusive effect in this action because the Inspectors were not parties to the habeas case and were not in privity with the respondent in the habeas case or the State of California.  Plaintiffs do not respond to this argument.

The Inspectors are correct that the doctrine of collateral estoppel that precludes the relitigation of issues previously decided requires that the parties in the second action be the same as or in privity with the parties in the prior proceeding.  The Inspectors also are correct that they were not in privity with the respondent in the habeas case and that the habeas respondent did not present a good deal of the evidence submitted by the Inspectors or make some of the arguments that the Inspectors make here.

Therefore, the Court concludes that the findings and conclusions in the Habeas Order do not have any preclusive effect on the issues in this case.  However, in certain instances, the facts and arguments addressed in the Habeas Order are identical to those presented here.  In those instances, the Court may reach the same conclusions it did in the Habeas Order.

DISCUSSION

In their separate motions, Tennison and Goff move for partial summary adjudication on the liability and causation elements of their claims that the Inspectors suppressed three pieces of material, exculpatory evidence:  (1) Ricard's taped confession;

United States District Court

For the Northern District of California

(2) Smith's statements corroborating Ricard's confession; and

(3) the Inspectors' request for $2,500 from the SFPD's SWP to pay a witness in the Shannon murder case.  Butterworth moves for summary judgment on the grounds that he is absolutely or qualifiedly immune from liability on all of Plaintiffs' claims.  The Inspectors move for summary judgment on all of Plaintiffs' causes of action on the grounds that: (1) there is no evidence that they violated Plaintiffs' rights by suppressing material information; (2) there is no evidence that they fabricated witness testimony; and (3) they are either absolutely or qualifiedly immune from liability for all alleged constitutional violations.

I. Butterworth's Motion for Summary Judgment

Butterworth argues that he is entitled to summary judgment because at all relevant times he was acting in the role of a prosecutor and thus is entitled to absolute immunity.  He argues, in the alternative, that he is entitled to qualified immunity on all claims.  Tennison's opposition addresses only Butterworth's conduct in questioning Pauline on April 22, 23, and 24, 1990.  Goff's opposition addresses only Butterworth's failure to disclose the Ricard confession to him.  Therefore, the Court grants Butterworth's motion for summary judgment on all of Plaintiffs' other claims.

A. The Questioning of Pauline

1. Absolute Immunity

"An official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Genzler v. Longanbach, 410 F.3d 630, 636 (9th Cir.

41

2005) (quoting <u>Burns v. Reed</u>, 500 U.S. 478, 486 (1991)).  The

presumption is that qualified, rather than absolute, immunity is

sufficient to protect government employees in the performance of

their official duties.  <u>Milstein v. Cooley</u>, 257 F.3d 1004, 1008

(9th Cir. 2001) (citing <u>Burns</u>, 500 U.S. at 486-87).

A prosecutor performing an advocate's role is an officer of

the court entitled to absolute immunity.  <u>Buckley v. Fitzsimmons</u>,

509 U.S. 259, 272-73 (1993).  Prosecutors therefore are absolutely

immune from liability for their conduct as "advocates" during the

initiation of a criminal case and its presentation at trial.  <u>Id.</u>;

<u>Imbler v. Pachtman</u>, 424 U.S. 409, 430-31 (1976) (prosecutor

entitled to absolute immunity from suit alleging that he knowingly

used perjured testimony and suppressed material exculpatory

evidence at trial); <u>Burns</u>, 500 U.S. at 490-91 & n.6 (prosecutors

absolutely immune for their conduct before grand juries and in

presenting evidence at probable-cause hearings for a search

warrant).

Prosecutors are entitled only to qualified, not absolute,

immunity when they perform administrative or investigatory, rather

than advocacy, functions.  <u>Kalina v. Fletcher</u>, 522 U.S. 118, 122-31

(1997).  Thus, in determining immunity, the court examines the

nature of the function performed, not the identity of the actor who

performed it.  <u>Id.</u> at 127.  Absolute immunity requires that the

activities at issue be "intimately associated with the judicial

phase of the criminal process."  <u>Imbler</u>, 424 U.S. at 430.

Prosecutors are not acting as advocates, and therefore are not

entitled to absolute immunity, before they have probable cause to

United States District Court

For the Northern District of California

have anyone arrested.  Buckley, 509 U.S. at 274; Herb Hallman
Chevrolet, Inc. v. Nash-Holmes, 169 F.3d 636, 643 (9th Cir. 1999).
However, even after probable cause has been established,
prosecutors are absolutely immune only for quasi-judicial
functions, not investigatory or administrative actions.  Broam v.
Bogan, 320 F.3d 1023, 1030-31 (9th Cir. 2003); Genzler, 410 F.3d at
638.

Activities in preparation for trial, such as the interview of
witnesses, may be investigatory or advocatory in nature.  Genzler,
410 F.3d at 638.  The timing of the prosecutor's conduct is a
relevant, but not determinative, factor.  Id. at 639-40.

Tennison presents several grounds for his contention that
Butterworth was acting as an investigator when questioning Pauline
and thus is not entitled to absolute immunity.  First, citing
Buckley, 509 U.S. at 274, Tennison argues that Butterworth did not
have probable cause to believe that Tennison was involved in the
Shannon homicide when he questioned Pauline.  Tennison bases this
on the fact that the November 28, 1989 warrant for Tennison's
arrest was predicated upon Hendrix' affidavit in which Hendrix
swore that Pauline corroborated Masina's account of the shooting
incident.  See Balogh Reply Dec., Ex. 57, Arrest Warrant for
Tennison and Hendrix Affidavit.  Tennison argues that Hendrix'
affidavit was false because Pauline's statement to the police was
inconsistent with Masina's story.

Pursuant to Buckley, 509 U.S. at 274, if at the time
Butterworth interviewed Pauline probable cause to arrest Tennison
was lacking, Butterworth was acting as an investigator, and not as

43

United States District Court
For the Northern District of California

1 an advocate.

2    The Court concludes that on April 22, 1990, there was probable

3 cause to arrest Tennison.  As noted by Butterworth, the information

4 in Hendrix' affidavit regarding Pauline's corroboration of Masina's

5 story, which Tennison states was false, was presented to the court

6 in both Tennison's and Goff's probable cause hearings.  See Achiron

7 Reply Dec., Ex. D, Tennison Preliminary Hearing; Ex. C, Goff

8 Preliminary Hearing.  At Tennison's preliminary hearing only Masina

9 testified, but the court heard testimony that Pauline had recanted

10 and that Masina had spoken to her after she recanted.  At Goff's

11 preliminary hearing, Butterworth called only Masina, but Goff

12 called Pauline as a defense witness.  Pauline was examined on the

13 discrepancies between her testimony and Masina's, her recantation

14 and her telephone conversation with Masina regarding her

15 recantation.  The court, in both cases, found probable cause.

16    Because the accuracy of the information contained in Hendrix'

17 arrest warrant affidavit was tested in court and the court found

18 probable cause, Tennison's argument that Hendrix' affidavit was

19 insufficient to establish probable cause to arrest is unpersuasive.

20    Tennison next argues that, even if there was probable cause

21 for his initial arrest, there was no probable cause after Pauline

22 recanted on April 22, 1990.  Tennison cites Butterworth's

23 deposition at p.p. 327-328 to establish that, after Pauline

24 recanted, Butterworth conceded that he needed Pauline to establish

25 probable cause.  However, Butterworth did not concede this at his

26 deposition.  Butterworth stated that he had to cancel the

27 preliminary hearing scheduled for April 23, 1990 because Pauline's

United States District Court

For the Northern District of California

28

United States District Court

For the Northern District of California

recantation "raised some question in my mind as to how valuable a witness she was going to be and whether I wanted to rely upon her for a probable cause finding. And if she were to testify at a preliminary hearing and recant, the only way I would have gotten a holding would be to have impeached her with her prior inconsistent statement. And I wasn't comfortable doing that, given the record of the 707 hearing. . . . I know that I wasn't comfortable proceeding in the face of her recantation. And I didn't have any other witnesses who were in a position to make an identification, so it wasn't really a difficult call at that point [to cancel the preliminary hearing]." Wong Dec., Ex. O, Butterworth Depo. at 327-328. Thus, Butterworth did not cancel the preliminary hearing because he believed probable cause was lacking, but because Masina was unavailable as a witness. When Masina was available as a witness, she alone testified at Tennison's rescheduled probable cause hearing. Tennison's argument that probable cause was extinguished by Pauline's recantation is not persuasive.

Tennison argues that even if probable cause did exist during Butterworth's questioning of Pauline, Butterworth was acting as an investigator because his purpose in interviewing Pauline was to persuade Pauline to change her story so that it would be consistent with Masina's.

As discussed in Gensler, 410 F.3d at 639, timing is an important element in determining whether the prosecutor is engaging in investigatory police activity or acting as a prosecutor. Here, the timing weighs in favor of concluding that Butterworth was acting as a prosecutor rather than an investigator. When Pauline

45

came to meet with Butterworth on April 22, 1990, the judicial proceedings against Tennison were underway.  The section 707 hearing regarding Tennison was held in March and April, 1990, with Pauline as a witness.  Tennison was arrested on April 5, 1990 and his preliminary hearing was set for April 23, 1990.  That Butterworth met with Pauline immediately before Tennison's preliminary hearing indicates that Butterworth was meeting with her in his role as a prosecutor marshaling evidence, not as an investigator looking for clues and evidence to establish probable cause.

Tennison argues that after Pauline recanted and Butterworth continued interviewing her, his questioning was investigative in nature and coerced her to change her testimony.

