IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN TENNISON,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; PRENTICE EARL SANDERS; NAPOLEON HENDRIX; and GEORGE BUTTERWORTH,<br><br>    Defendants.<br>_____<br>ANTOINE GOFF,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; PRENTICE EARL SANDERS; NAPOLEON HENDRIX; and GEORGE BUTTERWORTH,<br><br>    Defendants.<br>_____/ | No. C 04-0574 CW<br>Consolidated with<br>No. C 04-1643 CW<br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTIONS ON <u>MONELL</u> CLAIM |

    Defendant City and County of San Francisco (the City) moves for summary judgment on Plaintiffs' § 1983 claim under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978). Plaintiffs John Tennison and Antoine Goff separately oppose the motion, and cross-move for summary judgment in their favor. The City moves to

strike the cross-motions as untimely.[1]  The matters were heard on February 3, 2006.  Having considered the papers filed by the parties and oral argument on the motions, the Court denies the City's motion for summary judgment on the Monell claim and denies Plaintiffs' cross-motions.

## BACKGROUND

For a detailed summary of the procedural and factual background of this civil rights action, which arises out of Plaintiffs' conviction for the 1989 murder of Roderick Shannon, see the Court's March 22, 2006 Amended Order addressing the parties' cross-motions for summary adjudication of claims against the individual Defendants, San Francisco Homicide Inspectors Earl Sanders and Napoleon Hendrix (together, the Inspectors) and Assistant District Attorney George Butterworth.  On August 26, 2003, this Court granted Tennison's petition for a writ of habeas corpus based upon the suppression of material, exculpatory evidence.  The Court found that the prosecution's case against him was weak, that items of potentially exculpatory evidence had been suppressed in violation of Brady v. Maryland, 373 U.S. 83 (1963), and that there was a reasonable probability that any one of the items could have resulted in a different outcome for Tennison's trial or motion for a new trial.  After the Court granted Tennison's petition, the San Francisco district attorney decided

---

[1] The City's October 7, 2005 motion to strike was also untimely, as it was noticed for hearing on October 28, 2005, without a motion to shorten time.  The Court denies the City's motion to strike Plaintiffs' cross-motions on timeliness grounds.

2

not to retry the case, believing Tennison to be factually innocent of the crime.  See Tennison Complaint, Ex. B, People v. Tennison, No. 13660, District Attorney's Concurrence with Tennison's Mot. for Factual Innocence and Ex. C, Oct. 27, 2003 San Francisco County Superior Court Order (declaring Tennison to be factually innocent). Tennison and Goff then filed these civil rights suits.

Among the evidence supporting the Court's habeas ruling was a memo authored by the Inspectors seeking reward money for a witness or witnesses from the City's "Secret Witness Program" (SWP).  The SWP forms the basis for Plaintiffs' Monell claim.

Since the Court granted Tennison's habeas petition, the parties have had an opportunity for discovery of additional facts regarding the SWP that were not before the Court during Tennison's habeas proceeding.  For a summary of the evidence relating to the SWP in the context of the Goff-Tennison prosecution, see the Court's March 22, 2006 Order at pages 5-8.  The additional facts set forth below relate only to the Monell claim against the City, and are undisputed unless otherwise noted.

According to Assistant Chief of Police Morris Tabak, the City's Rule 30(b)(6) designee, the SWP was a community-based reward fund created and administered by the San Francisco Chamber of Commerce to encourage individuals to come forward confidentially to provide information to assist the police in solving crimes in San Francisco.  It was funded by private donations from the business community.  At the request of the SFPD, the Chamber of Commerce (COC) would post rewards for information leading to the arrest, prosecution and conviction of criminal suspects.  The SWP was

3

discontinued in 1992. In 2001, the COC discarded all records related to the 1989 through 1990 operation of the SWP. Chaw Decl. ¶ 2.

Inspectors' requests for authorization of a SWP reward were put into memoranda and then approved, first by their supervising lieutenant, then by the deputy chief and ultimately by the chief of police. The request would then be forwarded to the COC, which put the reward in place and monitored a tip line. COC would forward any information gained from the tip line to the police. Any reward payment would be delivered by the COC, not by SFPD investigators, to the individual who provided the information.[2] However, SFPD employees were involved in determining whether information had been helpful and whether a reward was warranted.

