1   JOHN HOUSTON SCOTT   SBN 72578
    THE SCOTT LAW FIRM
2   1388 Sutter Street, Suite 715
    San Francisco, California 94109
3   Telephone:      (415) 561-9601
    Facsimile:      (415) 561-9609
4
    RANDOLPH DAAR SBN 88195
5   506 Broadway St.
    San Francisco, CA 94133
6   Telephone: (415) 986-5591
    Fax: (415) 421-1331
7
    Attorneys for Plaintiff
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12  ANTOINE GOFF,                          Case No. C 04- 0574 CW consolidated with
                                                        C 04-1643 CW
13          Plaintiff,

14      vs.                                **FIRST AMENDED COMPLAINT FOR
                                           DAMAGES UNDER 42 U.S.C. § 1983**
15  CITY AND COUNTY OF SAN
    FRANCISCO; SAN FRANCISCO POLICE        **DEMAND FOR JURY TRIAL**
16  DEPARTMENT; PRENTICE EARL
    SANDERS; NAPOLEON HENDRIX; and
17  DOES 1 through 25, inclusive,

18          Defendants.

19

20          ANTOINE GOFF ("Goff") hereby alleges as follows:

21                          **INTRODUCTION**

22          1.      Antoine Goff brings this lawsuit because San Francisco police and prosecutors

23  maliciously and unconstitutionally sent him to prison for a crime he did not commit. The

24  defendants' willful suppression of evidence and manufacture and presentation of perjured

25  testimony robbed Goff of nearly 14 years of his life.  Goff  now seeks compensation on account

26

27                                          1

28      FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

of the personal physical injuries and/or personal physical sickness (and emotional distress flowing therefrom) he suffered as a result of his unconstitutional conviction and imprisonment, including physical incarceration, a loss of physical freedom and physical confinement in a small cell. While physically incarcerated in prison, Goff suffered serious physical injuries and attendant emotional distress, including a serious injury to his teeth and right shoulder during a prison disturbance. His serious physical injuries were not adequately diagnosed or treated. As a result, Goff suffered and continues to suffer chronic physical pain and physical sickness, mental and emotional distress, humiliation, embarrassment, and anxiety. Defendants' misconduct justifies an award to Goff of compensatory and punitive damages in an amount to be determined at trial, and of reasonable attorneys' fees.

2.     On October 3, 1990, Goff and co-defendant Tennison were convicted in the San Francisco Superior Court of first-degree murder in the killing of Roderick "Cooley" Shannon. Goff was convicted only because police and prosecutors suppressed a mountain of material, exculpatory evidence including the audiotaped confession of the real killer and corroborating testimony of another eyewitness confirming that Goff was not at the crime scene.

3.     Goff's state court appeal was denied on March 11, 1992. Goff's writ of habeas corpus in the California Supreme Court was denied on November 13, 2002. Goff filed a petition for writ of habeas corpus in the United State District Court on March 20, 2003.

4.     Co-defendant Tennison similarly sought post-conviction relief in state and federal courts. Tennison's federal habeas was heard prior to Goff's. On August 26, 2003, Judge Claudia Wilken of this Court vacated Tennison's conviction based upon the Supreme Court jurisprudence articulated in *Brady v. Maryland,* 373 U. S. 83 (1963), and its progeny. In her order granting Tennison's habeas petition, Judge Wilken emphasized that Tennison did not receive a fair trial and that, even in the absence of the numerous constitutional violations committed by the State, the prosecution's case against him was "weak." Judge Wilken's grounds

2

FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

1    for granting relief were the same *Brady* violations suffered by Goff and alleged in his habeas.

2        5.    On September 3, 2003, the San Francisco Superior Court, in Case No. 136375

3    granted relief to Goff, vacating the judgment and sentencing, and ordering his immediate release

4    from prison.  The Superior Court decision was based upon the *Brady* violations identified in the

5    103-page opinion of Judge Wilken in the *Tennison* case.   Specifically, Judge Wilken ruled that

6    the police and prosecutors denied Tennison his constitutional right to due process by willfully

7    suppressing at least five pieces of material exculpatory evidence: (1) a pretrial statement to

8    police by Chante Smith, an eyewitness to the murder, that Tennison was not at the scene of the

9    crime; (2) a February 9, 1990 police interview of Luther Blue, another eyewitness, during which

10   police offered a theory of the case consistent with the physical evidence and testimony of area

11   witnesses but incompatible with the trial testimony of the State's two alleged eyewitnesses,

12   Masina Fauolo ("Masina") and Pauline Maluina ("Pauline"); (3) the fact that the police

13   instructed Pauline to take a polygraph test during which she asserted that she was not a witness

14   to Shannon's murder; (4) the withdrawal by police of $2,500 from a "Secret Witness Program"

15   to pay a witness in the case; and (5) most disturbingly, the fact that another man had confessed

16   on audiotape to killing Shannon.