Intimidating and coercing a witness to change her testimony are not advocacy and are not entitled to absolute immunity.  Moore v. Valder, 65 F.3d 189, 194 (D.C. Cir. 1996) (quoted with approval in Gensler, 410 F.3d at 638).  Intimidating a witness to change testimony is "a misuse of investigative techniques legitimately directed at exploring whether witness testimony is truthful and complete and whether the government has acquired all incriminating evidence."  Id.

Although Pauline testified that Butterworth, as well as Hendrix and Masina, told her what to say at the trial, she explained that Butterworth communicated this to her by not wanting to hear her recantation, by not listening to her.  Although she stated that Butterworth yelled at her, she also indicated she interpreted Butterworth's behavior toward her to be like a parent

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

talking to a child.  Pauline's testimony does not provide evidence that Butterworth coerced or intimidated her.

Taking the evidence in the light most favorable to Plaintiffs, Plaintiffs have failed to raise a triable issue of material fact that Butterworth was not acting in his capacity as prosecutor at all times during his interaction with Pauline on April 20 through April 22, 1990 and thus is entitled to absolute immunity. Therefore, Butterworth's motion for summary judgment on Tennison's claim regarding Pauline's interviews on April 20 through April 22, 1990 is GRANTED.  Nonetheless, the Court discusses whether, even if Butterworth was not acting as a prosecutor, but was acting as an investigator, he is entitled to qualified immunity.

2. Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The threshold question is whether, if all factual disputes were resolved in favor of the party asserting the injury, the evidence would show the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  Id.  On the other hand, if a violation could be made out on the allegations, the next step is to ask whether the constitutional right in issue was clearly established.  Id.  The

47

question here is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. _Id._ If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. _Id._

The Ninth Circuit engages in a two-part test to determine if the right was clearly established at the time of the allegedly impermissible conduct. _Franklin v. Fox_, 312 F.3d 423, 437 (9th Cir. 2002). First, it must be determined if the law that governs the official's conduct was clearly established. _Id._ It is not necessary that a prior decision rule "the very action in question" unlawful for a right to be clearly established. _Anderson v. Creighton_, 483 U.S. 635, 640 (1987). Indeed, some wrongs are self-evident and a "right can be clearly established on the basis of 'common sense.'" _Lee v. Gregory_, 363 F.3d 931, 935 (9th Cir. 2004). The plaintiff bears the burden of proving that the right was clearly established at the time of the allegedly impermissible conduct. _Maraziti v. First Interstate Bank_, 953 F.2d 520, 523 (9th Cir. 1992).

The next question is whether, under that clearly established law, a reasonable official could have believed his conduct was lawful. _Act Up!/Portland v. Bagley_, 988 F.2d 868, 871-72 (9th Cir. 1993). The defendant bears the burden of establishing that his or her actions were reasonable, _Doe v. Petaluma City Sch. Dist._, 54 F.3d 1447, 1450 (9th Cir. 1995), and the defendant's good faith or subjective belief in the legality of his or her actions is irrelevant. _Alford v. Haner_, 333 F.3d 972, 978-79 (9th Cir. 2003).

48

**United States District Court**
For the Northern District of California

Thus, the Court must decide first whether, if the facts Plaintiffs allege are true, Butterworth committed a constitutional violation.  If so, the Court must then decide if the law was clearly established at the time of the conduct at issue, and if so, whether Butterworth's conduct was objectively reasonable.

Tennison contends that Butterworth's conduct in regard to Pauline violated his constitutional right to be free from criminal charges based on deliberately fabricated false evidence.

Individuals have a constitutional due process right to be free from criminal charges based upon deliberately fabricated false evidence.  <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (<u>en banc</u>).  To prevail on this claim, a plaintiff, at a minimum, must show that (1) the officer continued his investigation despite the fact he knew or should have known that the suspect was innocent or (2) the officer used investigative techniques that were so coercive and abusive that he knew or should have known that they would yield false information.  <u>Id.</u> at 1076; <u>Cunningham v. Perez</u>, 345 F.3d 802, 811-12 (9th Cir. 2003) (that officer continued to interview suspected child sex abuse victims after they initially denied abuse not so coercive or abusive that he knew or should have known he would receive false information).  There is no constitutional right to have witnesses interviewed in a particular manner or to have the investigation carried on in a particular way.  <u>Devereaux</u>, 263 F.3d at 1075.  Therefore, suggestive interview tactics alone do not amount to a constitutional violation.  <u>Gausvik v. Perez</u>, 345 F.3d 813, 817 (9th Cir. 2003) (officer's continued questioning of alleged sexual abuse victims after victims initially

**United States District Court**

For the Northern District of California

denied abuse and telling alleged victim she could not leave until she admitted abuse not so coercive and abusive that officer knew or should have known that he would receive false information).

In regard to the first <u>Devereaux</u> prong, after Pauline recanted, it was incumbent upon Butterworth to gather information to determine whether Pauline or Masina was being truthful.  Furthermore, although Pauline recanted, it does not necessarily follow that, on this basis, Butterworth knew or should have know that Tennison was innocent.  As noted above, Butterworth dismissed Tennison's case after Pauline's recantation because Masina, the only other witness, was in Samoa, and thus was not available to testify at Tennison's preliminary hearing, which was scheduled for the next day.  Because Pauline never stated that she saw Goff at the crime scene, she was not needed as a witness at Goff's preliminary hearing, and her recantation was not relevant to his case.  Plaintiffs have produced no evidence to demonstrate that Butterworth knew or should have known that Tennison was innocent at that point and should not have continued investigating.  Thus, the first <u>Devereaux</u> prong does not apply.

In regard to the second <u>Devereaux</u> prong, the evidence shows that when Pauline recanted, Butterworth raised his voice and confronted her.  However, Pauline testified that Butterworth's frustration with her reminded her of how a parent would reprimand a child and that Butterworth never told her what to say.  Furthermore, Butterworth's contact with Pauline was relatively brief.  He met with her for approximately half an hour on April 22nd, half an hour on April 23rd and a few minutes on April 24th.  Almost the entire

50

interview on April 23rd was recorded and nothing in the interview was coercive.  Therefore, assuming the facts Tennison alleges are true, and taking them in the light most favorable to Tennison, the Court finds that Tennison has failed to show that Butterworth violated his constitutional right to be free from being charged on the basis of deliberately fabricated evidence.  Therefore, Butterworth is entitled to summary judgment on the basis of qualified as well as absolute immunity on this claim.

Even if Tennison had established a constitutional violation, Butterworth would be entitled to qualified immunity.  At the time of the events at issue, the law was clearly established.  However, a reasonable person could have believed that the actions taken by Butterworth, under the circumstances, were lawful.

Thus, summary judgment is GRANTED in Butterworth's favor on Tennison's claim on the basis of qualified as well as absolute immunity.

D. Failure to Provide Ricard Confession to Goff

Butterworth argues that he is entitled to absolute prosecutorial immunity for his failure to turn Ricard's confession over to Goff after Goff's conviction.  Relying on Houston v. Partee, 978 F.2d 362, 367 (7th Cir. 1992), Goff argues that Butterworth is not shielded by absolute immunity because he was no longer involved in Goff's prosecution when he learned of the Ricard confession

A prosecutor may be absolutely immune for post-conviction conduct, but only if the conduct is an exercise of prosecutorial discretion, and is not purely investigatory or administrative. Broam, 320 F.3d at 1030-31; see Carter v. Burch, 34 F.3d 257 (4th

United States District Court

For the Northern District of California

Cir. 1994) (upholding absolute immunity for prosecutor who withheld exculpatory evidence while handling defendant's post-conviction motions and direct appeal).

Butterworth argues that, on May 17, 1991, the date he became aware of the Ricard confession, he was opposing Tennison's motion for a new trial and therefore was acting as a prosecutor.  This may be true in regard to Tennison's post-conviction proceedings, but it does not establish that Butterworth was acting as a prosecutor in regard to Goff's post-conviction proceedings.  The cases against Tennison and Goff were consolidated for trial, but the post-trial proceedings were litigated separately:  Goff's post-conviction new trial motion was filed on October 19, 1990; it was denied on October 31, 1990; on August 9, 1991, he filed an opening brief in his direct appeal of his conviction.  Because no post-conviction proceedings were pending in the trial court in Goff's case at the time Butterworth received the tape of Ricard's confession, Butterworth was not acting as a prosecutor in regard to Goff.  Because the Attorney General represents the people of the State on appeal, even though Goff's appeal was pending, Butterworth would not have been involved in it.

In Houston, the plaintiffs were convicted of committing the gang-related murder of Ronnie Bell.  Houston, 978 F.2d at 363. While the plaintiffs' appeals were pending, certain State and federal prosecutors, including the one who had prosecuted the plaintiffs, learned during an investigation of the gang's activities that the Bell murder had been committed by three other individuals, not by the plaintiffs.  Id. at 364.  None of the prosecutors

disclosed this information to the plaintiffs or their attorneys,
even though they knew it was relevant to the plaintiffs' pending
appeals.  Id.  Four years after the plaintiffs' conviction, the
plaintiffs' attorneys found out about the exculpatory evidence on
their own and filed post-conviction petitions which were granted.
Id. at 363, 365.  The plaintiffs sued the prosecutors.  The
defendant prosecutors had not been involved in the plaintiffs'
appeals.  Id. at 366.  The prosecutors asserted absolute immunity on
the plaintiffs' civil § 1983 claims against them on the ground that
absolute immunity attached during the plaintiffs' prosecution and
continued indefinitely.  Id. at 365-66.  The court rejected this
argument and concluded that, at the time the defendant prosecutors
learned about the exculpatory evidence, they were functioning as
investigators, not as prosecutors, and thus were not entitled to
absolute immunity.  Id. at 367.