Neither the COC nor the SFPD kept records of the identity of persons who received money or the amounts of payments made. According to Tabak, the "only" way to determine whether a witness in a particular case was paid money by the SWP would be through the testimony of the individuals involved. Tabak Dep. 47:9-16. It is possible that the SFPD would not even be informed by the COC that a reward had been paid; the SFPD "had no controls over the chamber of commerce as to what information they provided to us." Id. 57:9-17.

---

[2] Although Plaintiffs offer no evidence contradicting this general practice, the Inspectors' withdrawal from Contingent Fund B could contribute to a finding that, in the Shannon investigation, SFPD police officers made a direct payment to their primary eye-witness, a girl named Masina Fauolo, or another witness. On the other hand, a fact-finder could also reasonably conclude that the Contingent Fund B funds were used for witness travel, not as a reward. See March 22, 2006 Order at 79 n.10.

4

Plaintiffs suggest that it would have been possible for a witness to testify in a criminal case knowing that he or she would receive reward money only if the defendant was convicted.  Tabak is not aware of any policies or procedures that would prevent such an occurrence, although he states that such a thing would never happen because it would be contrary to "integrity" and "common sense."  Tabak Dep. 69:1-3.

Linda Klee, the District Attorney's Rule 30(b)(6) deponent, was unaware that the SWP existed, and was also unaware of any procedure by which prosecutors would have been informed of payments made to witnesses through the SWP.  Purcell Decl., Ex. 5, Klee Dep. 111-112.  In fact, Klee testified that after learning of the program's existence in connection with this litigation,

> I was so surprised by the Secret Witness Program that I, out of curiosity, went around and asked . . . probably five or six deputies in the office -- have they ever heard of the Secret Witness program.  All of them . . . as I recall were not on the homicide team.  Because all of our homicide team of those years aren't in the office anymore.  But nobody had heard of the Secret Witness Program.

Purcell Reply Decl., Ex. 42, Klee Dep. 66:10-19.  Klee did not speak with any prosecutor who dealt with homicide cases during the time frame of the SWP.

Hendrix claimed at his deposition that he "did not believe in" reward money because it "[t]aints testimony of the [witness] a lot of times."  Purcell Decl. Ex. 2, Hendrix Dep. 124:9-12.  He explained that he would not use reward money except as a last resort, after he had "exhausted every means possible."  Id. 124:22-23.  Sanders, on the other hand, states that he requested authority to offer reward money "[f]rom time to time."  Sanders Reply Decl.

5

¶ 4.  Between 1984 and 1990, Hendrix and Sanders jointly or separately sought reward money from the Secret Witness Program at least eleven times.  Purcell Decl. Ex. 3, Memos from the Inspectors regarding Secret Witness Program.

The City's inspection of the SFPD files for an estimated 250 homicide investigations conducted by Hendrix and Sanders between 1984 and 1996 revealed sixteen case files containing documents relating to a request for a reward or for witness protection funds. Kaiser Reply Decl. ¶¶ 2-3.  Based on these sixteen SFPD files, Plaintiffs subpoenaed the production of documents relating to SWP reward payments or witness protection expenditures from ten corresponding DA files.  Wallace Reply Decl. ¶ 3.  The DA's office concluded that of these ten, one case appeared never to have been prosecuted, and another case file could not be found.  Id. ¶ 3. The City produced to Plaintiffs the remaining eight DA homicide files.  Id. ¶¶ 3-4.  One of the eight related to witness protection measures, but not to any witness reward money.  Id. ¶ 5.  Five were only "dummy" files,[3] and two contained the DA's entire record.  Id. ¶ 5.  For the two prosecutions on which complete DA files were produced, the files included information obtained through the SWP, as well as communications demonstrating awareness of rewards promised or given to witnesses.  Purcell Decl., Ex. 7 at DA 2127

---

[3] According to Klee, some prosecutors kept only a "dummy" file after sending the original case file to the Attorney General's office for purposes of appeal.  Klee Reply Decl. ¶ 3.  She states that the fact that the "dummy" files contained no information about reward payments "does not imply that the documents were not in the files at the time of the prosecution."  Id. ¶ 4.