17       6.    This last and most egregious piece of police and prosecutorial misconduct took

18   place on November 7, 1990, a mere seven days after Goff was sentenced to state prison for life.

19   On that day, Lovinsky Ricard confessed to police, on audiotape, that he, not Goff had murdered

20   Shannon, and that Goff was not even present at the murder.  But neither the police nor the

21   prosecutor shared the confession with Goff's counsel. It was not until six and one-half months

22   later, on the last day of testimony on Tennison's motion for new trial, that the prosecution finally

23   came forward to Tennison's attorney with Ricard' s confession.

24

25

26

27                                          3

28   FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

7.      The police and prosecutor s unconstitutional actions were not limited to the suppression of exculpatory and impeachment evidence; their violative conduct also included the manufacturing of perjured testimony against Goff.  Prior to trial, Pauline told police and prosecutors that she had not actually witnessed the murder but had been bullied into lying by Masina, who coached her as to the details of her story.  Instead of recognizing that they had arrested the wrong man, the police and prosecutor focused their efforts on pressuring Pauline to retract her recantation.  Pauline eventually caved in to this pressure, retracting her confession and ultimately testifying as to her original and false story. Years after Goff was sentenced Pauline came forward and submitted a declaration confirming that she was not a witness to Shannon's murder, that Masina initially had instructed her to lie and coached her on what to say, and that the police and prosecutor had demanded that she stick to her original story, even after she told them it was false.

8.      The Office of the District Attorney of defendant City and County of San Francisco ("the DA's Office ) conceded that the prosecution's case was "weak", and on November 5, 2003, in response to Goff's motion for a declaration of factual innocence pursuant to Penal Code section 851.8, stipulated to defendant's request that he be declared innocent.

9.      The suppression of material, exculpatory evidence and the subornation of perjured testimony against criminal defendants insult and undermine the legitimacy of our system justice. Accordingly, Goff files this complaint seeking damages from the City and County of San Francisco, the San Francisco Police Department, Prentice Earl Sanders, Napoleon Hendrix, and George Butterworth (collectively "defendants ) for depriving him of clearly established constitutional rights.

**JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §1331 because Goff's claim arises under 42 U.S.C. §1983, a statute of the United States.

FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

11.     This Court has personal jurisdiction over each defendant named herein, because each defendant is currently domiciled in the State of California.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2), because all defendants to this action reside in this District and because a substantial part, if not all, of the events or omissions giving rise to Goff's claim occurred in this District.

**PARTIES**

13.     Plaintiff Antonie Goff is, and at all relevant times herein mentioned was, a citizen of the State of California and a resident of the City and County of San Francisco.

14.     Defendant City and County of San Francisco is a political subdivision of the State of California and is responsible for the administration of the San Francisco Police Department and the employment of the individual defendants in this action. The City and County has a legal obligation to uphold due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

15.     Defendant San Francisco Police Department ("SFPD") is an agency of the City and County of San Francisco.  Upon information and belief, the SFPD directly or indirectly participated in the authorization of the actions at issue here.  Upon information and belief, the SFPD delegated final policymaking authority to Inspectors Prentice Sanders and Napoleon Hendrix, in their positions as heads of the Gang Task Force, with respect to the investigation and arrest of suspects of gang-related crimes. Upon information and belief, the SFPD failed to adequately train its officers, including Inspectors Sanders and Hendrix, as to the proper procedures for preserving and producing exculpatory evidence, and failed to promulgate appropriate policies to prevent the suppression of such exculpatory evidence.

16.     Defendant Prentice Earl Sanders ("Sanders" ), sued here in both his individual and official capacities, is a resident of California.  At the time of the events in question, Sanders was employed by the SFPD as a Police Inspector and led the SFPD' s Gang Task Force with

FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

1   Defendant Napoleon Hendrix. At all times relevant to this complaint, Sanders was acting in the

2   course and scope of his employment and under color of California law.