Butterworth argues that Houston is distinguishable because the
prosecutors in that case were involved in a new investigation that
led to the exculpatory information.  Butterworth points out that he
was not acting as an investigator, but learned of the exculpatory
evidence in his role as prosecutor in Tennison's case.

This argument is unavailing because, even if he was not acting
as an investigator, neither was he acting as a prosecutor on Goff's
case.  Accordingly, Butterworth's motion for summary judgment based
upon absolute immunity is DENIED.  Butterworth does not move for
summary judgment based on qualified immunity.

1    II. Plaintiffs' and Inspectors' Cross Motions for Summary
2        Judgment on § 1983 Claims Based on <u>Brady</u> Violations

3        Plaintiffs argue that they are entitled to summary adjudication
4    that the Inspectors deprived them of due process by violating their
5    <u>Brady</u> rights, and that this caused them damage.  The Inspectors
6    argue that they are entitled to summary judgment on the ground that
7    there is no evidence that they violated Plaintiffs' constitutional
8    rights and, if they did, they are absolutely or qualifiedly immune
     from liability.

9        A. Legal Standard for § 1983 Claims Based on <u>Brady</u> Violation

10       In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the Supreme Court
11   held that "the suppression by the prosecution of evidence favorable
12   to an accused upon request violates due process where the evidence
13   is material either to guilt or to punishment, irrespective of the
14   good faith or bad faith of the prosecution."  <u>Id.</u>  The government
15   has a duty to disclose <u>Brady</u> material even if the defense fails to
16   ask for it.  <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976).  The
17   duty under <u>Brady</u> encompasses impeachment evidence as well as
18   exculpatory evidence.  <u>United States v. Bagley</u>, 473 U.S. 667, 676
19   (1985).  The government's promise of a benefit to a witness must be
20   disclosed under <u>Brady</u>.  <u>Giglio v. United States</u>, 405 U.S. 150, 154
21   (1972).

22       In the criminal context, "[t]here are three components of a
23   true <u>Brady</u> violation: [t]he evidence at issue must be favorable to
24   the accused, either because it is exculpatory or because it is
25   impeaching; that evidence must have been suppressed by the State,
26   either willfully or inadvertently; and prejudice must have ensued."

27

28                                    54

Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682.  The evidence need not be sufficient affirmatively to prove the defendant innocent; it need only be favorable and material. Gantt v. Roe, 389 F.3d 908, 912 (9th Cir. 2004).  Materiality is measured in terms of the collective effect of the suppressed material, not item by item. Kyles v. Whitley, 514 U.S. 419, 436 (1995).

> If the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.  This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.  On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt.

Agurs, 427 U.S. at 112-13.

The obligation to disclose under Brady "is the obligation of the government, not just the obligation of the prosecutor." United States v. Blanco, 392 F.3d 382, 393 (9th Cir. 2004).  The prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. Kyles v. Whitley, 514 U.S. 419, 437-38 (1995).  A prosecutor's duty under Brady necessarily requires the cooperation of other government agents who might possess Brady material. Blanco, 392 F.3d at 388.  Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. Id. at 393-94.

In the criminal context, there is no intent requirement to establish a <u>Brady</u> claim; whether non-disclosure was negligent or by design, it is the responsibility of the prosecutor.  <u>Brady</u>, 373 U.S. at 87.

The parties agree that to establish a civil rights claim based upon a <u>Brady</u> violation, the plaintiff must establish that the defendant intended to violate the plaintiff's constitutional right. However, they disagree on the level of intent that must be established.  Citing <u>Cunningham v. City of Wenatchee</u>, 345 F.3d 802, 812 (9th Cir. 2003), the Inspectors argue that bad faith must be shown and Plaintiffs argue that intent to violate a constitutional right is all that is required.

<u>Cunningham</u> was a civil rights case based, among other things, on the defendants' failure to preserve and gather evidence that might have exonerated the plaintiff in his criminal case.  <u>Id.</u>  The Inspectors argue that <u>Cunningham</u> addressed a <u>Brady</u> claim, pointing to the court's cursory summary in the beginning of the opinion that the complaint alleged that the defendants concealed exculpatory evidence.  <u>See</u> <u>id.</u> at 806.  However, in its analysis of this claim, the court described it as the defendants' failure to preserve and gather potentially exculpatory evidence by failing to document interrogations, failing to keep a record of witnesses' statements and failing to gather physical evidence.  <u>Id.</u> at 812.  The court then analyzed the claim under <u>Arizona v. Youngblood</u>, not <u>Brady</u>.  <u>Id.</u>

The Supreme Court in <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988), distinguished the claim before it, that the government lost evidence that could have been exculpatory, from a <u>Brady</u> claim, concluding

56

that a <u>Youngblood</u> claim, unlike a <u>Brady</u> claim, requires a showing of bad faith. <u>Youngblood</u>, 488 U.S. at 57. The Supreme Court explained:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in <u>Brady</u>, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

<u>Id.</u>

Therefore, <u>Cunningham</u> does not support the Inspectors' contention that the Ninth Circuit requires bad faith to establish a § 1983 claim based on a <u>Brady</u> violation.

The Inspectors also rely on <u>Daniels v. Williams</u>, 474 U.S. 327 (1986), which held that "the Due Process Clause is simply not implicated by a <u>negligent</u> act of an official causing unintended loss of or injury to life, liberty, or property." <u>Id.</u> at 328 (emphasis in original). However, <u>Daniels</u> did not require bad faith for a due process violation, it simply required more than negligence.

Circuit courts are divided on the question of whether a plaintiff must show bad faith to establish a civil rights claim based on a <u>Brady</u> violation. <u>Compare</u> <u>McMillian v. Johnson</u>, 88 F.3d 1554, 1567 (11th Cir. 1996) (in a § 1983 action, holding that investigators have a duty to disclose under <u>Brady</u>, irrespective of good or bad faith) <u>with</u> <u>Jean v. Collins</u>, 221 F.3d 656, 660 (4th Cir. 2000) (<u>en banc</u>) (in a § 1983 action, affirming, by an equally divided court, district court dismissal of complaint on ground that it merely alleged negligent conduct on the part of defendants and

that bad faith was required to hold police officers liable for due process violations); and <u>Villasana v. Wilhoit</u>, 368 F.3d 976, 980 (8th Cir. 2004) (in a § 1983 action, holding that bad faith required in <u>Brady</u> claims against law enforcement officials other than prosecutor).

Because neither the Supreme Court nor the Ninth Circuit has addressed this issue, this Court must decide whether police investigators are civilly liable for <u>Brady</u> violations only if they act in bad faith.

Based upon the fact that <u>Brady</u> makes the non-disclosure of exculpatory evidence a violation of the Due Process Clause irrespective of the good or bad faith of the non-disclosing officer, this Court concludes that bad faith is not required to establish a civil <u>Brady</u> violation.  Based upon <u>Daniels</u>, 474 U.S. at 331, which held that a due process violation requires only a deliberate decision on the part of a government official to deprive a person of life, liberty or property, the Court concludes that, to prove a § 1983 claim based on <u>Brady</u> against the Inspectors, Plaintiffs must establish only that they deliberately withheld exculpatory evidence from Butterworth.

B. Suppression of Ricard Confession

There is no dispute that the November 7, 1990 Ricard confession was exculpatory.  The Inspectors argue that Plaintiffs' <u>Brady</u> claim based on the Ricard confession fails because the Inspectors lacked the requisite intent to deprive Plaintiffs of a constitutional right, because Plaintiffs knew of Ricard's involvement and because the confession was not material in that it was inadmissible.

58

United States District Court

For the Northern District of California

1    1. Inspectors' State of Mind

2    Questions involving state of mind are generally issues of fact

3 that are inappropriate for summary judgment.  Braxton-Secret v. A.H.

4 Robins Co., 769 F.2d 528, 531 (9th Cir. 1985).

5    The Inspectors point out that there is no dispute that they

6 first learned about Ricard's confession second-hand, after

7 Plaintiffs' convictions, not as a result of their own investigation,

8 and that there is no evidence that they took any action to hide the

9 confession.  They argue that this establishes that they had no

10 intent to deprive Plaintiffs of a fair trial by failing to inform

11 Butterworth of the confession.  Plaintiffs contend that the

12 Inspectors' knowledge of the Ricard confession and their failure to

13 inform Butterworth of it is sufficient to show that the Inspectors

14 intentionally withheld it.

15    Disputed issues of material facts regarding whether the

16 Inspectors acted intentionally prevent the granting of summary

17 adjudication of this issue to either party.  In Plaintiffs' favor is

18 (1) Sanders' 2001 deposition in which he testified that he learned

19 of the Ricard confession soon after it was made and did not turn it

20 over to Butterworth and (2) Hendrix' 2005 deposition in which he

21 stated that, after they learned of the confession, the Inspectors

22 spent months investigating it.

23    However, the Inspectors' failure to turn over the tape to

24 Butterworth may have been a negligent, rather than an intentional,

25 act.  There is some evidence that the Inspectors did not intend to

26 deny Plaintiffs the use of the tape.  The Inspectors may have

27 thought, as Hendrix stated in his deposition, that Lewis or Gittens

28                                   59

would deliver the tape to Butterworth.  Further, the Inspectors investigated the confession, which could be found inconsistent with an intent to conceal it.  Finally, there is no evidence that the Inspectors took any affirmative acts to conceal the confession. Sanders' 2005 statements that he did not know about Ricard's confession until Butterworth told him about it and Hendrix' statement that he only learned about the confession from Sanders, if believed, would establish that Lewis did not inform the Inspectors of the confession and thus they could not have disclosed it to Butterworth.