1  (including defense request for statements made by "secret
2  witness"); Ackiron Decl., Ex. 1 at DA 1162 (documenting SFPD's
3  successful request for, and publication of, a reward funded by
4  mayor).  Neither of these DA files contained any record of whether
5  SWP funds requested or offered were in fact paid to witnesses.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

7

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991), cert. denied, 502 U.S. 994 (1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. Celotex, 477 U.S. at 323.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991). Once it has done so, the non-moving party must set

8

forth specific facts controverting the moving party's prima facie case. UA Local 343, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id. This standard does not change merely because resolution of the relevant issue is "highly fact specific." Id.

### DISCUSSION

The City moves for summary judgment on the grounds that the evidence fails to raise a triable issue of material fact that would allow a reasonable jury to find that Plaintiffs have proved the required elements of a Monell claim.

I.  Monell Claims Under 42 U.S.C. § 1983

   A.  Liability

Title 42 U.S.C. § 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. Graham v. Connor, 490 U.S. 386, 393-94 (1989).

Municipalities cannot be held vicariously liable under section 1983 for the actions of their employees. Monell v. Dept. of Social Services of the City of N.Y., 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

To impose liability on a government entity, a plaintiff must show that "the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002) (quoting Monell, 436 U.S. at 694)).

While the liability of municipalities does not depend upon the liability of individual officers, it is contingent on a violation of constitutional rights. Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994), cert. denied, 515 U.S. 1159 (1995).

B. Intent

The parties dispute whether Plaintiffs must show that the City was "deliberately indifferent" to their constitutional rights. Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410 (1997). The Ninth Circuit applies a "deliberate indifference" requirement in order to find liability in "single incident cases," such as where a municipal employee applies a facially permissible policy in an unconstitutional manner. Christie v. Iopa, 176 F.3d 1231, 1240 (9th Cir. 1999) (citing Fuller v. City of Oakland, 47 F.3d 1522, 1535 (9th Cir. 1995) and Hammond v. County of Madera, 859 F.2d 797, 803 (9th Cir. 1988)). In contrast, where a plaintiff claims that a particular municipal action in itself violates or directs employees to violate federal law, there is no "'state-of-mind requirement

10

1  independent of that necessary to state a violation' of the
2  underlying federal right." Brown, 520 U.S. at 404-405 (quoting in
3  part Daniels v. Williams, 474 U.S. 327, 330 (1986)).  The stringent
4  deliberate indifference standard is a response to the "danger of
5  permitting liability for . . . a facially valid policy." Christie,
6  176 F.3d at 1241.  As the Supreme Court explained,

> Where a claim of municipal liability rests on a single
> decision, not itself representing a violation of federal law
> and not directing such a violation, the danger that a
> municipality will be held liable without fault is high.
> Because the decision necessarily governs a single case, there
> can be no notice to the municipal decisionmaker, based on
> previous violations of federally protected rights, that his
> approach is inadequate.  Nor will it be readily apparent that
> the municipality's action caused the injury in question,
> because the plaintiff can point to no other incident tending
> to make it more likely that the plaintiff's own injury flows
> from the municipality's action, rather than from some other
> intervening cause.

Brown, 520 U.S. at 408.

Here, Plaintiffs' entire theory of municipal liability, and in particular their theory of causation, rest on their assertion that the Inspectors followed a practice that itself was unconstitutional.  For the reasons described in Section III below, the existence of such a practice is a disputed issue of fact.  If Plaintiffs succeed in proving the existence of such a practice, then they will not need to prove that the City acted with deliberate indifference to their constitutional rights.

II.  Deprivation of Constitutional Right

Defendants argue that Plaintiffs have failed to show evidence sufficient to establish that they were deprived of a constitutional right.  In its March 22, 2006 order, the Court set forth the legal standard for § 1983 claims based on the government's failure to

11

disclose, pursuant to Brady, exculpatory or impeachment information.  The Court concluded that disputes of material fact existed as to whether Masina was offered or paid reward money, whether the SWP memo was exculpatory and whether it was intentionally withheld.  See March 22, 2006 Order at 77-80. Therefore, a dispute of fact exists, for purposes of Plaintiffs' Monell claim, as to whether a civil rights violation occurred.