3          17.    Defendant Napoleon Hendrix ("Hendrix ), sued here in both his individual and

4   official capacities, is a resident of California.  At the time of the events in question, Hendrix was

5   employed by the SFPD as a Police Inspector and led the SFPD' s Gang Task Force with Sanders.

6   At all times relevant to this complaint, Hendrix was acting in the course and scope of his

7   employment and under color of California law.

8          18.    Plaintiff does not presently know the true names and capacities of Defendants

9   DOES 1 through 25, inclusive, and therefore sue them by these fictitious names.  Plaintiff is

10  informed and believes, and on that basis alleges, that DOES 1 through 25, and each of them,

11  were responsible in some manner for the injuries and damages alleged herein and claimed in this

12  lawsuit.  Plaintiff will seek leave to amend this Complaint to add their true names and capacities

13  when they have been ascertained.

14                     **FACTUAL BACKGROUND AND ALLEGATIONS**

15              **The Political and Social Climate and the Gang Task Force**

16         19.    The summer of 1989 marked the height of violent confrontations between warring

17  street gangs in the Hunter s Point and Sunnydale neighborhoods of San Francisco. The violence

18  claimed the lives of more than 40 people. Public outrage at the terror being inflicted upon these

19  communities created tremendous political pressure on the SFPD and city prosecutors to crack

20  down on gang-related crimes.  Desperate to curb the ever-increasing violence and stifle the

21  resulting political outcry, the SFPD formed a specialized group of 15 officers known as the

22  "Gang Task Force."  The purpose of this group was to concentrate on gang activities in San

23  Francisco, using any means necessary to solve murders and stop gang warfare.  The SFPD

24  placed defendants Sanders and Hendrix, both homicide Inspectors with over a decade of

25  investigatory experience, in charge of the Gang Task Force.

26

27                                          6

28              FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

**The Killing of Roderick Shannon**

20.     On August 19, 1989, Roderick "Cooley" Shannon was shot in the parking lot of the Super Fair Market on the corner of Leland and Rutland Streets in San Francisco California. The homicide followed a car chase through a local neighborhood, after which Shannon fled from his vehicle on foot, was cornered by a group of people in the parking lot of the supermarket, and then was shot to death with a 12-gauge shotgun.

21.     Because Shannon's death was believed to be related to the ongoing confrontation between the Sunnydale and Hunters' Point neighborhoods, the case was assigned to the Gang Task Force.  That automatically made Sanders and Hendrix the lead investigators responsible for solving and initiating the prosecution of the murder.  In the investigatory stage, Sanders and Hendrix received assistance from Gang Task Force Officers Neville Gittens and Michael Lewis.

**The Police's Improper Investigatory Tactics**

22.     The day after the murder, Sanders and Hendrix spoke to Patrick Barnett, Shannon's cousin and the owner of the car Shannon was driving the night of the murder.  The police gave Barnett the descriptions of the vehicles that witnesses had identified as taking part in the car chase that preceded Shannon's murder, including a yellow Buick Skylark.  Sanders and Hendrix then asked Barnett to find them a witness to the killing. The next day, eleven-year-old Masina Fauolo, who testified that she was Shannon's "best friend " contacted Hendrix.  Masina said that she had witnessed the killing but provided no more information.  Masina called Hendrix later that day and then identified the cars police had told Barnett were involved in the chase, including the yellow Skylark.  During these calls, however, Masina could not identify or describe any the participants in the car chase.

7

23.     Over time, Hendrix worked on Masina, having many conversations with the girl through late August and September 1989.  Masina later confirmed that she spoke to Hendrix "every day."  Finally, in late October 1989, Hendrix showed Masina a selection of photographs and asked her to identify participants in the chase.  One of the photos showed Goff standing with Hendrix next to Goff's car, a yellow Skylark.  Hendrix admitted at deposition that this photo was the "most suggestive" photograph of Goff that he possessed.  From that photo Masina identified Goff as one of the men who had killed Shannon.

24.     Subsequently, Hendrix asked Masina to identify someone who could corroborate her story. Masina told Hendrix that fourteen-year old Pauline Maluina had witnessed the killing along with her. Hendrix first interviewed Pauline on November 26, 1989. The audiotape of the interview shows that, when Pauline was initially unable to corroborate Masina's story, Hendrix informed her of certain material facts, including (1) the location of the incident described by Masina; (2) the type of the gun used in the killing; and (3) the types of vehicles involved.