2. Plaintiffs' Knowledge of Ricard's Involvement

Citing United States v. Dupuy, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985) and United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991), the Inspectors argue that Plaintiffs' knowledge of Ricard's alleged involvement in the Shannon murder precludes their Brady-based § 1983 claim.

"Where defendants had within their knowledge the information by which they could have ascertained the supposed Brady material, there is no suppression by the government."  Dupuy, 760 F.2d at 1502 n.5; Aichele, 941 F.2d at 764 (same).  If the government provides to the defense the means of obtaining the exculpatory evidence, there is no Brady violation.  Dupuy, 760 F.2d at 1502, n.5.  A defendant cannot claim a Brady violation if his counsel was "aware of the essential facts enabling him to take advantage of any exculpatory evidence." United States v. Shaffer, 789 F.2d 682, 690 (9th Cir. 1986); see, e.g., United States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (where government discloses all information necessary for defense to

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

discover alleged <u>Brady</u> material on its own, government is not guilty of suppressing evidence).  "Any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." <u>Dupuy</u>, 760 F.2d at 1502, n.5 (quoting <u>Giles v. Maryland</u>, 386 U.S. 66, 96 (1967) (White, J., concurring)).

However, the availability of particular information through the defendant himself does not negate the government's duty to disclose. <u>United States v. Howell</u>, 231 F.3d 615, 625 (9th Cir. 2000). "Defendants often mistrust their counsel, and even defendants who cooperate with counsel cannot always remember all of the relevant facts or realize the legal importance of certain occurrences." <u>Id.</u> Therefore, defense counsel is entitled to plan trial strategy on the basis of full disclosure by the government, regardless of the defendant's knowledge or memory of the disclosed information. <u>Id.</u>

The Inspectors point to statements made by Tennison at the hearing on his motion for new trial and statements made by Goff at the § 4900 hearing showing that Plaintiffs knew of Ricard's involvement in the murder before the Inspectors did.

Tennison's testimony at the hearing on his motion for new trial indicates that, at least five months before the hearing, he had heard of Ricard's involvement with the Shannon murder and shortly thereafter heard that Ricard had made a taped confession to the police.  Tennison testified that he told Adachi that he knew Ricard had committed the crime, but it is not clear that he told Adachi that he had heard that Ricard had confessed to the police on tape. Goff's testimony at the § 4900 hearing indicates that he had heard

61

United States District Court

For the Northern District of California

Ricard brag about shooting Shannon and had told Melton this very soon after he had been charged with the murder.  There is no evidence that Goff or Melton knew that Ricard had given a taped confession to the police.

Thus, the evidence shows that Plaintiffs and their attorneys suspected that Ricard was the shooter, before the trial in Goff's case and before the new trial proceeding in Tennison's case. However, it is not clear whether the attorneys knew of Ricard's taped confession to the police.  The evidentiary value of Ricard's taped confession to the police, after being Mirandized, surpasses any evidence that Plaintiffs could have given about their knowledge of Ricard's involvement.

Disputed issues of material facts prevent summary adjudication for either side on the issue of whether the extent of Plaintiffs' attorneys' knowledge of Ricard's involvement excused the prosecution from disclosing the tape.

3. Admissibility of the Ricard Confession

The Inspectors move for summary adjudication that, even if they intentionally failed to inform Butterworth of Ricard's confession, the confession was not material because it was inadmissible hearsay.

To support a claim under Brady, the withheld information must be material.  Brady, 373 U.S. at 87.  To be material, the withheld information, or evidence acquired through it, must be admissible. United States v. Kennedy, 890 F.2d 1056, 1059-60 (9th Cir. 1989).

The Inspectors point out that the confession was not admitted at the hearing on Tennison's motion for new trial because the confession was hearsay and Tennison's attorney did not establish

62

**United States District Court**

For the Northern District of California

1    that Ricard was unavailable to testify, as required for the

2    declaration-against-interest exception to the hearsay rule.  The

3    Inspectors further argue that, even if Tennison's attorney had been

4    able to show Ricard was unavailable, the court of appeal found that

5    Ricard's confession was not sufficiently trustworthy to have

6    qualified as a declaration against interest.

7         Plaintiffs respond that the trial court and the court of appeal

8    found Ricard's confession to be inadmissible and untrustworthy

9    because the courts did not have a full factual record before them.

10        In favor of Plaintiffs' argument, at the time the trial court

11   and the court of appeal made their decisions that Ricard's

12   confession to the police was inadmissible and unreliable, Smith's

13   corroborating statements were not part of the record.  In addition,

14   if the confession had been turned over to Plaintiffs in a timely

15   manner, Adachi's interview of an anonymous person would not have

16   been introduced into evidence to confuse matters.  However, as noted

17   by the Inspectors, Ricard's confession suffered from internal

18   inconsistencies and, therefore, the courts might have found it

19   inadmissible even with Smith's statements and without the anonymous

20   confession.

21        The Court finds that disputed issues of material fact preclude

22   a determination of whether the State courts would have found

23   Ricard's confession admissible if all relevant facts had been timely

24   disclosed.  Therefore, the cross-motions for summary adjudication of

25   the issue of admissibility of the confession are DENIED.

26        In summary, based upon disputed issues of material facts as

27   discussed above, the cross-motions for summary adjudication of

28

1  whether the Inspectors violated Plaintiffs' due process rights under

2  <u>Brady</u> are DENIED.

3      The Inspectors argue that even if they committed a

4  constitutional violation, they are absolutely or qualifiedly immune

5  from liability.

6          4. Absolute Immunity

7      Peace officers and other investigators are protected by

8  absolute immunity when performing prosecutorial or quasi-judicial

9  functions, typically by assisting the prosecutor to prepare the case

10  after probable cause for arrest has been established.  <u>KRL v. Moore</u>,

11  384 F.3d 1104, 1113 (9th Cir. 2003).  As noted above, the absolute

12  immunity inquiry is focused on the nature of the function performed,

13  not the identity of the actor who performed it.  <u>Forrester v. White</u>,

14  484 U.S. 219, 229 (1988).

15      The Inspectors argue that they were not acting in an

16  investigative capacity in November, 1990, when Ricard confessed,

17  because the investigation had long ended, the Inspectors' only role

18  at that time was to assist Butterworth in his duties as a

19  prosecutor, and Plaintiffs had already been convicted.  However,

20  these facts do not end the inquiry.  As stated in <u>Gensler</u>, 410 F.3d

21  at 639, timing is relevant, but is not dispositive of the

22  classification of the defendant's activity.

23      At his 2001 deposition, Sanders testified that he received the

24  Ricard confession within a day or two after it was made, immediately

25  began investigating it and informed Butterworth of the

26  investigation.  At his 2005 deposition and in his 2005 declaration,

27  Sanders testified that he did not learn of the confession until

28

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

Butterworth told him about it in May, 1991.  At his 2005 deposition, Hendrix testified that he learned of the Ricard confession from Sanders, that they immediately took steps to locate Ricard, and that he never informed Butterworth of the confession.  In his 2005 declaration, Hendrix stated that he did not investigate the Ricard confession.  Butterworth testified that he never learned about the Ricard confession from the Inspectors; instead he was informed about it by Lewis, whom he happened to meet accidentally in the cafeteria, months after it had been given.

If the Inspectors learned of the Ricard confession soon after it was made in 1990 and then investigated it, they were acting in an investigative capacity.  Accordingly, absolute immunity would not shield them from <u>Brady</u> liability for withholding the Ricard confession.  The Inspectors' motion for summary judgment on this ground is DENIED.

(2) Qualified Immunity

(a) Clearly Established Law

At the time the Inspectors learned of Ricard's November, 1990 confession to the police, the law regarding the constitutional duty of law enforcement officials to turn over exculpatory evidence was clearly established.  The seminal Supreme Court cases establishing this duty were decided in 1963 and 1976.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. at 87; <u>Agurs</u>, 427 U.S. at 107.

Citing <u>Broam v. Bogan</u>, 320 F.3d 1023, 1032 (9th Cir. 2003), the Inspectors argue that there was no clearly established law that a police officer has a legal duty to investigate and provide post-conviction, second-hand information to the prosecution or the

65

defense.

In <u>Broam</u>, the court stated that once probable cause to arrest has been established, a law enforcement officer has no constitutional duty to investigate independently every claim of innocence, whether the claim is based on mistaken identity or lack of the requisite intent.  <u>Id.</u>  However, the court did not hold, as the Inspectors argue, that a law enforcement officer has no constitutional duty to turn over to the prosecution material exculpatory evidence in his possession.  In fact, <u>Broam</u> indicated the opposite, that "an officer is not entitled to a qualified immunity defense, however, where exculpatory evidence is ignored that would negate a finding of probable cause."  <u>Id.</u>  The Ninth Circuit has also stated:

> There is no ambiguity in our law.  The obligation under <u>Brady</u> and <u>Giglio</u> is the obligation of the government, not merely the obligation of the prosecutor. . . . 'Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does.'

<u>Blanco</u>, 392 F.3d at 393-94 (internal citations omitted).

Relying on <u>Villasana</u>, 368 F.3d at 979 (citing <u>Imbler v. Pachtman</u>, 424 U.S. 409, 427 (1976)), the Inspectors next argue that, because only the prosecutor has a duty to disclose evidence to the defense, Plaintiffs cannot seek § 1983 damages for an alleged <u>Brady</u> violation from non-prosecutors who do not have absolute prosecutorial immunity.