III.  Policy, Custom or Practice

Defendants argue that Plaintiffs have failed to show evidence sufficient to establish a policy, custom or practice of suppressing Brady information regarding rewards offered or given under the SWP. Plaintiffs argue that the testimony of Defendants' own witnesses conclusively establishes such a practice.

A plaintiff may bring an action under § 1983 based on a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" City of St. Louis v. Prapotnik, 485 U.S. 112, 127 (1988) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168 (1970)).  Proof of "random acts or isolated events [is] insufficient to establish custom."  Thompson v. City of Los Angeles, 885 F.2d 1439, 1444 (9th Cir. 1989) (citing Prapotnik at 127).  However, a plaintiff may prove "the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." Gillette v. Delmore, 979 F.2d 1342, 1349 (9th Cir. 1989) (citing McRorie v. Shimoda, 795 F.2d 780, 784 (9th Cir. 1986)).

12

As evidence from which the existence of an unconstitutional practice could be inferred, Plaintiffs point to Tabak's testimony that the SFPD kept no record of SWP payments to witnesses and that no mechanism existed to ensure that SWP reward information was passed along to the DA; Klee's testimony that she and others at the DA's office were not aware of the SWP; and the absence of SWP reward information in the DA's file on the Shannon case. Defendants, on the other hand, note that the survey of Hendrix' and Sanders' SFPD files and the corresponding DA files shows that SWP reward-related information, if not records of payments, was disclosed to defendants in two other cases. They also note that the probative value of Klee's testimony is slight because she did not speak with prosecutors who worked on homicide cases during the time when the SWP was in effect.

The custom-related evidence before the Court is susceptible to multiple competing inferences which preclude summary adjudication in favor of either party. Plaintiffs have shown that an unconstitutional custom may have been followed. SFPD inspectors could have been faced with two competing policies or practices, one that applied to secret informants, and one that applied to witnesses. An inspector trying to follow both the SFPD's usual policy of disclosing Brady material about witnesses, as well as a practice of offering rewards to secret informants payable only upon conviction, could have been aware that a secret informant who was a witness would be eligible for reward money through the SWP, and, in accordance with the SWP practice, failed to disclose the witness' participation in the SWP to the DA.

13

The fact that only two DA files have been found to contain any witness reward information and Klee's ignorance of the SWP program could allow a fact-finder to draw the inference that inspectors routinely kept potential impeaching evidence from prosecutors and thus from criminal defendants. If a jury were to find that a constitutional violation relating to an SWP reward had in fact occurred during the Shannon investigation and prosecution, this would provide further evidence of an unconstitutional practice. However, Plaintiffs have not shown that a custom of failing to disclose SWP reward information undisputedly existed. The two DA files in which SWP reward information was found would allow a fact-finder to infer that there was no custom of keeping SWP rewards secret. A fact-finder could also infer from Klee's ignorance and the relatively small number of SWP requests submitted by Hendrix and Sanders that the program simply was rarely used.

IV.  Causation

Finally, Defendants argue that even if the operation of the SWP was an unconstitutional practice, Plaintiffs could not prove that it was the cause of their injury.

To prove causation in a § 1983 case, a plaintiff must demonstrate that, through a policy, custom or practice, "the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404. "Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving . . . issues of fault and causation is straightforward." Id. at 404 (emphasis in original).

On this issue, Defendants merely repeat their argument that no

14

constitutional injury occurred.  If at trial Plaintiffs prove both that they suffered a constitutional deprivation related to the withholding of SWP reward information, and that the withholding of SWP reward information was customary, then a finding that municipal practice was the moving force behind the injury may follow.

## CONCLUSION

For the foregoing reasons, the Court DENIES the City's motion for summary judgment of the Monell claim (Docket No. 374).  The Court DENIES Plaintiffs' cross-motions for summary judgment (Docket Nos. 381 and 426).  Defendants' motion to strike Plaintiffs' cross-motions is DENIED as moot (Docket No. 428).

IT IS SO ORDERED.


Dated  3/29/06

CLAUDIA WILKEN
United States District Judge

15