### Masina and Pauline's Unbelievable Stories

25.     The story Sanders and Hendrix concocted for the girls to tell was implausible on its face. The girls ultimately testified at trial that they had been driving around in a stolen car on the night in question.  Eleven-year old Masina claimed to have been driving.  They claimed to have been parked at "Lovers' Lane" an unlit parking lot on a hillside off Visitacion Avenue facing away from the roadway.  Masina claimed that several other cars pulled into and parked on the opposite side of the lot.  She said she was able to identify the passengers in the other cars by looking in her rearview mirror across the lot in pitch darkness. Masina also claimed that she saw Shannon's car drive by, and then heard the passengers in the other cars announce their intention to chase him.  She then allegedly started her car, turned around, and followed the speeding cars chase him. down Visitacion, purportedly without losing sight of those cars despite their

8

1   significant head start.  She followed the chase down the hill on Visitacion, and straight on

2   Visitacion until Shannon's car crashed into a fence.  Both girls testified that they did not hear

3   any gunshots during the chase.  Finally, they claimed to have left the stolen car at the murder

4   scene, but no stolen car was ever found anywhere near the scene.

5                    **The Patent Weakness of the Manufactured Trial Evidence**

6          26.     The prosecution presented no physical evidence linking Goff to the crime scene.

7   To the contrary,  the prosecution's entire case hinged upon the patently unreliable testimony of

8   Masina and Pauline, whose "stories (were) internally inconsistent, inconsistent with each other,

9   and inconsistent with the physical evidence and the neighbors' evidence regarding the car

10  chase."

11         27.     The prosecution knew the girls were lying. First, there were the manifest

12  inconsistencies between the girls' story and the physical evidence and the testimony of area

13  residents. The undisputed physical evidence showed, among other things, that Shannon's car had

14  crashed into a fence while traveling <u>backward</u>, that it had been struck by gunfire during the

15  chase, and that Shannon had been shot in the head at point-blank range by a 12-gauge shotgun

16  and likely instantaneously killed.  The neighborhood residents confirmed that the car chase had

17  approached the neighborhood from the east and ended with Shannon's car being pursued in

18  reverse, through a series of turns, by a black pick-up truck, before crashing into a fence

19  backward.  The resident witnesses also confirmed that shots were fired during the chase.  But

20  Masina and Pauline's testimony contradicted all this evidence.  Neither Masina nor Pauline

21  mentioned the unusual and distinctive fact that Shannon's car had crashed while traveling

22  backward.  Both Masina and Pauline also swore that no shots were fired during the chase.  Most

23  implausibly, Masina testified that, after Shannon was shot in the head with a shotgun, he spoke

24  to her clearly, imploring her to get help.

25

26

27                                               9

28.     As the girls identification testimony was the only evidence presented at trial that connected Goff to the killing, the police and prosecutor had an obligation to ensure its credibility. But there is no indication that any of them undertook such efforts. Indeed, Sanders, Hendrix and Butterworth took extreme measures to ignore and obscure the unreliable nature of the girls testimony, and then coached the witnesses to perpetuate the girls ' lies.

29.     Despite this misconduct, the efforts to railroad Goff began to unravel on April 21, 1990, when Pauline came to the Hall of Justice to discuss her testimony prior to the preliminary hearing. Butterworth expressly told Pauline that he wanted to talk to her because he could not reconcile her statements with Masina's. There, Pauline dropped the bombshell that she had not actually witnessed the murder. Instead, she told police and Butterworth that Marina, who was known around the Geneva Towers housing complex as a bully whose family was connected to the local gangs, had coerced her into lying and that Masina was a liar herself. Pauline further stated that Masina had told her what to say when the police initially contacted her, and that she had picked Goff out of a photo lineup because Masina had told her to. Pauline admitted she had never met or seen Goff.   On April 22 , 1990, Butterworth had Pauline return to the Hall of Justice to discuss the matter again. Pauline again confirmed that Masina had suborned Pauline's testimony, and that she (Pauline) was not an eyewitness.

30.     Instead of investigating Pauline s statements about Masina and pursuing leads on other suspects, Butterworth and Hendrix immediately focused their energy on pressuring Pauline to retract her recantation. They brought Pauline back to the Hall of Justice on April 24, 1990. They instructed her to submit to a polygraph examination, during which she stuck to her story and reconfirmed that she had not witnessed the murder. Finally, with all other options exhausted, Butterworth and the police put Pauline on an unmonitored phone call with Marina, the same person who had coerced Pauline into lying to the police about a murder. It was only after Masina berated her, out of the earshot of the police in the next room, for recanting her story

FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

1    that Pauline finally retracted her recantation.  Given Pauline's explicit statements impugning

2    both her own and Masina s credibility, the police and prosecutor cannot in good faith argue that

3    they had no reason to doubt the reliability of the girls' story.