The Inspectors mischaracterize the holding of <u>Villasana</u>. <u>Villasana</u> did not hold that investigators cannot be civilly liable for a <u>Brady</u> violation; it addressed the standard that should apply

66

to such claims.  Id. at 980.  Courts have held investigators liable for failing to disclose material exculpatory evidence to the prosecutor.  See McMillian v. Johnson, 88 F.3d 1554, 1567 (11th Cir. 1996) (although investigators have no Brady obligation to turn over exculpatory evidence to the defense, they have a duty, under Brady, to turn over such evidence to the prosecutor); Newsome v. McCabe, 256 F.3d 747, 752 (7th Cir. 2001) (under a qualified immunity analysis, concluding that it was clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information); Jones v. City of Chicago, 856 F.2d 985, 993 (7th Cir. 1988) (in § 1983 case, upholding jury verdict against defendant police officers on ground that jury could have found defendants concealed from prosecutors facts material to decision whether to prosecute plaintiff).

Thus, clearly established law would inform a reasonable officer that Ricard's confession should have been turned over to the prosecutor, who in turn would be responsible for providing it to defense counsel.

(b) Reasonable Conduct

Again relying on Villasana, 368 F.3d at 978, the Inspectors argue that they are entitled to qualified immunity because they reasonably believed that Butterworth was responsible for providing any exculpatory evidence to defense counsel, and they were not.  As discussed above, this argument is a mischaracterization of well-established law regarding the duty of law enforcement officials to turn over all exculpatory evidence to the prosecutor; the Inspectors fail to explain how Butterworth could have disclosed Ricard's

confession to Plaintiffs if the Inspectors never told him about it.

The Inspectors argue that because they never had possession of the tape of the Ricard confession, they could not have suppressed it. Furthermore, they argue that "a reasonable officer could have believed that Lewis, the SFPD officer who actually took Ricard's confession, would have advised Butterworth of the confession."

The Inspectors cannot avoid responsibility for their obligation by assuming that a subordinate fulfilled it. At his deposition, Hendrix testified that he and Sanders were responsible for turning over evidence connected to the Shannon homicide to the district attorney because it was their case and that it was Lewis and Gittens' responsibility to get the tape of the Ricard confession either to the district attorney or to Sanders or himself. Lewis testified that he did get the tape to the Inspectors. He testified that, immediately after he took Ricard's confession, he informed the Inspectors of it by putting a copy of the taped confession in a place where the Inspectors would receive it, and that he spoke to Hendrix about the confession the next day. Sanders testified that he received the tape of Ricard's confession within a day or two of November 7, 1990, the date it was made. Years later, Sanders testified that he did not receive the tape of the confession from Lewis in 1990 but that he learned of it from Butterworth in May, 1991.

Viewing the evidence in the light most favorable to Plaintiffs, it was the Inspectors' responsibility to inform Butterworth of the confession, and they did not have reason to believe that Lewis or Gittens did so. Therefore, these facts do not demonstrate the

United States District Court

For the Northern District of California

1   Inspectors acted reasonably under the circumstances.

2       Next, the Inspectors argue that they are protected by qualified

3   immunity because Butterworth learned of the confession and provided

4   it to Plaintiffs' defense attorneys in sufficient time for it to be

5   considered by the trial and appellate courts and the failure to

6   inform Butterworth of the confession earlier did not violate clearly

7   established law of which a reasonable officer would have been aware.

8       Due process requires the disclosure of exculpatory material in

9   sufficient time to permit the defendant to make effective use of the

10  material.  LaMere v. Risley, 827 F.2d 622, 625 (9th Cir. 1987).  In

11  determining whether the timing of the disclosure satisfied due

12  process, a court considers the prosecution's reasons for late

13  disclosure and whether the defendant had an opportunity to make use

14  of the disclosed material.  Id.

15      In its August 26, 2003 Habeas Order, the Court explained why

16  the delay in turning over the Ricard confession was prejudicial to

17  Tennison.  Purcell Dec., Ex. 52, August 26, 2003 Order at 100-102.

18  In the habeas proceeding, the respondent had not explained why the

19  Inspectors did not inform Butterworth of the confession.  The only

20  explanation the Inspectors make here, that it was Lewis'

21  responsibility, is insufficient when viewing the facts in the light

22  most favorable to Plaintiffs.  Although the Court's ruling in the

23  habeas case has no preclusive effect on the issues in this case,

24  because the facts are the same, the Court adopts the reasoning in

25  the August 26, 2003 Habeas Order regarding prejudice to Tennison due

26  to the delay in receiving Ricard's confession.  Furthermore, Goff

27  was similarly prejudiced by the delay in his receipt of the

28

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

confession, because he could have immediately used it as the basis of his State appeals and habeas petitions.[8]  As discussed previously, although the State courts found the confession to be unreliable, they did so without the benefit of all of the withheld Brady material and they compared it to the anonymous Ricard confession obtained by Adachi that would not have been submitted if the taped Ricard confession to the police had been timely turned over to both Plaintiffs.

Therefore, the fact that eventually Butterworth learned of the confession from Lewis and then informed Tennison of it does not excuse the Inspectors from their duty to turn the tape over in sufficient time for Plaintiffs to make use of it.  These facts fail to demonstrate that the Inspectors acted reasonably under the circumstances.

Accordingly, the Court DENIES the cross-motions for summary adjudication of this claim and DENIES the Inspectors' motion for summary judgment of absolute or qualified immunity.

B. Suppression of Smith's Statement

The Inspectors argue that Plaintiffs' Brady claim based on Smith's information fails because the information is not exculpatory, the Inspectors lacked the requisite intent to deprive Plaintiffs of a constitutional right and Plaintiffs' knowledge of

_____

[8]As discussed previously in relation to Butterworth's motion for summary judgment, Butterworth did not turn over the Ricard confession to Goff.  However, Butterworth's actions are not relevant to whether the Inspectors are protected by qualified immunity.  Therefore, for this discussion, it is assumed that the Inspectors would have fulfilled their responsibilities if they had turned the tape over to Butterworth.

United States District Court

For the Northern District of California

1  Smith's involvement means the Inspectors did not suppress the

2  confession.

3          (1) Exculpatory Information

4      The Inspectors argue that Smith's information is not

5  exculpatory on the ground that, before 1992, Smith did not tell the

6  police that she had witnessed Shannon's murder.  They argue that her

7  January 3, 1990 phone call to Sanders was mysterious because she

8  only identified herself as "Chante" and provided only a contact

9  phone number.  They point out that they interviewed the five

10 individuals who she had heard were present at the murder and learned

11 nothing about the murder.  The Inspectors, pointing to Sanders' note

12 as evidence, also argue that Smith did not say that Tennison and

13 Goff were not at the murder scene.

14     In her 1995 declaration, Smith states that she told Sanders in

15 1990 that he had arrested the wrong people for the Shannon murder

16 because she had heard that Ricard had shot Shannon and that Tennison

17 and Goff were not present at any point during the homicide.  Smith

18 Reply Dec. at ¶ 8.  The fact that Sanders did not write this

19 information in his note does not prove that Smith did not provide

20 it.

21     Furthermore, the Inspectors' characterization of Smith's call

22 as mysterious is inconsistent with the evidence that the Inspectors

23 knew Smith and her friends before the Shannon murder.  For instance,

24 at Smith's 1992 interview, Sanders asked her how long she had known

25 himself and Hendrix, and Smith replied that she had known them for a

26 couple of years, from before the Shannon murder.  Purcell Dec., Ex.

27 47, 1992 Smith Interview at 76.  Sanders stated, "We know all of

28

71

**United States District Court**
For the Northern District of California

your, a lot of your buddies, and people who hang out with you on the street, is that correct?"  <u>Id.</u>  Smith replied, "Yes."  <u>Id.</u>  At his 2001 deposition, Sanders testified that he and Hendrix knew Smith, just as they knew many of the young people in her neighborhood, and that they had questioned her about a number of the gang-related murders that had occurred in her neighborhood.  Balogh Reply Dec., Ex. 63, 2001 Sanders Depo. at 143-44.

Further, the Inspectors' follow-up interview of Luther Blue after Smith disclosed his name to Sanders indicates that she told Sanders that the car chase started at the Seven-Eleven.  This was exculpatory because it cast doubt on Masina's testimony that the car chase started at Lovers' Lane.  Finally, if Smith's information had been disclosed, she could have testified at Tennison's motion for new trial, and important parts of Ricard's confession would have been corroborated, which would have been a significant factor in the trial judge's analysis of whether Ricard's confession was trustworthy.  It is reasonable to infer that, after Ricard confessed, Smith would have no reason to fear retaliation from Ricard or Blue if she testified that she had been an eyewitness to Shannon's shooting.

Therefore, the information Smith relayed to Sanders in 1990 was exculpatory.

(2)  Intent

The Inspectors argue that Sanders' January 3, 1990 note about the Smith interview was in Butterworth's file and this negates any inference that Sanders intended to bury information connected to

United States District Court

For the Northern District of California

Smith.[9]   Also, according to the Inspectors, the fact that they interviewed the five individuals Smith named and put notes of those interviews in the file demonstrates that they had no intention to withhold any of Smith's information.   Lastly, to support their claim that Sanders' note was sufficient to fulfill his <u>Brady</u> obligation, the Inspectors point to Adachi's and Melton's testimony that, had they seen Sanders' note, they would have been alerted to Smith and her information.

Plaintiffs respond that they never saw Sanders' note and, even if they had, it was insufficient to alert anyone to Smith's identity or the substance of her statements because it omitted Smith's last name, and her statements that Ricard had committed the murder, that Plaintiffs were not at the murder scene, and that the car chase started at the Seven-Eleven store.   As evidence that Sanders' note was insufficient under <u>Brady</u>, Plaintiffs cite Butterworth's testimony that he could not ascertain its significance.   Plaintiffs also argue that Sanders' intent to suppress Smith's information is demonstrated by the fact that he made no notes of his further contacts with Smith which would have alerted Plaintiffs to the significance of her information, nor are there notes that members of the GTF interviewed Smith regarding her knowledge of the truck that was thought to be involved in the car chase.