**The Suppression of Exculpatory and Impeachment Evidence**

5    31.    Even if the police and prosecutor had reason to believe that Goff was guilty based

6    upon the testimony of Masina and Pauline (and they did not), any such reason vanished entirely

7    in light of the mountain of evidence showing that Goff was innocent. As noted in the

8    introduction of this complaint, Judge Wilken identified five pieces of improperly withheld

9    evidence that tends to show Goff's innocence.  Most of this evidence was known to police and

10   prosecutors before trial, or was discovered in the time between Goff's conviction and the hearing

11   on co-defendant Tennison's motion for new trial.  Instead of producing this exculpatory evidence

12   to defense counsel- or, as they should have done, dismissing the case and focusing their efforts

13   on finding and prosecuting the actual killer - the police and prosecutor concentrated on

14   suppressing the evidence and securing an unconstitutional conviction of Tennison, and further

15   bolstering their case against Goff and any appellate remedies that he had available.

16   32.    Most significantly, the police and prosecution suppressed an audiotaped

17   confession by Shannon's actual killer.  In a November 7, 1990 interview, seven days after Goff

18   was sentenced to prison for life, Lovinsky Ricard confessed to police, that he, not Goff, had shot

19   Shannon.  Ricard described in detail the events of the night of the murder. He related a car chase

20   consistent with the physical evidence and the neighborhood eyewitnesses, including the

21   distinctive fact that both lead cars in the chase were driven in reverse.  In response to questions,

22   Ricard specifically told the police that Goff was not present at the murder scene.  Neither the

23   police nor the prosecutor informed Goff's counsel of Richard's confession.  It was not until six

24   and one-half months later; on the last day of testimony on Tennison's new trial motion, that the

25   prosecution came forward with Ricard' s confession to Tennison's attorney..

26

27

28

33.     Prior to the actual confession by Ricard, San Francisco Police Department Detective Lewis had received information prior to Goff's conviction that in fact Ricard had shot and killed Shannon.  Detective Lewis received this information from sources on the street and was the basis for his February 8, 1990, interview with Ricard.  Detective Lewis stated that the word on the street was that Goff was not involved in Shannon's murder.  This information was never provided to the defense, nor did Saunders and Hendrix follow up on Lewis' information.

34.     Second, the police and prosecution suppressed the identity and statements of Chante Smith who personally saw Ricard kill Shannon.  In January 1990, prior to Goff s trial, Hendrix and Sanders had interviewed Smith about Shannon's murder.  Smith told the officers that Lovinsky Ricard, not Goff, had killed Shannon, and that Goff was not present at the crime scene.  Smith also identified other individuals who were present during the car chase and subsequent murder of Shannon.  The prosecution did not inform Goff of Smith' s identity or her exculpatory statements until November 2001 , and then only did so pursuant to a court order by United States Magistrate Judge Howard Sperm granting discovery in Goff's habeas corpus proceeding.

35.     Third, the police and prosecution suppressed a videotaped interview with Luther Blue conducted on February 9, 1990. During that interview, the police revealed a view of the case consistent with the physical evidence and the testimony of the neighborhood residents and Chante Smith, but directly at odds with Masina and Pauline s concocted stories.  Specifically, Sanders told Blue during the interview that the police knew that the car chase leading to Shannon's murder began at the Bayshore 7-Eleven and that Blue had been present during the car chase and the murder. Indeed, Sanders directly confronted Blue, stating his belief that, "You were there, Luther." Indeed, Sanders told Blue that the police knew these things because "somebody has talked to us.  These statements show that police knew that Blue was involved in Shannon's murder, and that the events leading up to the murder unfolded in a manner very

12

different from the sequence offered by the girls.  Further, the statements show that the police may have had additional information regarding the "somebody" who had previously talked to them. The prosecution never provided information about this "somebody" to Goff.  The prosecution also never produced a copy of Blue's interview to Goff or his counsel until required to do so in 2001 pursuant to Judge Spero' s order.  Moreover, the police never logged the occurrence of the Blue interview into their investigation log.  Instead, they briefly reinterviewed Blue a few days later, Mirandized him, asked him only whether he had been a participant in the murder which he denied, and then entered this second interview into the investigation log.  It was only this second audiotape and the investigation log that the prosecutor and police produced to Goff.  By giving Goff's counsel the tape of the second interview and omitting the first from the investigation log, the prosecution not only withheld exculpatory and impeachment evidence, it also conveyed misleading information regarding the relevance and gravity of Blue's knowledge.