Because Butterworth testified that Sanders' note was in his

---

[9]The Inspectors actually argue that the facts show that Sanders did not act in bad faith.   As discussed above, Plaintiffs must show that the Inspectors deliberately intended to withhold <u>Brady</u> material; it is not necessary to show they acted in bad faith.

73

1  file and therefore it would have been turned over to Plaintiffs'

2  attorneys, but Plaintiffs' attorneys testified that they did not

3  receive the note, there is a dispute about whether Sanders included

4  the note in the file he gave Butterworth.  And, even if Sanders gave

5  the note to Butterworth, it was cryptic and failed to disclose

6  significant details.  The fact that Adachi and Melton thought the

7  note was important does not mean the note was sufficient as written.

8  The Inspectors' insistence that they did not know Smith or the

9  people she mentioned is belied by other testimony where the

10 Inspectors admit they knew Smith before the Shannon murder, knew the

11 people with whom she associated and knew that she said that the car

12 chase started at the Seven-Eleven store instead of Lovers' Lane.

13 The Inspectors do not address Plaintiffs' argument that Sanders made

14 no notes of his further contacts with Smith or of the interviews of

15 Smith by members of the GTF.  Therefore, Sanders' note did not

16 fulfill his <u>Brady</u> obligations.  However, a fact-finder could infer

17 that Sanders thought the note was sufficient.  As noted above,

18 questions involving state of mind are generally inappropriate for

19 summary judgment.  Therefore, there are disputed issues of material

20 fact regarding intent and the cross-motions for summary adjudication

21 of this issue are DENIED.

22          (3) Plaintiffs' Knowledge of Smith

23      The Inspectors argue that they are not liable for a <u>Brady</u>-based

24 § 1983 violation because Plaintiffs independently knew of Smith and

25 that she might have information about the Shannon murder, and thus

26 Plaintiffs' attorneys could have discovered the alleged <u>Brady</u>

27 material on their own.

28

United States District Court

For the Northern District of California

(a) Tennison's Knowledge of Smith

Citing Smith's 1992 police interview, the Inspectors claim that Tennison knew Smith because she talked to him before his trial and he asked her to be a witness for him at his trial.  The Inspectors argue that Tennison or Adachi could have found Smith and learned of her information before trial.  This argument is unpersuasive.  At her 1992 interview, Smith stated that she barely knew Tennison and that she only spoke with him coincidentally when she worked as an operator and Tennison placed a telephone call from jail.  Although Tennison asked her to speak to his attorney about the Shannon homicide, she declined because she feared that she would be killed by Ricard or Blue if she did so.  She explained that, because she feared for her life, she asked her family not to give her telephone number or address to Plaintiffs and that she moved from her former address to ensure that her whereabouts would be secret.  Smith's statements are corroborated by the testimony at the hearing on Tennison's motion for new trial.  At the time of the hearing, the only information known to Tennison was that a person named Chauntey White may have witnessed the Shannon murder; even though Tennison's brother searched for her, he was unable to locate her.

This evidence establishes that Tennison had some vague information about Smith, that he diligently searched for her, but that the search was unsuccessful.  On the basis of this evidence, the Court cannot find that Tennison's attorney had the knowledge and means to obtain Smith's information on his own.

(b) Goff's Knowledge of Smith

The Inspectors cite Goff's deposition and his testimony at the

75

United States District Court

For the Northern District of California

§ 4900 hearing to show that he had a close romantic relationship with Smith before the Shannon murder, that after the murder he heard she might have been involved and that he told Melton this.  The evidence shows that Goff was not romantically involved with Smith; they just knew each other from the neighborhood, they had gone to the movies together once or twice, but Smith did not even know Goff's last name.  A few weeks after the murder but before he was arrested, Goff heard Ricard mention Smith's name in connection with the murder.  Goff asked Smith about her involvement, but when she denied knowing anything, he did not pursue the subject.  Goff had also heard that the car chase started at the Seven-Eleven.  After he was arrested, Goff gave his attorney this information.  After the trial, Goff coincidentally had a brief conversation with Smith in her role as operator when he was placing a call from jail.  Goff asked Smith to talk to his attorney and Smith refused.

Unlike Tennison, Goff had heard immediately after he was arrested about Smith's connection to the murder and that the car chase started at the Seven-Eleven and he informed his attorney of this.  On the basis of this evidence, the Court finds that there are disputes of material fact regarding whether Goff's attorney  had sufficient information to have found Smith and her exculpatory information on his own.

In summary, based upon disputed issues of material facts, the cross motions for summary adjudication on liability are DENIED.

(4) Absolute Immunity

Although the Inspectors make a blanket argument that they are absolutely immune from all of Plaintiffs' claims, they do not

76

specifically argue that absolute immunity applies to Plaintiffs'
Brady claim regarding Smith and the information she provided.
Therefore, absolute immunity is DENIED in regard to this claim.

(5) Qualified Immunity

The Inspectors argue that, even if they committed a
constitutional violation, they are qualifiedly immune from
liability.  As discussed above, the law regarding the duty of police
to turn over exculpatory evidence to the prosecutor was clearly
established at the time these events occurred.  Thus, the Court
addresses whether the Inspectors' conduct was reasonable under the
clearly established law.

As discussed above, the Court has found that the information
Smith told the Inspectors was exculpatory and that Sanders'
handwritten note of his first interview with Smith was insufficient
to fulfill his Brady obligation.  For all the reasons stated above,
the Inspectors' failure to alert Butterworth to this information so
that he, in turn, could have informed Plaintiffs of it, cannot be
summarily adjudicated to be objectively reasonable under clearly
established law.  Therefore, the Inspectors' motion for summary
adjudication of qualified immunity is DENIED.

C. Request for Money From Secret Witness Program

(1) Exculpatory Evidence

The Inspectors argue that there is no constitutional violation
for failing to disclose the SWP memo to Butterworth because the
information is not exculpatory in that no one received any reward
money.  Plaintiffs argue that the memo is exculpatory because it had
impeachment and investigative value.  They argue that the

77

United States District Court

For the Northern District of California

exculpatory nature of the memo is reinforced by the April 23, 1990 conversation between Hendrix and Masina, which shows that Hendrix discussed a reward with Masina, and by the two entries from the ledger of Contingent Fund B indicating payments to Sanders and Hendrix in the total amount of approximately $1,400.

Although Masina declares that she was not offered a reward and did not receive one, the enhanced tape of the April 23, 1990 conversation between Hendrix and Masina is evidence that Hendrix may have discussed a reward with Masina.  As acknowledged by Hendrix, a reward taints a witness' testimony at trial.  Purcell Dec., Ex. 15, Hendrix Depo. at 124.  The audio experts' disagreement about whether the word "reward" is mentioned by Hendrix raises a factual issue for a jury to decide.

Also, the Inspectors do not explain the whereabouts of the original audio tape nor how copies of the audio tape came to be in such poor condition.

Spoliation of evidence, defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation," supports an inference that the evidence was unfavorable to the party responsible for its destruction.  <u>Byrni v. Town of Cromwell, Bd. of Educ.</u>, 243 F.3d 93, 107 (2nd Cir. 2001).  An inference of spoliation, in combination with some evidence for the plaintiff, can allow the plaintiff to survive summary judgment.  <u>Medical Lab Mgmt. Consultants v. American Broadcasting Cos., Inc.</u>, 306 F.3d 806, 825 (9th Cir. 2002).

Here, the fact that the audio tape was not disclosed, and the

United States District Court

For the Northern District of California

1  original was not preserved, for use as evidence in Plaintiffs'

2  criminal case or their future habeas petitions, which were

3  reasonably foreseeable to the Inspectors, raises an inference that

4  the conversation on the audio tape was unfavorable to the Inspectors

5  and the criminal case against Plaintiffs.  This, in conjunction with

6  the evidence of the SWP memo, contributes to the inference that, at

7  the very least, a reward was discussed with Masina.[10]  Thus, the SWP

8  memo could be found to be exculpatory.  The Inspectors' argument

9  that the SWP memo is inadmissible hearsay is unpersuasive; armed

10 with the memo, Plaintiffs' trial counsel could have asked the

11 Inspectors about it at trial and used it to impeach them if they

12 denied making the request from the SWP.

13       The Court concludes that there are disputed issues of fact

14 regarding whether the SWP memo was exculpatory.

15            (2) Intent

16       The Inspectors argue that they did not intend to withhold the

17 SWP memo, as evidenced by the fact that they placed it in the police

18 case file where Butterworth could access it and turn it over to

19 Plaintiffs.

20       Officer Tabak, San Francisco's Rule 30(b)(6) witness on police

21 procedures, testified that it is standard procedure for the police

22

23       [10]The withdrawals from Contingent Fund B might contribute to
   this finding.  On the other hand, a fact-finder could credit

24 Goldberg's testimony that the money was used for witness travel.
   The ledger entry of the $1,250 payment indicates it was for witness

25 expenses and the payment was made in early October, 1999 when
   Masina traveled from Samoa to the United States to provide an in-

26 person taped statement of her account of Shannon's homicide.  See
   Masina Dec. and Wong Dec., Ex. LL, Tennison's Preliminary Hearing

27 at 54 (Shortly after the Shannon homicide, Masina left the United
   States to live in Samoa).

28
                                  79

to turn over everything to the district attorney's office.  The
district attorney discloses everything to the defense.  Balogh Dec.,
Ex. 81, Tabak Depo. at 48.  Tabak also stated that it is not SFPD's
policy for the investigator who is aware of exculpatory evidence to
leave it in the police case file and assume that if the district
attorney is interested, he would come to the SFPD where the file is
located and look at it.  Id. at 99.  Instead, Tabak stated, the
investigator should make an effort within a reasonable amount of
time to reveal that exculpatory information to the district
attorney.  Id.