36.     Fourth, the police and prosecutor suppressed information related to Pauline's recantation and permitted both girls to give perjured testimony.  As noted above, on April 22, 1990, days before Goff's preliminary hearing, Pauline completely recanted her testimony placing Goff at the scene.  The next day, Butterworth called Pauline back to the Hall of Justice.  There, Pauline repeated her story under questioning by Butterworth and Hendrix, confirming that Masina had convinced her to lie, that she had never even seen Goff prior to identifying him in the photo lineup, that Masina coached her on how to identify Goff, and that Masina was a liar. Pauline was then called to return for a third day of questioning, during which Hendrix had a polygraph test administered to Pauline.  Pauline repeated that she had not witnessed the murder. The police failed to preserve the formal record of the polygraph results, but subsequently created a memo describing the results as "inconclusive."  After failing to persuade Pauline to retract her recantation with the polygraph, Hendrix placed Pauline in a room, by herself, and had Pauline call the person Pauline had stated repeatedly had convinced her to lie - Masina.  Neither Hendrix

FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983

nor any other police officer monitored the call.  Eventually, Pauline emerged from the room and retracted her recantation. While the police informed Goff's counsel that Pauline had recanted and then retracted her recantation, they omitted impeachment evidence related to the polygraph test and the phone call to Masina.  Then, despite their knowledge that Masina and Pauline could not be relied upon as witnesses, they offer their testimony anyway. When Pauline testified, Butterworth artfully questioned her to continue to suppress these facts.

37.     Fifth, the police and prosecution suppressed information about both their request for funds from the "Secret Witness Program" and the subsequent disbursement of those funds. On October 4, 1989, six weeks after Masina had come forward, Hendrix submitted a request for $2,500 from a police account known as the "Secret Witness Program."  The memo accompanying the request stated that the money would be disbursed in order to convince a witness to come forward regarding the Shannon homicide.  Hendrix' request was granted and he withdrew $2,500 from the account. Masina was the only person who claimed to be a witness at that time.  The only reasonable inference one can draw is that Hendrix used the money to pay Masina to testify.  Again, the police and prosecutor never told Goff's counsel about the Secret Witness Program money.  Hendrix continued to attempt to suppress the information at his deposition, denying the existence of the Secret Witness Program and insisting that it was improper police procedure to pay witnesses.  Only when Hendrix was confronted with his memo requesting the withdrawal did he admit he had requested the Secret Witness money in this case. Because the police suppressed the Secret Witness payment, Goff's counsel was unable to investigate and pursue this impeachment evidence.

38.     Additional exculpatory evidence has come to light in the years since Goff was sentenced. First, three witnesses have come forward to corroborate Ricard' s confession and his statement exonerating Goff. These witnesses - Chante Smith, Luther Blue, and Mark Anthony - have each declared under penalty of perjury that he was present when Ricard shot Shannon.

---

14

FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

They each further declared that they knew Antoine Goff prior to the night of Shannon's murder, and that Goff was not at the crime scene.  Second, Pauline has submitted a declaration confirming that she did not witness Shannon's murder, that Masina urged her to lie and fed her the original story, and that Hendrix and Butterworth had demanded that she retract her recantation, even after she told them her original story was false.

39.     In March 2001, Detective Lewis acknowledged to Goff that he believe Goff was not guilty of the crime of which he was convicted.

40.     City and County officials have acknowledged the wrongfulness of Goff's conviction.  The San Francisco District Attorney's office has repeatedly and publicly declared that Goff is innocent.  Not surprisingly, within days of Judge Wilken's order regarding co-defendant Tennison, the district attorney agreed to grant Goff's petition for writ of habeas corpus, based on Judge Wilken's ruling in the Tennison case.  Even further, the DA's office has publicly indicated it is concerned that the police misconduct resulting in Goff's wrongful conviction was not an isolated occurrence, and has asked the Board of Supervisors for $250,000 to examine other homicide cases handled by Sanders and Hendrix during the same period.