    Tabak's testimony is sufficient to raise a dispute of fact
regarding whether the Inspectors negligently or intentionally
withheld the memo by placing it in the police case file instead of
turning it over to Butterworth.

    Because there are disputes of material fact regarding whether
the SWP memo was exculpatory and whether the Inspectors intended to
withhold it, the cross motions for summary judgment on the issue of
liability are DENIED.

        (3) Qualified Immunity[11]

    The Inspectors argue that even if they committed a
constitutional violation, qualified immunity protects them from
liability.

    As discussed above, at the time this conduct took place the law
regarding the Inspectors' duty to turn over to the prosecutor
exculpatory information was well-established.  If the SWP memo was

---

[11]The Inspectors do not argue that absolute immunity applies to
this claim.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   exculpatory, a reasonable officer would know that it was necessary

2   to turn it over directly to the district attorney.  Therefore,

3   disputed facts regarding the memo's exculpatory value preclude

4   summary judgment on whether the Inspectors' conduct was reasonable

5   under the circumstances.  The Inspectors' motion for summary

6   judgment of qualified immunity for failure to disclose the SWP memo

7   is DENIED.

8        D. Luther Blue's Interviews and Pauline's Polygraph

9        Only the Inspectors move for summary judgment on these claims.

10  They argue that they fulfilled their <u>Brady</u> obligations by providing

11  the video tapes of each of their two interviews with Luther Blue to

12  Butterworth, that Butterworth himself ordered Pauline's polygraph

13  and that they informed him of the results.  Tennison concedes that

14  the Inspectors' conduct in regard to the Blue interviews and

15  Pauline's polygraph are not independent grounds for liability under

16  <u>Brady</u>.  Tennison Opp. at 57.  Goff does not address the Blue

17  interview.  Goff argues that the polygraph was material exculpatory

18  evidence, but doesn't address how the Inspectors could be liable for

19  failure to disclose it to Butterworth given that Butterworth knew of

20  it.  Therefore, the Court GRANTS the Inspectors' motion for summary

21  judgment on Plaintiffs' <u>Brady</u> claims to the extent they are based on

22  suppression of the Blue interviews and Pauline's polygraph.

23       E. Materiality

24       Plaintiffs argue that they are entitled to summary judgment on

25  the element of materiality on all of their <u>Brady</u> claims.

26       As discussed above, in the context of a <u>Brady</u> violation,

27  evidence is material "if there is a reasonable probability that, had

28                                 81

1    the evidence been disclosed to the defense, the result of the

2    proceeding would have been different." Bagley, 473 U.S. at 682.

3    In the Habeas Order, the Court undertook an extensive review of

4    the case the prosecution presented against Tennison to the jury and

5    concluded that it was weak.  Habeas Order at 72-80.  The Inspectors

6    do not present additional evidence on this issue nor do they argue

7    that the prosecution's case was strong.  Therefore, the Court adopts

8    here the finding that the prosecution's case against Tennison was

9    weak.  The Court also finds the prosecution's case against Goff was

10   weak because there was only one eyewitness who identified Goff,

11   instead of two eyewitnesses who identified Tennison.

12   However, because materiality is to be considered in terms of

13   the collective effect of the suppressed evidence, it is premature to

14   determine materiality before a jury resolves the disputed factual

15   issues as to what evidence is suppressed and who is liable for it.

16   Therefore, even though the case against Plaintiffs was weak, the

17   Court will not summarily adjudicate the materiality of the

18   suppressed evidence.

19       F. Causation

20   The parties cross-move for summary adjudication as to whether

21   the Inspectors' alleged failure to disclose exculpatory evidence to

22   the prosecutor caused Plaintiffs' injury.

23   To establish a civil rights violation, the plaintiff must show

24   that the defendant's unconstitutional conduct was the actual and

25   proximate cause of the plaintiff's injuries.  White v. Roper, 901

26   F.2d 1501, 1505 (9th Cir. 1990); Van Ort v. Estate of Stanewich, 92

27   F.2d 831, 836-37 (9th Cir. 1996); Arnold v. Int'l Business Machines

28                                      82

United States District Court

For the Northern District of California

Corp., 637 F.2d 1350, 1355 (9th Cir. 1981).  The defendant's conduct
is the actual cause of the injury only if the injury would not have
occurred "but for" that conduct.  White, 901 F.2d at 1505.  If it is
established that the conduct was one of the causes of the
plaintiff's injury, the next question is whether the conduct is the
proximate cause of the injury.  Id. at 1506.  The defendant's
conduct is not the proximate cause of the injury if another cause
intervenes and supercedes the defendant's liability for the
subsequent events.  Id.; Van Ort, 92 F.2d at 837 (traditional tort
law defining intervening causes that break the chain of proximate
causation applies in § 1983 actions); Arnold, 637 F.2d at 1355
(same).  Whether the conduct of another person is an intervening
cause of the plaintiff's injuries depends upon what was reasonably
foreseeable to the defendant at the time.  White, 901 F.2d at 1505.
Foreseeable intervening causes will not supersede the defendant's
responsibility.  Id.

The Inspectors offer many reasons for their argument that they
are not the legal or the proximate cause of Plaintiffs' injuries:
witnesses were untruthful during the investigation, Plaintiffs'
defense counsel failed to investigate and present an adequate
defense, the courts ruled adversely on the allegedly suppressed
Ricard confession and Plaintiffs failed to use their own knowledge
of the alleged facts to defend themselves.

Plaintiffs respond that the Habeas Order provides the best
template for analysis of causation.  However, in the habeas case the
issue of causation was not addressed.

As discussed above in the context of liability, the Court has

83

**United States District Court**
For the Northern District of California

found disputed issues of material facts in regard to many of the same arguments the Inspectors raise here.  The factual dispute is compounded here because the Inspectors' ability to foresee any of the alleged intervening events must be determined.  Therefore, the Court finds that disputed issues of material facts preclude summary adjudication for either side of the issue of causation.

III. The Inspectors' Motion for Summary Judgment on Fabrication of Evidence and Continued Investigation Claim

Only the Inspectors move for summary judgment on Plaintiffs' claim that the Inspectors fabricated evidence in their interviews of Masina and Pauline and continued their investigation of Plaintiffs even though they knew or should have known that Plaintiffs were innocent.

(A) Absolute Immunity

The Inspectors argue that Hendrix is absolutely immune from Tennison's claim that he allegedly coerced Pauline into committing perjury during the April, 1990 interviews.[12]

As discussed in relation to Butterworth's motion for summary judgment, the Court has found that Butterworth acted as a prosecutor and not as an investigator during the April 20 through April 22, 1990 interviews of Pauline about her recantation.  At these interviews, Hendrix was working primarily at Butterworth's direction.  However, Butterworth testified that he did not direct Hendrix to arrange the telephone conversation between Pauline and Masina after Pauline took the polygraph examination.  Hendrix has

---

[12]Sanders was not present at the interviews and Pauline did not testify about Goff.

**United States District Court**
For the Northern District of California

not pointed to any contrary evidence.  Therefore, Hendrix was not
under Butterworth's direction when he arranged the phone call and
cannot claim that he was acting as a prosecutor in doing so.  Thus,
Hendrix is absolutely immune from Plaintiffs' claim regarding his
actions during the April 20 through April 22, 1990 interviews of
Pauline, except for his conduct in setting up the phone call between
Masina and Pauline.

(B) Constitutional Violation

As discussed above, to prevail on a fabrication of evidence
claim, a plaintiff, at a minimum, must show that (1) the officer
continued his investigation despite the fact he knew or should have
known that the suspect was innocent or (2) the officer used
investigative techniques that were so coercive and abusive that he
knew or should have known that they would yield false information.
Devereaux, 263 F.3d at 1076.  Suggestive interview tactics alone do
not amount to a constitutional violation.  Gausvik, 345 F.3d at 817.

(1) Phone Call Between Pauline and Masina

Plaintiffs argue that it was coercive for Hendrix to allow
Pauline to participate in an unmonitored conversation with Masina,
the person Pauline said had pressured her to lie.  As evidence, they
point to Hendrix' deposition testimony that good interview
techniques require witnesses to be interviewed separately and that
he himself never put witnesses in a room together allowing them to
talk over their respective testimony.  Wong Dec., Ex. B, 2005
Hendrix Depo. at 37-40.

In his declaration, Hendrix states that, after the polygraph,
Pauline asked him if she could speak to Masina, who was then living

85

in Samoa.   Hendrix states he arranged the call and didn't monitor it

because he "believed the girls were friends, and did not see

anything improper in allowing two witnesses who had already given

statements about the murder to speak."   Hendrix Dec. at ¶ 23.

Butterworth testified that he was not concerned that Pauline spoke

with Masina over the telephone because Masina was in Samoa at the

time so it was unlikely that she would be able to pressure or coerce

Pauline.   Wong Dec., Ex. O, Butterworth Depo. at 334-35.

Butterworth also stated that Hendrix had told him that Pauline had

asked to speak to Masina and Butterworth thought it was unlikely

that Pauline would make such a request if she felt threatened by

Masina.   Id. at 335.   Pauline stated that it was not her idea to

speak to Masina, that Hendrix just handed her the phone and said

that there was a phone call for her from Masina.   Wong Dec., Ex. M,

Pauline Depo. at 98-99.