41.     The courts have also recognized the injustice in Goff's conviction. As noted above, the district court vacated Goff's conviction due to Defendants' due process violations. In addition, on November 5, 2003, Judge Tsenin of the San Francisco Superior Court issued an order under California Penal Code §851.8 finding Goff factually innocent of Shannon's murder. The DA's office was present at the hearing on this matter and stipulated to the fact of Goff's innocence and the order finding Goff factually innocent.

42.     In sum, it is established beyond dispute that Sanders, Hendrix and Butterworth violated Goff's due process rights in two distinct ways . First, they withheld material exculpatory and impeachment evidence that probably would have led to Goff's acquittal. Second, they relied extensively on perjured testimony, while deliberately ignoring and failing to investigate other

15

1   exculpatory evidence.  Judge Wilken has already ruled that the defendants violated Goff's due

2   process rights, and the San Francisco Superior Court has already declared Goff factually

3   innocent.  Goff now deserves to be compensated for the years he lost as a result of the State's

4   willful misconduct, and for serious physical injuries (and emotional distress flowing therefrom)

5   suffered while unconstitutionally confined in prison, which injuries were not promptly or

6   adequately treated.

7                                          **Municipal Liability**

8        43.     As noted above, in or around, 1989 and in response to the occurrence of

9   numerous gang-related homicides and drive-by shootings, the SFPD formed a "Gang Task

10  Force" to focus intensely on curtailing gang activities in San Francisco. The SFPD placed

11  Sanders and Hendrix in charge of the Gang Task Force.

12       44.     Because Shannon's murder appeared to be a gang-related homicide, the case was

13  assigned to the Gang Task Force.  Sanders and Hendrix became lead investigators on the case.

14       45.     Upon information and belief, the SFPD delegated final policymaking authority to

15  Hendrix and Sanders with respect to the investigation and attest of gang-related suspects. Upon

16  information and belief, the SFPD did not supervise their activities, and Hendrix and Sanders

17  were not constrained by policies not of their making.  Upon information and belief, the SFPD

18  and CCSF approved and ratified the conduct of Sanders and Hendrix.

19       46.     Upon information and belief, the SFPD failed adequately to provide its officers

20  including Inspectors Sanders and Hendrix, with sufficient training regarding the preservation and

21  production of exculpatory evidence, and failed to promulgate appropriate policies to prevent the

22  suppression of such exculpatory evidence. This failure constitutes gross negligence on the part of

23  the SFPD to its obligation to insure the preservation of a suspect's constitutional rights.

24

25

26

27                                            16

28              FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

**Officer Liability**

47.     As set forth above, Hendrix and Sanders directly participated in the suppression

material, exculpatory and impeachment evidence that probably would have led to Goff's

acquittal. Both men actively solicited perjured testimony, while deliberately ignoring and failing

to investigate other exculpatory evidence.

48.     At the time of the Shannon investigation, Supreme Court authority clearly

established that due process (1) requires the disclosure of any material, exculpatory evidence to

the defense, and (2) forbids the presentation of false testimony to the jury. No reasonable

officer could have entertained the notion that the suppression of exculpatory evidence or the

subornation of perjury were actions in line with constitutional requirements.

49.     Hendrix and Sanders were actually aware of their obligation under the due

process clause to disclose to the defense any exculpatory evidence they unearthed during their

investigation.  Indeed, they confirmed this fact in their depositions taken in Goff's habeas case.

Because they knowingly and willfully withheld, ignored, and failed to investigate exculpatory

information in violation of clearly established due process rights, Hendrix and Sanders are not

entitled to qualified immunity from suit.

**Prosecutor Liability**

50.     As set forth above, Butterworth directly participated in the suppression of

material, exculpatory evidence tending to exonerate Goff for the Shannon homicide. In addition,

Butterworth manufactured evidence for trial by pressuring Pauline to retract her recantation.  In

doing these acts, Butterworth knowingly fabricated evidence during the investigative phase of

the prosecution.  Because he acted in an investigatory role, rather than as an advocate for the

State, during his interview with Pauline, Butterworth is not entitled to absolute immunity from

suit.

51.     Neither is Butterworth entitled to qualified immunity. At the time of the

17

1   investigation, Supreme Court jurisprudence had clearly established that due process requires the

2   investigation and production of exculpatory evidence and forbids the presentation of false

3   testimony.  No reasonable prosecutor could have thought that withholding exculpatory evidence

4   and suborning perjury could conform to constitutional due process requirements. Because

5   Butterworth knowingly violated clearly established constitutional law in prosecuting Goff, he is

6   not entitled to qualified immunity here.