Thus, there is a dispute of fact regarding whether Pauline

asked to speak to Masina.   However, even if Pauline had requested to

speak to Masina, it can be inferred that Hendrix knew or should have

known that this unmonitored phone call could yield false

information.   Thus, a jury could find that Hendrix committed a

constitutional violation.   However, Tennison has not carried his

burden of showing there is clearly established law regarding

allowing witnesses to talk to each other.   Thus, even if a

constitutional violation was committed, a reasonable officer in

Hendrix' position would not have been aware that he was violating

Plaintiffs' constitutional rights.   The Inspectors' motion for

summary adjudication that Hendrix is qualifiedly immune on this

86

United States District Court

For the Northern District of California

1  claim is GRANTED.

2          (2) Continued Investigation

3      Opposing the Inspectors' motion for summary adjudication that

4  they did not commit a constitutional violation in this regard,

5  Plaintiffs argue that, because it was obvious that Masina and

6  Pauline were lying, the Inspectors knew it.  No other credible

7  evidence tied Plaintiffs to Shannon's murder and thus, Plaintiffs

8  argue, the Inspectors continued their investigation of Plaintiffs

9  despite the fact that they knew that Plaintiffs were innocent.

10      The Inspectors argue that no evidence shows that they knew

11  Plaintiffs were innocent and point to a great deal of evidence that

12  shows that they reasonably believed, based on the statements of

13  Masina and Pauline, that Plaintiffs were guilty.  The Inspectors

14  point out that there were sufficient reasons for them to believe

15  that Masina was credible because: (1) her account of the murder

16  never changed; (2) she had no motive to make up this story;

17  (3) neighborhood witnesses corroborated the chase route and vehicles

18  she described; (4) she admitted to having been in a stolen car, even

19  though she could have faced criminal liability; (5) other witnesses

20  corroborated aspects of her story; (6) the forensic evidence

21  established that Shannon received two shots from a shotgun,

22  consistent with what Masina described; (7) police found Shannon's

23  body in the corner of the parking lot as Masina had described it;

24  (8) Masina did not benefit from testifying against Plaintiffs;

25  (9) Masina put herself and her family at risk by testifying; and

26  (10) a neighborhood witness indicated that she saw a Filipina girl

27  matching Masina's description who did not look like she belonged

28                                    87

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

with the rest of the individuals who were near the scene of the shooting.  The Inspectors argue that there were sufficient reasons for them to believe Pauline because:  (1) during her first police interview, she identified Tennison from a photo line-up; (2) at that same interview, she identified an individual named Wayland Gibson, whose street name was "Buck," as having been present at the murder and Masina had said she heard someone say, "Buck, come here," just before the car chase began; (3) Pauline's story that Masina forced her to lie did not add up because shortly after the murder Pauline moved to Hawaii and Masina moved to Samoa and it was not reasonable to believe Masina could have exerted influence from thousands of miles away; (4) Pauline's denial that she was in a stolen car before the murder did not mar her credibility because she may have been afraid this would get her into trouble; and (5) she may have recanted her original story because she was afraid of retaliation.

As Plaintiffs point out, some of the reasons the Inspectors give for believing Masina and Pauline are questionable.  For instance, as the Court noted in the October 26, 2003 Habeas Order, the Inspectors' theory that neighborhood witnesses corroborated Masina's story is weak given that some neighborhood witnesses contradicted aspects of her statement and that Masina's and Pauline's stories were inconsistent with each other.  See Purcell Dec., Ex. 52, August 26, 2003 Habeas Order at 72, 77-79. Nonetheless, even if Pauline and Masina were lying, that is not sufficient evidence that Plaintiffs were innocent to compel a conclusion that the Inspectors continued their investigation of Plaintiffs when they knew or should have known them to be innocent.

**United States District Court**
For the Northern District of California

1    Plaintiffs have cited no case in which a claim like this one

2  prevailed.  Although Devereaux, 263 F.3d at 1074-75, held that there

3  is a clearly established constitutional due process right not to be

4  criminally charged on the basis of false evidence deliberately

5  fabricated by the government, it found that the defendants had not

6  violated such a right.  Id at 1077, 1079.  The plaintiff in

7  Devereaux had based his constitutional claim on the first Devereaux

8  prong: coercive interview techniques.  The Court has found only

9  three cases addressing the second Devereaux prong of continued

10 investigation, and all those cases have held the defendant did not

11 commit a constitutional violation.  See Cunningham, 345 F.3d at 811-

12 12 (continued investigation not unconstitutional); Milstein, 208 F.

13 Supp. 2d at 1123-24 (defendants entitled to qualified immunity due

14 to insufficient evidence to support claim that they knew or should

15 have known plaintiff was innocent); Guerrero v. City and County of

16 San Francisco, 2003 WL 22749099, *10 (N.D. Cal 2003) (no reasonable

17 juror could find that defendant knew or should have known that

18 plaintiff was innocent).

19    Although the information the Inspectors uncovered in their

20 investigation was contradictory and somewhat inconsistent, no

21 evidence supports Plaintiffs' claim that the Inspectors knew or

22 reasonably should have known that Plaintiffs were innocent.  In

23 Milstein, 208 F. Supp. 2d at 1123, the plaintiff had been indicted

24 by a Grand Jury and later held to answer after a preliminary

25 hearing.  The court relied on these facts for its conclusion that

26 there was evidence to support the defendants' belief that the

27 plaintiff was guilty of the crimes charged.  Id.  Here, too,

28

**United States District Court**
For the Northern District of California

1 Plaintiffs were held to answer after preliminary hearings on the

2 crimes charged.  Significantly, at Goff's preliminary hearing, the

3 court found probable cause even though Pauline testified to her

4 recantation.  Furthermore, although this Court granted Tennison's

5 habeas petition, it did so based on <u>Brady</u> violations; the Court did

6 not address the issue of Tennison's guilt or innocence.

7     The Court concludes that the Inspectors did not violate

8 Plaintiffs' constitutional right to be free from being charged with

9 fabricated evidence by continuing their investigation of Plaintiffs.

10 Furthermore, even if the Inspectors' conduct constituted a

11 violation, a reasonable officer in their position would not have

12 known that they were violating Plaintiffs' constitutional rights.

13 Therefore, the Inspectors' motion for summary adjudication based on

14 their continuing investigation of Plaintiffs is GRANTED.

15     F. Punitive Damages

16     The Inspectors move for summary adjudication of Plaintiffs'

17 demand for punitive damages.

18     Punitive damages may be awarded in a § 1983 suit "when the

19 defendant's conduct is shown to be motivated by evil motive or

20 intent, or when it involves reckless or callous indifference to the

21 federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30,

22 56 (1983).  In <u>Dang v. Cross</u>, 422 F.3d 800, 807-08 (9th Cir. 2005),

23 the Ninth Circuit held that punitive damages may be awarded in

24 federal civil rights cases when the defendant's conduct is

25 oppressive or malicious or in reckless disregard of the plaintiff's

26 rights.  Malicious conduct is accompanied by ill will or spite or is

27 done for the purpose of injuring the plaintiff. <u>Id.</u> at 809 (citing

28

**United States District Court**
For the Northern District of California

Ninth Circuit Model Civil Jury Instruction 7.5).  Reckless conduct
in conscious disregard of the plaintiff's rights reflects complete
indifference to the plaintiff's safety or rights or is done in the
face of a perceived risk that the conduct will violate the
plaintiff's rights under federal law.  Id.  (citing same jury
instruction).  Conduct is oppressive if it injures or damages the
plaintiff or violates the plaintiff's rights with unnecessary
harshness or severity as by misuse or abuse of authority or power or
by taking advantage of the plaintiff's weakness, disability or
misfortune.  Id. at 809-10.  Although the standard for compensatory
and punitive damages is overlapping, the distinction is that
compensatory damages are mandatory once a violation is found, but
the award of punitive damages requires a discretionary moral
judgment that the conduct merited the particular punitive award
imposed in addition to the compensatory award.  Larez v. City of Los
Angeles, 946 F.2d 630, 648-49 (9th Cir. 1991) (citing Smith, 461
U.S. at 52).

     Relying on the same arguments discussed above, the Inspectors
contend that there is no evidence that they acted recklessly or
maliciously in regard to Plaintiffs' right to a fair trial.

     Because the award of punitive damages turns on the intent of
the Inspectors, it, like other questions where motive is at issue,
cannot be resolved on summary judgment.  If the jury were to find
for Plaintiffs on the disputed facts and draw inferences in
Plaintiffs' favor, such findings could support an award of punitive
damages.  Plaintiffs have raised a disputed issue of fact regarding
whether the Inspectors acted oppressively, recklessly or with

1 callous disregard for Plaintiffs' constitutional rights.   Therefore,

2 the Inspectors' motion for summary adjudication on the request for

3 punitive damages is DENIED.

CONCLUSION

5       Based on the foregoing, Butterworth's motion for summary

6 judgment (Docket # 201) is GRANTED in part, the Inspectors' motion

7 for summary judgment (Docket # 215) is GRANTED in part, Plaintiffs'

8 motion to strike (Docket # 298) is DENIED and Plaintiffs' motions

9 for partial summary adjudication (Docket ## 152, 155) are DENIED.

10 The Inspectors' request to file a separate statement of disputed and

11 undisputed facts is DENIED (Docket # 215).   The only remaining claim

12 against Butterworth is Goff's <u>Brady</u> claim for suppression of the

13 Ricard confession.   The claims remaining against the Inspectors are

14 Plaintiffs' <u>Brady</u> claims based on the suppression of Ricard's

15 confession, Smith's statements, the SWP memo and Hendrix' April 23,

16 1990 phone call with Masina.

17

18 IT IS SO ORDERED.

19 Dated   3/22/06
                    _____          _____

20                                                        CLAUDIA WILKEN
                                                          United States District Judge

21

22

23

24

25

26

27

28
                                          92

United States District Court
For the Northern District of California