7                                              **CAUSE OF ACTION**

8   **Violation of the Fourteenth Amendment to the United States Constitution**
    **42 U.S.C. §1983**

9

10      52.     Plaintiff Goff incorporates by reference the allegations contained in paragraphs 1

11  through 49, as if those allegations were set forth fully herein.

12      53.     At all times herein mentioned, Defendants had an obligation to comply with the

13  due process requirements set forth in the Fourteenth Amendment to the United States

14  Constitution. Defendants failed to meet this obligation with respect to Goff.

15      54.     In the conduct described above, defendants Sanders, Hendrix and Butterworth

16  acted willfully, wantonly, maliciously, oppressively, and with conscious disregard and deliberate

17  indifference for  Goff's rights. By suppressing material, exculpatory and impeachment evidence

18  and by suborning perjured testimony, Sanders, Hendrix and Butterworth violated  Goff's clearly

19  established due process rights guaranteed by the Fourteenth Amendment.

20      55.     At all times herein mentioned, defendants Sanders, Hendrix and Butterworth

21  acted or purported to act within the course and scope of their employment and under color of

22  law.

23      56.     At all times herein relevant, defendants Sanders and Hendrix were employees of

24  defendant SFPD and thus were agents of defendant City and County of San Francisco.  At all

25  times herein relevant, defendant Butterworth was an employee of the San Francisco District

26

27                                                    18

28

1   Attorney s  office and thus was an agent of defendant City and County of San Francisco.

2

3        57.    Upon information and belief, defendants City and County of San Francisco and

4   SFPD delegated final policymaking authority to defendants Sanders and Hendrix in the

5   investigation of homicides assigned to the Gang Task Force.  In addition, CCSF and SFPD

6   approved and ratified the conduct of Sanders and Hendrix.

7        58.    In the alternative, upon information and belief, defendants City and County of

8   San Francisco and SFPD failed to implement adequate policies and programs to supervise their

9   employees as to the proper manner of conducting criminal investigations.  Upon information and

10  belief, defendants City and County of San Francisco and SFPD knew or should have known that

11  their failure to provide reasonable training would likely result in a violation of the due process

12  rights of a person in Goff's situation.  Upon information and belief, defendants City and County

13  of San Francisco and SFPD' s failure to provide adequate training was a substantial factor in the

14  deprivation of Goff's due process rights.

15       59.    As a result of Defendants' policies, practices, conduct and acts alleged herein,

16  Goff was denied his constitutional rights and was maliciously prosecuted and falsely imprisoned

17  for nearly 14 years. As a result, he suffered and continues to suffer personal physical injuries

18  and/or personal physical sickness, and emotion distress flowing therefrom. As a result of his

19  physical incarceration, he suffered a loss of physical freedom and was physically confined in a

20  small cell. While physically incarcerated in prison, he suffered serious physical injuries,

21  including a serious injury to his teeth and right  shoulder during a prison disturbance.  Goff's

22  serious physical injuries and emotional distress flowing therefrom were not adequately

23  diagnosed or treated while in prison, which failure of diagnosis and treatment exacerbated the

24  seriousness of the injuries. In addition to his serious physical injuries, while in

25  prison Goff was routinely subjected to non-consensual touching and control of his

26

27                                   19

28             FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983

movements by prison staff. Because of all these things, Goff suffered and continues to suffer chronic physical pain and physical sickness, mental and emotional distress, humiliation, embarrassment, and anxiety. Defendants' misconduct justifies an award to Goff of compensatory and punitive damages in an amount to be determined at trial, and of reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Goff prays that the Court, as to all the defendants and each of them jointly and severally:

1.      Award compensatory and general damages against all defendants and each of them in an amount to be determined according to proof;

2.      Award exemplary and punitive damages against all individual defendants in an amount to be determined according to proof;

3.      Award costs, expenses, and reasonable attorneys ' fees pursuant to 42 U. S.C. §1988; and

4.      Grant such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff Goff hereby demands a trial by jury for all issues so triable.


DATED: August 26, 2009                          SCOTT LAW FIRM


                                     By:      ____/s/ John Houston Scott_____
                                              JOHN HOUSTON SCOTT
                                              Attorney for Plaintiff

F:\Cases\Cases - Active\Goff,Tennison\Pleadings\Goff's Motion for Leave to File First Ad Compl\First Amended Complaint.8.24.09.wpd

FIRST AMENDED COMPLAINT FOR DAMAGES UNDER 42 U.S.C.§ 1983